Page 1

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF GEORGIA

3                         ATLANTA DIVISION

4

5      LARRY COSTON,

6            Plaintiff,

7      vs                              CIVIL ACTION

8      NORFOLK SOUTHERN RAILWAY        FILE NO.: 1:22-cv-01304-SEG

       COMPANY,

9

            Defendant.

10

11

12                         DEPOSITION OF

13                         LARRY COSTON

14

15

16                      November 28, 2022

17                         9:40 a.m.

18

19

20                    2740 Bert Adams Road

21                    Atlanta, Georgia 30339

22

23

24            Ashley N. Ellis, CVR-7199, CCR

25            Job No. CS5559351

Page 2

1    APPEARANCES OF COUNSEL
2
3    On behalf of the Plaintiff(s):
4      TRENT S. SHUPING, ESQUIRE
       Warshauer Law Group, P.C.
5      2740 Bert Adams Road
       Atlanta, Georgia 30339
6      Office: 404.892.4900
       Fax: 404.892.1020
7      E-mail: tss@warlawgroup.com
8    On behalf of the Defendant(s):
9      ROBERT S. HAWKINS, ESQUIRE
       Cozen O'Connor
10     1650 Market Street, Suite 2800
       Philadelphia, Pennsylvania 19103
11     Office: 215.665.2015
       E-mail: rhawkins@cozen.com
12
13   (Pursuant to Article 10(b) of the Rules of Regulations of the
14     Georgia Board of Court Reporting, a written disclosure
15   statement was submitted by the court reporter to all counsel
16            present at the proceeding.)
17
18
19
20
21
22
23
24
25

Page 4

1              INDEX TO EXHIBITS
2
3    EXHIBIT      DESCRIPTION          PAGE
4    For the Defendant:
5    Exhibit 1     CSR            13
6    Exhibit 3     Formal investigation letter   24
7    Exhibit 4     Dismissal letter       25
8    Exhibit 5     Reprimand letter       28
9    Exhibit 6     Suspension letter      48
10   Exhibit 7     May 2022 waiver       52
11   Exhibit 8     Employee history record    67
12   Exhibit 9     Screenshots         69
13   Exhibit 10    Screenshots         70
14   Exhibit 11    Rules for equipment
15            operation and handling    71
16
17    (Defendant's Exhibit No. 2 was not marked on the record.)
18    (Defendant's Exhibits 1 through 11 were retained by counsel.)
19
20
21
22
23
24
25

Page 3

1              INDEX TO EXAMINATIONS
2
3    WITNESS: LARRY COSTON
4
5    CROSS-EXAMINATION                Page
6    By Mr. Hawkins ................................. 5
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        MR. HAWKINS:  We're on the record.  My name is Robert
2    Hawkins, representing Norfolk Southern Railway Company in
3    the claims brought by Larry Coston.  The Civil Action
4    Number is 22CV01304 U.S. District Court in the Northern
5    District of Georgia, Atlanta Division.
6              CROSS-EXAMINATION
7    BY MR. HAWKINS:
8        Q   Good morning, Mr. Coston.  My name is Robert Hawkins.
9    I'll be asking you some questions about the claims you've
10   brought against Norfolk Southern.  Do you understand that?
11       A   Yes, sir.
12       Q   And would you say your full name for the record and
13   would the court reporter swear the witness in?
14       A   Larry Coston.
15             WHEREUPON,
16             LARRY COSTON,
17   having been produced and first duly sworn as a witness,
18   testified as follows:
19   BY MR: COSTON:
20       Q   Mr. Coston, I'll be asking you some questions about
21   the claims you have against Norfolk Southern.  And you are
22   aware now that you are under oath here today, right?
23       A   Yes, sir.
24       Q   So just a few ground rules, so to speak.  The court
25   reporter will take down all of my questions and all of your

2 (Pages 2 - 5)

1 answers. So it's important for you to answer verbally and loud
2 enough for the court reporter to hear. She cannot take down
3 head nods or other kinds of gestures so you need to answer
4 verbally. Is that okay?
5   A  I understand.
6   Q  And if you don't hear or understated any of my
7 questions, please ask me to repeat and I'll be happy to do it.
8 And if you need to take a break at any time, please tell us. I
9 am happy to do that around every hour or so, but if you need to
10 take a break, you know, sooner than that, please let us know
11 and so long as there's no question pending, we'll be happy to
12 take a break. Okay?
13   A  Understand.
14   Q  Is there any reason why you would not be able to hear
15 and understand and answer my questions here this morning?
16   A  No.
17   Q  Have you reviewed any documents before your
18 deposition here today?
19   A  Yes, I did.
20   Q  What documents were they?
21   A  One was my transcript from the investigation.
22   Q  You cut out a little there. Did you say transcript
23 from the investigation?
24   A  Yes, sir.
25   Q  Were there any other documents that you reviewed?

1   A  Yeah, a couple of other documents I've reviewed.
2   Q  What were they?
3   A  One was where I signed a form that I would follow
4 Norfolk Southern's rules and safety procedures.
5   Q  Were there others?
6   A  Let's see. My job application with Norfolk Southern
7 and that's about it.
8   Q  All right. And when you refer to the investigation,
9 you're referring to the investigation with regard to the
10 incident that happened November 27th, 2020, correct?
11   A  Yes.
12   Q  So when either I or you refer to the investigation,
13 unless we otherwise say, we'll all assume that we're referring
14 to that one investigation?
15   A  Okay. Understand.
16   Q  Mr. Coston, where do you live?
17   A  Rex, Georgia.
18   Q  And who, if anyone, lives with you?
19   A  My wife and my son.
20   Q  How long have you lived at your current location?
21   A  Fifteen years.
22   Q  You are currently married, I assume?
23   A  Yes.
24   Q  How long have you been married?
25   A  A little over five years now.

1   Q  Did you say five years?
2   A  Yes, sir, a little over five years.
3   Q  How old is your son?
4   A  Nineteen.
5   Q  Before your current marriage, were you married
6 before?
7   A  No.
8   Q  Is your spouse employed?
9   A  Yes.
10   Q  What is her current position?
11   A  I'm not sure the exact title of her position.
12   Q  Where does she work?
13   A  She works for Delta Global.
14   Q  Dealt Global?
15   A  Correct.
16   Q  Is that a part of the airline company?
17   A  That's a subsidiary.
18   Q  What does your wife do for Delta Global?
19   A  Basically she's a security officer.
20   Q  How long has she held that position?
21   A  I think two years now.
22   Q  What other positions has she held since November of
23 2020?
24   A  None.
25   Q  So she was not employed outside the house before

1 becoming employed with Delta Global?
2   A  She's retired.
3   Q  She's retired?
4   A  She's retired from the State of Georgia.
5   Q  When did she retire from the State of Georgia?
6   A  I think it was 2019, I believe.
7   Q  Does your spouse have health benefits as a retiree
8 from the State of Georgia?
9   A  No.
10   Q  Does your spouse qualify for Medicare?
11   A  No.
12   Q  Apart from your employment with Norfolk Southern, do
13 your wife or your son have health benefits from any other
14 source?
15   A  No.
16   Q  Mr. Coston, what are your activities outside of work?
17 And I'll limit your answer, if you would, to, say, 2020 to the
18 present.
19   A  You're talking about recreational activities?
20   Q  Right, any other activities outside of work.
21   A  Dealing with my son's activities when he was in
22 school. I go to the gym, walk pretty much every evening, and
23 that's about it.
24   Q  Have your activities outside of work changed in any
25 significant way since November 2020?

3 (Pages 6 - 9)

Page 10

1   A   Not significantly, but it changed.

2   Q   And how so?

3   A   Well, to a certain degree, I cut some people off.

4   You know, I stopped going to the gym as much.

5   Q   Which people did you cut off?

6   A   Well, one was my sister and a couple of coworkers.

7   Q   Why did you cut those folks off?

8   A   Sister was some family issues and the coworkers were

9   becoming annoying about the job.

10   Q   Becoming -- I didn't hear you there.

11   A   Annoying.  Annoying.

12   Q   Annoying, okay.  In what ways were they becoming

13   annoying about the job?

14   A   Gossip, rumors.

15   Q   Which coworkers were these that you cut off?

16   A   Which coworkers?

17   Q   Yes, some names.

18   A   I'd rather not say.

19   Q   You need -- you need to answer the questions.  This

20   is the part of your deposition.

21   A   One would be Manny Morales.

22   Q   Manny?

23   A   Manny Morales.

24   Q   Who else?

25   A   Van Snipes.

Page 11

1   Q   I'm sorry, again, you cut off.

2   A   Van Snipes.

3   Q   Were there any others?

4   A   No.  You need to know my sister's name?

5   Q   No.  If it was family issues, not interested.

6   A   Okay.

7   Q   But let me ask you about your coworkers.  What gossip

8   or rumors were being spread?

9   A   Well, the railroad, it's just the normal gossip.

10   They call you every day about somebody lining the switch wrong

11   or somebody got a train they shouldn't have got.  You know,

12   stuff that doesn't even matter.

13   Q   Did any of those gossip or rumors involve your

14   activity?

15   A   Well, they did call me about when I first got

16   dismissed from the railroad, but you know, that's the norm for

17   the railroad.

18   Q   Who called you when you were dismissed?

19   A   Several people called me when I got dismissed.  I

20   should say when I got taken out of service, I should say.

21   Q   And who called you?

22   A   Let's see.  Manny Morales, Van Snipes, Eric Keepler,

23   Doug Revis.  You want me to keep going?

24   Q   Sure.

25   A   Carlos Frankel, Cordel Seaway.

Page 12

1   Q   Mr. Coston, did any of the employees that you just

2   mentioned have any knowledge of the incident of November 27,

3   2020?

4   A   No.

5   Q   What, if anything, did you tell those individuals

6   about the incident from November 27, 2020?

7   A   I basically just told them I was taken out of service

8   from going to slow over to Austell, from Atlanta to Austell.

9   Q   Is there any reason why you cut back on your gym

10   attendance?

11   A   Just didn't have the desire to do it.

12   Q   Mr. Coston, I'm going to ask you a few questions

13   about your educational background and job history.  For that

14   purpose, I'm going to put onto the screen a document which is

15   your CSR, your career service record and a couple of pages of

16   your employment application.  I -- let me see if I can do this

17   correctly here.  Okay.  Did that work?

18   A   Yes, sir.

19   Q   All right.  I have on the screen -- I'm going to

20   scroll down.  Do you recognize this as a clear service record

21   from Norfolk Southern?

22   A   Yes.

23   Q   And you acknowledge these documents are updated

24   periodically throughout your employment.  So you know that?

25   A   Uh-huh, yes.

Page 13

1   Q   So this one is dated March the 30th of 2021, so it

2   will not reflect any information that occurred after that.  So

3   it's not a perfect document, but it does have some information.

4   Do you understand that?

5   A   Yes.

6   Q   All right.  Is the home address listed on your CSR

7   correct?

8   A   Yes.

9   Q   And your hire date would have been March 20th, 2006?

10   A   Yes.

11   Q   And your birth date is correctly listed?

12   A   Yes.

13   Q   And this will be Deposition Exhibit 1, and I may ask

14   you a few questions about this down the road, but that's all I

15   really wanted to find out for now.  The second document I want

16   to show you is three page -- the first three pages of your

17   employment application.  Is this the same type of document --

18   whether the format is the same, it doesn't matter, but is this

19   the document that you reviewed to prepare for today?

20   (Defendant's Exhibit No. 1 marked for identification.)

21   A   Yes.

22   Q   So the last updated date notes 12/18/2005.  Did you

23   apply for employment with Norfolk Southern in late 2005?

24   A   Yes.

25   Q   There's a handwritten note as to the address.  Was

4 (Pages 10 - 13)

Page 14

1  your address on          Avenue when you first applied for
2  employment?
3      A   Yes.
4      Q   And did you later move to the          Lane?
5      A   Yes.
6      Q   And I think you said earlier you had been at that
7  location for about 15 years?
8      A   Yes.
9      Q   All right.  Is the high school attended listed
10  accurately as          High School?
11      A   Yes.
12      Q   Was there any particular course of study that you
13  took?  Was it academic or trades based?
14      A   No, just general studies.
15      Q   And you graduated what year?
16      A   Eighty-two, 1982..
17      Q   All right.  After graduating -- and I'll scroll down
18  to the bottom of this so you don't have to go backwards on
19  this.  I'm now going to Page 2 of Deposition Exhibit No. 2.
20  And if you would, just tell us the jobs that you held prior to
21  joining Norfolk Southern and in each case why you left to go to
22  the next job.
23      A   One would be          .
24      Q   Was that your first job after high school?
25      A   No, it was not.  First job after high school would

Page 15

1  be -- would have been a department store name TG&Y, which is
2  gone.  I worked there and left there for a better job.  I
3  worked for the State of Alabama in the mental health system.
4  Let's see.  And then I moved to Atlanta.  And I'm trying to
5  remember my next job after that.
6      Q   Where were you living prior to Atlanta?
7      A          Alabama.  And I'm trying to remember my
8  next job.  I'm not exactly sure my next job, but I worked for
9  the State of Georgia for a number of years -- well, actually, I
10  worked for          r first.  I'm sorry.
11  Worked there, left there and went to the State of Georgia and
12  worked for the State of Georgia and then went to Delta Air
13  Lines.
14      Q   The State of Georgia, was that where you were
15  supervising mentally ill clients?
16      A   Correct.  Correct.
17      Q   Did you have any formal training in the mental health
18  field?
19      A   No, I did not have any formal training.
20      Q   Was there on-the-job training of some sort?
21      A   Yes.
22      Q   And then you left there, according to your
23  application, approximately 2009; is that right?  That can't be
24  right.
25      A   No, no.

Page 16

1      Q   You were at Norfolk Southern in 2006, right?
2      A   No, that -- that should have been maybe 90 -- maybe
3  '99 or something like that, or whatever.
4      Q   So you left --
5      A   No, I left there in 2000.  I left there in 2000 going
6  to Delta Air Lines.
7      Q   And then you worked at Delta Air Lines from 2000
8  until when?
9      A   Until I got hired with Norfolk Southern.
10      Q   What did you do for Delta Air Lines?
11      A   I was a ramp agent.
12      Q   As a ramp agent, were you under a union contract or
13  was that nonunion?
14      A   Nonunion.
15      Q   And your jobs there, loading and unloading aircraft?
16      A   Correct.
17      Q   And then you applied for employment to Norfolk
18  Southern?
19      A   Yes.
20      Q   All right.  I know I cut you off a few times.  Are
21  there any other jobs you left out?
22      A   I'm sure there is because I've worked a ton of little
23  side jobs.  Like one was Miami Air.  I worked there and that
24  was a little part-time job.  I'm sure there's some other jobs I
25  left out.  I just don't remember them all right now.

Page 17

1      Q   You applied in late 2005 for a position with Norfolk
2  Southern, correct?
3      A   Yes.
4      Q   And you applied for and were hired as a conductor?
5      A   Yes.
6      Q   Please describe for us the training you received in
7  conductor training?
8      A   Spent a month down in conductor training school down
9  in -- by McDonough, Georgia.  And after that month, I spent
10  about four months on-the-job training with Norfolk Southern
11  before I was -- before I was made a qualified conductor.
12      Q   And as a conductor, you -- well, let me rephrase
13  that.
14      After your training period, you became a qualified
15  conductor?
16      A   Yes.
17      Q   Did you become, at that point, a member of the union
18  called SMART, which might have been UTU at that time?
19      A   Yes, it was 90 days after that.
20      Q   And throughout your employment with Norfolk Southern,
21  have you always been a member of the union called SMART as
22  opposed to the Brotherhood of Locomotive Engineers in Training?
23      A   Yes.
24      Q   At any point, did you join the BLET?
25      A   No.

5 (Pages 14 - 17)

1  Q   So you've always been a member of SMART?

2  A   Yes.

3  Q   As a conductor with Norfolk Southern, in what

4  divisions or territories did you work?

5  A   Charlotte South only.

6  Q   Where was your home terminal or reporting point?

7  A   Atlanta.

8  Q   What part of Atlanta?  I believe there's a few

9  different reporting points, right?

10  A   That would be the east end.

11  Q   Does that reporting point have any other names --

12  A   It would be the Gainesville District.

13  Q   Gainesville District?

14  A   Yes.

15  Q   Please describe where geographically the trains that

16  you operated as a connector traveled.

17  A   From Atlanta all the way to Lynnwood, North Carolina.

18  It used to go from Atlanta -- some of the trains went from

19  Atlanta to Columbia, South Carolina.  I'm sorry, yeah.  And

20  that would be the east end of Atlanta, which would be the

21  Gainesville District, going east of Atlanta.

22  Q   How did you receive your assignments as a conductor?

23  Were you on regular assignment, extra boards, pools?

24  A   As a conductor?

25  Q   Yeah.

1  A   Starting out, I was on the extra board, and I think

2  just probably maybe four and a half years before I was able to

3  hold down a regular assignment.

4  Q   Where was the regular assignment?

5  A   It was a pool job.

6  Q   Would that have been an assignment where a group of

7  employees would take assignments on the first in, first out

8  basis?

9  A   Yes.

10  Q   Where did the pool operate?

11  A   Atlanta to Greenville, South Carolina.

12  Q   What commodities did the train transport?

13  A   It could be anything from fuel, rice, cars.

14  Q   So it would have been mixed freight, not any kind of

15  train?

16  A   Yeah, just mixed freight.

17  Q   What were your job duties as a qualified conductor?

18  A   The shooter assignment was making from Atlanta to

19  Greenville, make sure the cars -- the paperwork was correct to

20  link the train together in the yard.

21  Q   When you linked the train together, that means you

22  classified or --

23  A   We were just connecting the cars together.

24  Q   Was there any restrictions on the matter in which you

25  connected the cars?

1  A   What do you mean by any restrictions?

2  Q   I'll lay the groundwork.  Did any of the cars that

3  you transport as a conductor carry hazardous materials?

4  A   Yes, they did.

5  Q   Was sort of materials did they carry that were

6  hazardous?

7  A   Chlorine.  That's the one main thing that I can think

8  of, the chlorine.

9  Q   As a result of the content of some of the cars, were

10  there any restrictions on the manner in which you classified or

11  coupled them?

12  A   Yes.

13  Q   And what were those restrictions?

14  A   They had to be at least six cars back from the

15  engines.

16  Q   When you were in this pool, from Atlanta to

17  Greenville, what was the name of the yard where your train

18  began operating?

19  A   Inman Yard.

20  Q   Inman Yard is a flat switching operation, not a hump

21  yard, right?

22  A   Yes.

23  Q   When you were in the pool, did you return home after

24  a tour of duty or did you take rest and then take another treck

25  back in the opposite direction?

1  A   Take rest and come back in the train opposite

2  direction.

3  Q   Please describe for us the line of road that you

4  operated between Atlanta and Greenville.  Was there any special

5  hazards?  Any complications?

6  A   Well, you had sort of track speeds and it was the

7  main line which -- I don't know if you -- what do you mean by

8  certain hazards?  Were there like hills or --

9  Q   Yes, anything that would have been unusual?

10  A   Other than the train speeds, I mean I don't think the

11  hills and curves are unusual.

12  Q   Is the line of road between Atlanta and Greenville

13  signaled or is it --

14  A   Yes, it is.

15  Q   -- unsignaled territory?

16  A   Yes, it is.

17  Q   It's signaled?  Does it currently have a positive

18  train control applied?

19  A   Yes.

20  Q   So on the line of road between Atlanta and

21  Greenville, there would have been curves, hills, and different

22  grades going uphill or downhill, correct?

23  A   Yes.

24  Q   Those are not unusual features in a line of railroad,

25  correct?

1   A   Well, not for that end.  I mean, it was -- how do I
2   say?  Because I had did it, I didn't think anything was unusual
3   about that particular end other than I just knew it, you know.
4   Q   As a conductor, were you responsible to ensure that
5   the train did not exceed posted track speeds?
6   A   Yes.
7   Q   Where would you find, as a conductor, what the
8   maximum track speed was for any particulars length of road?
9   A   That would be in the -- I can't even think of the
10  name of the -- the timetable.  I'm sorry.
11  Q   Were there times when the track speeds listed in the
12  timetable were changed because of slow orders or other special
13  bulletins?
14  A   Yes.
15  Q   And what would cause that type of special restriction
16  on speed?
17  A   Could be a defect in the tracks, could be they're
18  working on the tracks.
19  Q   Unless there were a slow order or other special
20  restriction, the train you were operating as a conductor would
21  have been expected to proceed at track speed, would it not?
22  A   Yes.
23  Q   Were there times when you worked as a conductor when
24  you needed to qualify over new or different territory?
25  A   No.  You talking about after I had marked up, right?

1   After I had qualified as a condenser.
2   Q   Yes.
3   A   There were no other territories I had to learn.
4   Q   So for the entire period of time you worked as a
5   condenser, you were qualified on the physical characteristics
6   of the same territory that you worked?
7   A   Correct.
8   Q   So while you working, if I understand you
9   correctly -- let me rephrase this so that the court reporter
10  can take it down properly.
11      While you were working as a conductor after your
12  qualifications went into affect, you never had to qualify over
13  the physical characteristics of new or different territory?
14  A   Never.
15      MR. HAWKINS:  All right.  I'm going to suggest a
16  five-minute break at this point unless anybody objects.
17      MR. SHUPING:  That's fine.
18          (BREAK TAKEN)
19  BY MR. HAWKINS
20  Q   All right.  We're back on the record.  Is the court
21  reporter ready?
22  A   Yes.
23  Q   All right.  I'm going to direct your attention, Mr.
24  Coston, to May 2012.  At that time, were you dismissed by
25  Norfolk Southern in connection with a speeding incident?

1   A   Yes.
2   Q   Please describe the incident that gave rise to that
3   incident.
4   A   Basically, I was speeding over a slow order.  Me and
5   the engineer forgot the slow order.  I think it was 25 miles
6   per hour, and I'm not exactly sure the speed we went over it,
7   but we both forgot it and we admitted we forgot it and went
8   over it.  If I had to guess, I would say 30 to 35 miles per
9   hour over the speed limit.  I mean as far as the -- our speed
10  would have been 30 to 35 miles per hour.  The slow order was
11  25.
12  Q   I'm going to screen share a document or two here.
13  Directing your attention to a document which is marked -- it is
14  not marked, but it would be -- yes, it is -- Exhibit Number 3.
15  This is a two-page letter.  Do you recognize this as the letter
16  informing you of the formal investigation regarding the
17  speeding incident?
18      (Defendant's Exhibit No. 3 marked for identification.)
19  A   Are you -- I thought you were going to put a letter
20  up or something.
21  Q   Let me try again.  Does that work?
22  A   Yes.  Yes.
23  Q   I'll get the hang this one of these days.  All right.
24  So you do recognize this as the letter announcing the formal
25  investigation?

1   A   Yes.
2   Q   And I'll scroll down to Exhibit 4, and hopefully you
3   can see that as well.  Is this the letter that advised you of
4   your dismissal?
5      (Defendant's Exhibit No. 4 marked for identification.)
6   A   Yes.
7   Q   Did there come a time when you were offered
8   reinstatement by Norfolk Southern?
9   A   Yes.
10  Q   How did that come about?
11  A   To be honest with you, I'm not sure how it came
12  about, but I was notified by my union rep in the end of
13  November of that particular year that Norfolk Southern wanted
14  to bring me and the engineer back.
15  Q   After the dismissal -- let me rephrase that.
16      Before the dismissal, you attended a formal
17  investigation, correct?
18  A   Yes.
19  Q   Who represented you at the formal investigation?
20  A   Tommy Gholston and Mark Cook, if I remember, yes.
21  Q   And Mr. Gholston in particular is a union officer
22  with SMART-TD?
23  A   Yes.
24      MR. HAWKINS:  And for the court reporter, that's
25  SMART all caps dash TD all caps.

Page 26

BY MR. HAWKINS
2  Q   What did Mr. Gholston or Mr. -- who was the second
3  officer for the union?
4      A   Mark Cook.
5      Q   What did Mr. Gholston or Mr. Cook tell you about
6  reinstatement?
7      A   Well, he was not the one who notified me about the
8  reinstatement.  He represented me during the investigation, but
9  it was JC Roy that notified me that the company wanted to
10 reinstate us.
11     Q   Who is Mr. JC Roy?
12     A   JC Roy was the local union rep.
13     Q   Were you told that the company was willing to
14 reinstate you and the engineer on a leniency basis?
15     A   Not so much as those exact words.  He just said that
16 they wanted to reinstate us.
17     Q   Did you have any conversations with Norfolk Southern
18 supervisors or management as to why the company was offering
19 you reinstatement at that time?
20     A   No.
21     Q   If my calculations are correct, you would have been
22 out of work -- or you were out of work from May 2012 through
23 November of 2012.  Is that approximately correct?
24     A   Yes, somewhere in there.
25     Q   All right.  And I'll direct your attention to June of

Page 27

1  2014.  At that time, were you disciplined for failing to use a
2  brake stick to tie a hand brake on a train?
3      A   I received a -- a do better letter is what it's
4  called.
5      Q   I'm trying to share, and please verify if I've done
6  it successfully, Exhibit 4.  Is that a letter you received --
7      A   Yes.
8      Q   -- in connection with the brake stick incident?
9      A   Yes.
10     Q   And you would recognize this as a notice of
11 investigation, correct?
12     A   Yes.
13     Q   And not to get too deep into the details, but under
14 your collective bargaining agreement before the railroad
15 accesses discipline, the company has to give you notice of any
16 charges and then go through an investigation or a waiver,
17 right?
18     A   Yes.
19     Q   This letter, which is Exhibit 4 for the record, is a
20 notice of investigation that begins the discipline process,
21 right?
22     A   Yes.
23     Q   And this is the one that you received in June 2014
24 related to the brake stick incident?
25     A   Yes.

Page 28

1      Q   All right.  I'll direct your attention to the
2  following document which is dated September 18, 2014 and is
3  marked as Exhibit -- it's not marked as exhibit, but it should
4  be Exhibit 5.  This letter advises you that a letter of
5  reprimand had been assessed as a result of the brakes stick
6  incident, right?
7      (Defendant's Exhibit No. 5 marked for identification.)
8      A   Well, well, I should say just a letter.  I did not
9  receive any discipline off of that.
10     Q   Well, you were assessed a letter of reprimand in
11 connection with the brake stick incident, were you not?
12     A   Yes.
13     Q   When you say you weren't assessed any discipline, do
14 you mean that you were not given any time off?
15     A   That's correct.  Well, if you want to call that
16 discipline, yes, I guess I got some discipline.
17     Q   All right.
18         MR. HAWKINS:  For the court reporter, let's make
19 Exhibit 4, a two-page document that will include the
20 letter of September -- excuse me, June 27 and September
21 18th, that will be a two-page exhibit.  Otherwise, we'll
22 have to remark the exhibits and there's no good reason to
23 do that.
24 BY MR. HAWKINS
25     Q   Mr. Coston, what supervisors were involved, to your

Page 29

1  knowledge, in the incident involving the speeding incident in
2  May of 2012?
3      A   I don't remember the supervisors.
4      Q   Do you remember which supervisors were involved with
5  the brake stick incident in June of 2014?
6      A   Yes, Anthony Terry.
7      Q   Let me direct your attention to 2015.  Did there come
8  a time when you became a locomotive engineer?  Did you answer?
9      A   Yes.
10     Q   You became a locomotive engineer is 2015, correct?
11     A   Yes.
12     Q   There are disadvantages in doing this by Zoom.  One
13 of which is every once in a while, the sound cuts out.
14     A   Well, I didn't say nothing that time.
15     Q   Thank you.  When you became a locomotive engineer,
16 was that something you volunteered to stand for engine service
17 or were you compelled by seniority to do it?
18     A   Compelled by seniority.
19     Q   On your collective bargaining agreement, when the
20 company run short of engineers, conductors stand for engine
21 service training by way of seniority, right?
22     A   Yes.
23     Q   You still remained a member of SMART-TD during the
24 time and after your time in your training as an engineer?
25     A   Yes.

8 (Pages 26 - 29)

1    Q    Describe for us the training you received to become a
2  locomotive engineer.
3    A    I spent a month down in engineer training school down
4  in McDonough, Georgia and then spent I think about four months
5  on-the-job training to learn the territory and learn how to
6  work the different industries along that territory.
7    Q    As an engineer, you are required to take periodic
8  rules classes, are you not?
9    A    Yes.
10   Q    And you're required to pass written tests?
11   A    Yes.
12   Q    When you first qualified as an engineer, what
13  territories did you operate over?  Let me rephrase that because
14  that was unclear.  When you were training to become an
15  engineer, you mentioned that you went out over certain
16  territories.  What territories were they?
17   A    It was only the Charlotte South district.
18   Q    And the Charlotte South district, what are the
19  geographic points these?
20   A    That would be Atlanta to Greenville, South Carolina
21  and several local points along the way, like Gainesville,
22  Georgia; Toccoa, Georgia; Commerce, Georgia; and I believe that
23  is it -- and, of course, Greenville.
24   Q    After you became a locomotive engineer, what
25  divisions or territories did you work?

1    A    Only the Charlotte South.  Can I make a correction?
2  We did go -- some jobs went from Atlanta to -- well, from or
3  side to East Point, Georgia which is -- I think that might --
4  I'm not exactly sure how far that is, but the high seniority
5  guys would work those particular jobs and that would be off of
6  our territory.  And I think I might have -- I might have worked
7  that as a trainee, if I do remember.  Yeah, I think I worked it
8  is a trainee, LET, but I never worked it as an engineer I don't
9  think.
10   Q    The LET is a locomotive engineer in training, right?
11   A    Correct.
12   Q    And you worked those territories with the high
13  seniority employees?
14   A    Yes.  Yes.
15   Q    So it was not by yourself?  It was with the high
16  seniority folks?
17   A    Yes.
18   Q    Describe the territory a little bit more clearly if
19  you would.  Let me rephrase the question to make it clear for
20  the record.  There were times when you worked territory other
21  than Charlotte South as an engineer trainee, right?
22   A    Yes.
23   Q    Describe where those additional territories were that
24  you worked as an engineer trainee?
25   A    That would be -- the only one would be Atlanta to

1  East Point, Georgia.
2    Q    When you say Atlanta, where within the Atlanta --
3    A    That would be Chamblee, Georgia to East Point,
4  Georgia.
5    Q    Why did the high seniority employees select that
6  particular territory?
7    A    Well, I think it's just because it's the day shift
8  and the job paid well, I guess.
9    Q    That's a good combination.  During your employment
10  with Norfolk Southern, either as a conductor or engineer, have
11  you ever had needed to relocate your personal residence to keep
12  your job or to exercise your seniority?
13   A    No.
14   Q    When you first became a locomotive engineer after
15  2015, how did you receive your assignments?
16   A    I was on the extra board and the call office would
17  give us a call and let us know what job we were working.
18   Q    The person who would call you, what position did that
19  person occupy?
20   A    That would be the call office, and I can't give you
21  the exact position that they --
22   Q    It would be generally known as crew call?
23   A    Crew call.
24   Q    Were you on -- let me rephrase it.  Had you been on
25  the engineers extra board all of your time as a locomotive

1  engineer?
2    A    Had I been on there?
3    Q    I'll rephrase it.  The question wasn't clear.  Was
4  there ever a time when you progressed from the engineers extra
5  board to a different type of assignment as a locomotive
6  engineer?
7    A    Yes.
8    Q    When you did that happen and what type of assignment
9  did you take?
10   A    I'm not exactly sure what time it happened, but I
11  actually took a pool job out of Atlanta to Greenville, and I
12  also took an Atlanta to Commerce, Georgia job.
13   Q    So let me back up.  While you were on the extra
14  board, where did you work physically?
15   A    Just the Charlotte South end, and it could be
16  Atlanta, in the yard.  As far as pool jobs, it could be
17  Chamblee.  It could be Gainesville, it could be Toccoa or
18  Commerce.
19   Q    Are those all from Atlanta East?
20   A    Well, some of them are based out of those particular
21  cities like Gainesville and Toccoa.  Even though they are on
22  the -- on the Charlotte South, they would be considered local
23  jobs.
24   Q    What pool assignments have you held as a locomotive
25  engineer?

1    A   I'm not sure what you mean by -- pool assignment will
2 be just a group of engineers that were run from Atlanta to
3 Greenville.
4    Q   And again, that would be on a first in, first out
5 basis, right?
6    A   Yes.
7    Q   So if I could summarize, in a pool assignment, you
8 would exercise your contractual seniority to take a position
9 within a pool, right?
10    A   Yes.
11    Q   And then the employees who were in that pool would
12 protect or serve assignments that ran between two specific
13 points?
14    A   Yes.
15    Q   And when you operated from the initiation point to
16 the termination point, you would then rest and then take the
17 next available train going in the opposite direction?
18    A   Yes.
19    Q   Please describe the line of road that you operated --
20 and this is before November 2020 -- as a locomotive engineer.
21 Were there hills?  Were there curves?  Were there downgrades?
22    A   Yes, it would be all that.  It would be the mainline
23 from Atlanta to Greenville and hills, curves, different
24 characteristics of the track.
25    Q   What other specific characteristics do you recall?

1 Were there any close clearances?
2    A   Not on the main line that I can recall, just hills
3 and curves, you know.
4    Q   And as a locomotive engineer, what would you do when
5 approaching a hill or a curve?
6    A   Depending on the train, I mean, it all depends.
7 Every train runs different.
8    Q   Were there occasions when you would slow the train
9 down?
10    A   Yes, it would be.
11    Q   And how would you do that as a locomotive engineer?
12    A   You would use a lever to come out of power.
13    Q   In other words, you would cease applying power to
14 accelerate the train and it would automatically slow down?
15    A   Yes.
16    Q   Were there times when you applied braking mechanisms
17 to slow the train down?
18    A   Yes.
19    Q   And that would be when you approach either a curve or
20 a hill of some sort, correct?
21    A   Yes.
22    Q   As a locomotive engineer, were you trained and
23 qualified to operate trains uphill or on descending grades?
24    A   Yes.
25    Q   You were also trained and qualified to operate trains

1 around curves, correct?
2    A   Yes.
3    Q   You were familiar, as a locomotive engineer, with the
4 term called an approach signal, are you not?
5    A   Yes.
6    Q   Would you please explain, for the record, what an
7 approach signal is?
8    A   An approach signal is giving you a warning to stop at
9 the very next signal.
10    Q   I'm sorry, it cut out.
11    A   It's giving you a warning letting you know that you
12 will be stopping at the next signal.
13    Q   So an approach signal is a signal that appears to the
14 locomotive engineer, correct?
15    A   That appears?
16    Q   It's visible to the locomotive engineer?
17    A   Yes.
18    Q   Is it visible along the line of road or does it
19 appear in the cab of the locomotive?
20    A   Along the line of road.
21    Q   And how far in advance of the next signal was a more
22 restrictive speed limit does the approach signal occur?
23    A   If you're traveling faster than 30, you have to drop
24 your speed below 30 once you see that approach signal, and
25 you've got to prepared to stop at the next signal.

1    Q   So if I understand your testimony correctly, if you
2 see an approach signal, you are required to slow the
3 locomotive -- the entire train obviously -- down to 30 miles
4 per hour if you were going in excess of 30 miles per hour,
5 right?
6    A   Correct.
7    Q   And you need to be prepared to stop at the very next
8 signal, correct?
9    A   Yes.
10    Q   Please describe what steps you would take to slow the
11 engineer -- the train down to 30 miles an hour if the train
12 were operating in excess of 30 miles per hour?
13    A   Once again, it depends on the train.  Some trains
14 just come out of power, some trains you have to apply braking
15 mechanisms to slow it down.
16    Q   So give us the --
17    A   It depends on the characteristics of the territory
18 you're on, where you're at.  I mean, if I'm going straight
19 downhill, I might have to do something different.  But if
20 you're going uphill, I just come out of power.
21    Q   All right.  So let me try to break that down so that
22 I understand it.  Depending on the physical characteristics of
23 the property where you're operating, if you simply stop
24 applying power for the train, it would slow down automatically,
25 right?

Page 38

1    A   Depending on the characteristics of the territory
2    that you're on.
3    Q   So if you're going uphill and you wanted to slow the
4    train down, you would simply stop applying power?
5    A   Yes.
6    Q   But if you're going downhill, you might have to do
7    something else?
8    A   Yes.
9    Q   What would you do?
10   A   I might have to go in the dynamic or I might have to
11   use air brakes.
12   Q   All right.  Again, for the record, please explain
13   what dynamic and air brakes mean.  What are those two options
14   to the engineer?
15   A   Dynamic is just using the engine brakes pretty much
16   to slow the train down.  And air will apply brakes throughout
17   the train.  It just depends on your speed and where you're at
18   which one you will use.  There's no set way to stop the train
19   or slow it down.  You just have to know the territory in order
20   to do it.  And then again, you might have a different train.
21   Your train could be heavier than a train before.  So it depends
22   on the train, depends on the -- on the tracks, whether it's
23   raining, whether it's sunny.  I mean, it depends.  There's no
24   set answer if that happens.
25   Q   The engineer's options to slow the train down, that

Page 39

1    would include eliminating the power, as you put it coming out
2    of power, right?
3    A   Uh-huh.
4    Q   It would also include applying a braking mechanism
5    which could either be the engine's brakes or the air brakes
6    through the train?
7    A   Yes.
8    Q   Does the engineer have any other options short of
9    putting the train into emergency?
10   A   No, other than using the territory to slow it down,
11   you know what I'm saying?
12   Q   And I want to go back through the variables that you
13   described, the factors that might affect what the engineer
14   does.  You mentioned the weather, whether there is rain or
15   snow.  Those might affect the engineer's choice of what options
16   to select?
17   A   Yes.
18   Q   Why would that make a difference.
19   A   Why would raining?
20   Q   Sure.
21   A   Because, I mean, it's wet.
22   Q   It will take you longer to stop, right?
23   A   Yes.
24   Q   Would the issue as to whether or not it was daylight
25   or nighttime make any difference?

Page 40

1    A   Yes, it would.
2    Q   Please explain why.
3    A   You can't see as far as in the daylight -- I mean in
4    the dark so you might want to start preparing a little sooner,
5    quicker or get the speed down a little faster.
6    Q   Would the engineer -- let me rephrase that.  Do you,
7    as a locomotive engineer, need to slow a train down when it
8    goes around a curve?
9    A   Depending on the curve and the speed.
10   Q   Would it also perhaps depend on what's on the train?
11   A   Yes, it would be.
12   Q   So let me go back to the question about slowing or
13   stopping a train.  And this may be obvious to you as a train
14   locomotive engineer, but it's not obvious for the record, so
15   I'm going to ask the question anyway.  Why would the speed or
16   the length of the train make any difference in terms of what
17   the engineer needs to do to slow or stop the train?
18   A   Because of the weight of train, the height of the
19   train could make a difference in your speed and stopping it.
20   Q   Why would the height of the train make any
21   difference?
22   A   Because you have -- it could be top-heavy.
23   Q   Are you referring to having a double stacked train?
24   A   That is correct.
25   Q   So if the train were top-heavy, what affect would

Page 41

1    that have on the stop --
2    A   That would also have weight and it also would be the
3    resistance, wind resistance.
4    Q   I may have asked you earlier.  You are trained and
5    qualified to operate trains around curves, correct?
6    A   Yes.
7    Q   And you're also trained on how to react to approach
8    signals, are you not?
9    A   Yes.
10   Q   So please explain how you would bring the train to a
11   stop if the signal following an approach signal is, in fact, a
12   stop signal?
13   A   I would slow the train down.  It also depends on
14   where I'm at, what am I doing.  It's not a set stopping thing
15   to do every time you're on a train, even if you've stopped at
16   the same signal before.  It's nothing set.  I would just slow
17   the train down and make sure that I'm able to stop at the next
18   signal, whether it's using the air brakes, the territory, or
19   the dynamic break.
20   Q   When deciding whether to use the engines brakes or
21   the air brakes, does the engineer have a preference as to one
22   versus the other?
23   A   No, not really.
24   Q   Since you became a locomotive engineer, what
25   territories have you operated as a locomotive engineer?  And

11 (Pages 38 - 41)

Page 42

1  I'm not referring to the time when you were an engineer in
2  training?
3      A   On the Charlotte South and the Charlotte North.
4      Q   Please describe the geographic locations that are
5  included in the Charlotte South and Charlene North?
6      A   Double track, single track, hills, curves, bridges,
7  overpasses.
8      Q   So on the Charlotte South territory, are there areas
9  where the railroad is double tracked?
10     A   Yes.
11     Q   Are there also areas on Charlotte South where the
12  railroad is single track?
13     A   Yes.
14     Q   Is that also true for Charlotte North?
15     A   Yes.
16     Q   From the perspective of the locomotive engineer,
17  please describe the difference it makes whether a stretch of
18  territory is single track or double track?
19     A   Well, single track is only one train can go over that
20  track, and double track, there's two sets of tracks.  You can
21  have trains going in opposite directions meeting people.
22     Q   The trackage between Inman Yard and Austell, Georgia
23  is that single track or double track?
24     A   Some of it's double track.  I think it might all be
25  double track.  I'm not sure.  I don't remember.

Page 43

1      Q   Does it refresh your recollection that it's double
2  track all the way or do you not remember?
3      A   I. don't remember to be honest with you.
4      Q   When is the last time you operated between Inman Yard
5  and Austell?
6      A   It was the day I got taken out of service.
7      Q   You haven't operated in that direction since?
8      A   No.
9      Q   You're familiar with the automated train energy
10  management system, are you not?
11     A   Yes.
12     Q   Are you trained and qualified to operate with that
13  system?
14     A   Yes.
15     Q   Explain for the record what the train energy
16  management system does?
17     A   It actually runs the train.  Once you get the train
18  moving, it takes over and actually runs the train over the
19  territory.
20     Q   The system engages only when the train is operating
21  above approximately eight miles an hour.  Is that your
22  recollection?
23     A   Yes.
24     Q   And I want to make sure that you're comfortable with
25  it.  Is eight miles an hour about the right speed when that --

Page 44

1      A   Yes.
2      Q   And then what happens once you reach the eight mile
3  an hour threshold and the system is engaged?
4      A   It will ask you to engage in it and then, once you
5  engage in it, it takes over.
6      Q   When you say it takes over, the energy management
7  system controls the speed of the train and stopping of the
8  train, correct?
9      A   It controls the speed of the train.  It doesn't
10  control the stopping.  You have to stop the train.
11     Q   Explain where the change over occurs between the
12  energy management system slowing the train and you as the
13  engineer taking over to stop it.
14     A   Well, a lot of times, you have to decide when to take
15  over to stop the train.  Let's say on a slow -- on an approach
16  signal, it doesn't recognize the -- it just runs off a clear
17  signal.  It doesn't recognize the approach.
18     Q   Where would -- all right.  Let me see if I understand
19  your testimony.  If the energy management system does not
20  recognize an approach signal but continues to operate as if
21  there is a clear signal, then the engineer needs to step in and
22  slow the train down, correct?
23     A   That is correct.
24     Q   Now, I want to go back to your earlier testimony.
25  The energy management system runs the train once it is engaged,

Page 45

1  right?
2      A   Yes.
3      Q   What is the function of the locomotive engineer while
4  the energy management system is engaged?
5      A   Is to monitor it and to ensure that it follows the
6  track speed, make sure it's slowing down properly for a turnout
7  or a crossover.  You have to judge because sometimes it will
8  not judge the weight of the train in the downhill -- let's say
9  downhill and able to get it down for that particular turnout or
10  crossover or curve speed or whatever.
11     Q   If the engineer decides that the energy management
12  system is going too fast, the engineer needs to step in and
13  slow the train down, correct?
14     A   Yes.
15     Q   And that's what you do as a locomotive engineer,
16  right?
17     A   Yes.
18     Q   What does the energy management system do when the
19  train approaches an approach signal?
20     A   Just continues to run the train.
21     Q   Does it slow it down to the 30 mile an hour speed
22  limit?
23     A   No.
24     Q   So does the engineer need to step in whenever the
25  energy management system is engaged and the train comes to an

12 (Pages 42 - 45)

1  approach signal?

2  A  Yes.

3  Q  So is it your testimony that the train energy

4  management system does not slow the train down when a train

5  reaches an approach signal?

6  A  No.  Are you talking about energy management or trip

7  optimizer?

8  Q  I'm talking about energy management.

9  A  Energy management doesn't slow it down.

10  Q  All right.  Was does slow the train down?

11  A  What does slow the train down?

12  Q  You mentioned the optimizer?

13  A  Yeah, the trip optimizer will follow that speed.  It

14  will slow it down a 30 miles an hour, but it won't stop the

15  train.

16  Q  To your knowledge, what is the difference between the

17  energy management system and trip optimizer?

18  A  Not really big differences other than what we just

19  talked about as far as recognizing the clear signals and

20  approaches and all of that, but they engage in different

21  speeds, different throttle positions.

22  Q  For the energy management system to be engaged, the

23  engineer needs to accept a prompt to engage the system; is that

24  right?

25  A  Yes.

1  Q  The energy management system will prompt an engineer

2  to engage the system once the train reaches a certain speed,

3  right?

4  A  Yes.

5  Q  I want to share with you a different document.  All

6  right.  I'm directing your attention to a document that is 697,

7  for the record, Bates Number 697 and 700.  And these are two

8  letters.  I'm going to ask you to identify these.  Are these

9  letters relating to discipline you received as a locomotive

10  engineer?

11  A  Yes.

12  Q  And feel free to refer to the text of the letter, but

13  don't feel obligated to.  Just tell us what happened on that

14  occasion, that occasion being March 31st, 2016.

15  A  Basically we derailed a car because we shoved over a

16  derail and it derailed our last car.

17  Q  Where was the train operating at that time?

18  A  Lula, Georgia on the Y up there, the north leg of the

19  Y in Lula, Georgia.

20  Q  And what city in Georgia?

21  A  Lula.

22  Q  Okay.  So you were in the Lula, Georgia approaching a

23  Y?

24  A  No, we were on the Y.  They had placed a portable

25  derail on that particular track.

1  Q  Were you shoving at that time?

2  A  Yes.

3  Q  Where was your conductor?

4  A  On the rear of the train directing the shove.

5  Q  What happened at that time?

6  A  We shoved over a derail.

7  Q  And you accepted a waiver in connection with that

8  incident, did you not?

9  A  Yes.

10  Q  And the waiver included a deferred suspension of ten

11  days?

12  A  Yes.

13  Q  What supervisors were involved in that incident?

14  A  I think it was -- I just remember his last name was

15  Clevenger.

16  Q  Who was your conductor?

17  A  Michael Goodman.

18  Q  All right.  I'm going to direct your attention to

19  Exhibit 6 and directing your attention also to August of 2016.

20  Did there come a time when you were disciplined in connection

21  with an incident involving failure to perform inspection and

22  ensure that slack was adjusted before making a car cut?

23  (Defendant's Exhibit No. 6 marked for identification.)

24  A  Yes.

25  Q  Please tell us what happened on that occasion.

1  A  The conductor failed to recognize that the last car

2  didn't have any hand brakes on it, and we did a C102.  And when

3  we cut away from that car, the car rolled over a derail.

4  Q  So if I understand you correctly, the remainder of

5  the train was intact and the last car was not connected to the

6  rest of the train?

7  A  Yes.

8  Q  And because the last car had no hand breaks on it, it

9  rolled freely?

10  A  Yes.

11  Q  And because it was rolling freely, it went over a

12  derail?

13  A  Yes.

14  Q  Scrolling down to the last page of that document,

15  which is Bates label 0853, in connection with that incident,

16  you received a ten day actual suspension, correct?

17  A  Yes.

18  Q  And the conductor was disciplined as well to your

19  knowledge, wasn't he?

20  A  I -- as far as the ten days?

21  Q  Yes.

22  A  I'm not sure on that.  I can't quote you on that.

23  Q  Where did the incident involving the rollout and

24  derailment in 2016, August 2016, occur?

25  A  That would have been Commerce, Georgia.

1    Q   Would that be on the -- still be on the Charlotte
2 South territory?
3    A   Yes.
4    Q   What were -- what was the train doing?  What were you
5 doing as the locomotive engineer when the rest of the train
6 pulled away from the car that had no hand breaks?
7    A   I was operating the train.  I was increasing the
8 power to pull away from the car that he supposedly tied down.
9    Q   All right.  So if I understand you correctly, the
10 train would have shoved a certain number of cars into, what, a
11 customer location?
12    A   No, they were already sitting there.
13    Q   What did your train do with respect to those cars?
14    A   We just coupled to them and pulled them part of them
15 away.
16    Q   Pulled part --
17    A   Pulled some of the cars away.  It was like maybe 15
18 cars.  We coupled to the cars with just the engines, and we
19 were going to lead, I think, maybe two or three cars there.
20 And we were going to lead those two or three cars, they
21 actually rolled.
22    Q   Okay.  I think I understand.  So all three of the
23 cars rolled or just the one that didn't have any hand breaks?
24    A   To be honest with you, I wasn't back there.  I never
25 seen it, but I just know that the rear car got over the derail.

1 I don't know whether it was two or three cars or all of them
2 rolled together.  But I just know that one car actually went
3 over the derail.  I was -- I don't know how --
4    Q   You would have been on --
5    A   Yes.
6    Q   And you would have been applying power to move the
7 rest of the cars out to the main line?
8    A   Correct.
9    Q   And you were leaving cars -- was it a customer
10 location?
11    A   No, it was a -- what was that?  Like a storage track.
12    Q   On NS property?
13    A   Yes.
14    Q   So you were leaving three cars deposited, as it were,
15 on NS storage tracks and pulling the remainder out for delivery
16 or to take them to another yard?
17    A   Yes.
18    Q   And you were supposed to leave three cars there and
19 you did leave three cars there, but one of them didn't have any
20 air brakes?
21    A   To be honest with you, I can't give you exactly which
22 cars didn't have the brakes, but I do know they were damaged
23 cars from a derailment before, but I can't give you the exact
24 number and all of that.  I really can't, you know.
25    Q   Understood.  All right.  I'm going to fast-forward to

1 2022.  Directing your attention to a document marked as
2 Exhibit 7.  Can you identify -- is this document a waiver that
3 occurred in May of this year, 2022?
4    (Defendant's Exhibit No. 7 marked for identification.)
5    A   Yes.
6    Q   Please explain what occurred on that occasion.
7    A   Applied the air brakes and failed to bail the air off
8 the engines in time, that is basically what this one is.
9    Q   Where did this occur?
10    A   Gainesville, Georgia.
11    Q   What were you doing at that time?
12    A   Running a train on the mainline just trying to slow
13 the train down.
14    Q   And if I read this document correctly, you accepted a
15 waiver on that occasion?
16    A   Yes.
17    Q   And for record purposes, a waiver is a document where
18 the employee accepts discipline instead of going to a formal
19 investigation.
20    A   Yes.
21    Q   And the course of your employment with Norfolk
22 Southern, you understand that that is something that occurs
23 under your collective bargaining agreement?
24    A   Yes.
25    MR. HAWKINS:  All right.  Suggest a five minute break

1 at this point.  We've been going about an hour.
2    MR. SHUPING:  Sure.
3    (BREAK TAKEN)
4 BY MR. HAWKINS:
5    Q   Mr. Coston, I want to ask you a few questions about
6 positive train control, and we know that by the acronym PTC; is
7 that fair?
8    A   Yes.
9    Q   You described a little bit earlier the energy
10 management system, but this is questions about PTC.  The first
11 one is:  What information does the PTC technology give to you
12 as the locomotive engineer when you're running a train?
13    A   It gives me the distance between the next signal, it
14 gives me the -- some of the curve speeds.  It gives me some of
15 the slow orders, depending on where they're at.
16    Q   Does it show you the grade of the track as your
17 approaching?
18    A   Yes, it does.
19    Q   Does it show you the head end and the rear end of the
20 train that you're operating?
21    A   Yes, it does.
22    Q   Does it show you signal locations?
23    A   Yes.
24    Q   And is it fair to say that PTC tells the engineer
25 where signal locations are five miles before you actually reach

Page 54

1 the signal location?

2   A   Yes.

3   Q   You mentioned that PTC gives the engineer information

4 regarding some of the curve speeds.  Are there curve speeds

5 that PTC does not tell the engineer about?

6   A   Well, the system -- the curve speed can be behind a

7 slow order.  It will give you the first restriction first.  It

8 doesn't give you them back to back, you know.  You have to go

9 through one in order to get the next one.

10   Q   So if the train is approaching an area that's covered

11 by a slow order, it will tell the engineer to comply with the

12 slow order first, right?

13   A   Correct.

14   Q   And after the engineer passes the territory covered

15 by the slow order, it with then tell the engineer what the

16 approaching curve speed would be, correct?

17   A   It could be curve speed, slow order, depending on

18 what it is.

19   Q   Whatever the next speed restriction is?

20   A   Yes.

21   Q   And you are aware that the PTC information is

22 integrated into the energy management system as well, correct?

23   A   Yes.

24   Q   So when you, as the locomotive engineer, are

25 monitoring the energy management system and the auto pilot,

Page 55

1 that system has built within it the information that's revealed

2 by the PTC system?

3   A   Yes.

4   Q   Describe the function of a locomotive engineer when

5 you're operating a train that is correct by it integrated PTC

6 and energy management system?

7   A   It's basically to monitor it to make sure it's

8 following track speeds, the restrictions.  Also to stop and

9 start the train too.

10   Q   Is there a speed in which the energy management

11 system disengages when you're bringing the train to a halt?

12   A   Energy management can disengage at any time.  There

13 is no -- that's why you have to stay on it because you could be

14 driving along and all of a sudden it just says -- it will ask

15 you to take over the train.  And then once you take over, it

16 will say give it back to it.

17   Q   When operating over PTC territory, describe, for the

18 record, what the locomotive engineer sees in terms of the

19 information the PTC gives you about the grade, the coverture,

20 and any speed restrictions.

21   A   It will give you all of that.  Six miles in advance,

22 it will give you the grade -- the grade, the curves, the

23 speeds, the slow order.  You know, it will give you that in

24 advance.

25   Q   You mentioned something earlier about a cut out.

Page 56

1 What is that?  Please describe that for the record.

2   A   You said a cut out?

3     MR. SHUPING:  Turnout, I'm guessing.

4     THE WITNESS:  Is it turnout or --

5 BY MR. HAWKINS

6   Q   I think you said -- I'm not sure what you said, but

7 we'll take the phrase turnout.  I think that's probably more

8 accurate.

9   A   Turnout is when you change the tracks, either a

10 turnout or a crossover.  You could be going from track one to

11 track two.  Like you could be coming, you could be in single

12 track, and you're going to cross over to track two.  Single

13 track is always track one, and you could be switching tracks to

14 track two when you come into double track, and we'll call that

15 a turnout.  Or you could be a reverse going from track two back

16 to one going into single track.  We call that a turnout.  And a

17 crossover would be if you're in double track -- already in

18 double track and you're going to cross over to track one or

19 track two.  We call that a crossover.

20   Q   PTC would give you all that information six miles in

21 advance as well; would it not?

22   A   Yeah, pretty much six miles in advance.

23   Q   You're familiar with the term restricted speed, are

24 you not?

25   A   Yes.

Page 57

1   Q   Under what circumstances is a locomotive engineer

2 permitted to operate at restricted speed?

3   A   I'm not sure.  It depends on where you are.  You

4 could be in the yard under restricted speed.  I don't know if

5 -- if you are taught by signal, you're going under restricted

6 speed, you know what I'm saying?

7   Q   Well, let me ask it a different way.  Who decides

8 when a train is supposed operating at restricted speed?

9   A   I mean, the engineer might have to decide that

10 depending if something is unsafe.

11   Q   So is it always up to the locomotive engineer to

12 decide whether or not to operate at restricted speed?

13   A   No, it's not always up to the locomotive engineer.

14   Q   So explain to me when a locomotive engineer can

15 decide to operate at restrictive speed?

16   A   If something is unsafe.  Let's say it is foggy and

17 you can't see.

18   Q   And would you define for us what restrictive speed?

19 In other words, what does it mean to say that an engineer is

20 operating at restrictive speed?

21   A   It means that he would be running up under 20 miles

22 an hour, and that does not mean that he has to operate at

23 20 miles an hour.  He could operate at five miles an hour if

24 the site distance calls for that or if the weight of the train

25 calls for that, you know what I'm saying.

15 (Pages 54 - 57)

Page 58

1    Q   You're referring to factors that would affect the
2  ability to stop the locomotive?
3    A   Yes.
4    Q   If an engineer decides to operate at restrictive
5  speed, is the engineer required to notify anyone or to seek
6  permission from anyone before doing so?
7    A   I'm not sure.  No, I would say no.  I'm not
8  100 percent sure on that one as far as when you're operating on
9  the main track.
10    Q   So is it your testimony that a locomotive engineer
11  can decide at his or her discretion whenever to run at
12  restrictive speed?
13    A   When the conditions call for that.  When it calls for
14  an engineer -- the safety of the train, the crew, the public,
15  it might call for that.
16    Q   What, if anything, does the engineer need to do in
17  terms of notifying management or seeking permission from
18  management to operate at restrictive speed?
19    A   Well, in my case, I would notify the dispatcher, and
20  the dispatcher would probably notify supervisor and the chief,
21  and then I would give them why I am operating at that -- up
22  under restrictive speed.
23    Q   You would agree that the dispatcher is not a
24  management official, right?
25    A   No, I don't -- I don't agree with that.

Page 59

1    Q   Is it your belief that a dispatcher is a management
2  official?
3    A   Yes, yes.  I mean the dispatcher is in communication
4  with the supervisor, the chief dispatcher.
5    Q   Are you not familiar with the fact that the
6  dispatchers are union employees represented by the dispatcher's
7  union?
8    A   No, I didn't know that they were represented by that.
9    Q   Mr. Coston, you're familiar with Norfolk Southern's
10  train assignments include train numbers 237 and 238, are you
11  not?
12    A   Yes.
13    Q   Please explain where those trains operate.
14    A   From Atlanta to Greenville and from Greenville -- 238
15  would go north out of Atlanta going north towards Greenville
16  and 237 would come south out of Greenville, South Carolina to
17  Atlanta.
18    Q   Are 237 and 238 a continuation of trains that were
19  made up at other locations or are they made up at Greenville
20  and Atlanta respectively?
21    A   At other locations.  The 237 originates in, I think,
22  Charleston, South Carolina, and it would be re-crewed in
23  Greenville, South Carolina by one of the Charlotte South crews.
24  The 238 would originate in Atlanta and be re-crewed in
25  Greenville.

Page 60

1    Q   And the 238 would then head on to Charleston?
2    A   Yes.
3    Q   Are the cars attached to the locomotives in both
4  directions loaded or are the empties or a combination?
5    A   A combination.
6    Q   Where in the Charleston area is 237 made up?
7    A   I've never been to Charleston so I couldn't tell you.
8    Q   But you understand that that train has already been
9  made up before it hits Greenville?
10    A   Yes.
11    Q   And in your experience, do you typically add or set
12  off cars at Greenville or does the train simply re-crew?
13    A   You can re-crew and you can add cars.  You can set
14  off cars in Greenville.  It depends on what is going on.
15    Q   Do you typically serve any customers in the
16  Greenville area?
17    A   No, no customers in the Greenville area.
18    Q   So again, the 237 is the one that is made up in
19  Charleston and then travels via Greenville to Atlanta, right?
20    A   Yes.
21    Q   Does that train perform any work, in other words, set
22  offs or pickups, between Greenville and Atlanta?
23    A   No.
24    Q   Let me go in the other direction.  The 238 is made up
25  in Atlanta?

Page 61

1    A   Yes.
2    Q   And that is not a continuation of a previously made
3  up train then, correct?
4    A   No.
5    Q   So in other words, cars that are classified into
6  outbound tracks in the Atlanta area are put together for an
7  outbound train that heads towards Greenville and that's 238,
8  correct?
9    A   Yes.
10    Q   You are very familiar with the change in which
11  Norfolk Southern decided to change the point of origination and
12  termination of 237 and 238 from Inman Yard to Austell, Georgia,
13  correct?
14    A   Say that -- ask the question again.
15    Q   I'll break it down in a couple of pieces?
16    A   Okay.
17    Q   There came a time when Norfolk Southern decided to
18  change the point of origination or termination of the train
19  pair 237, 238 from Inman Yard to Austell, Georgia, correct?
20    A   Yes.
21    Q   When it did so, at what location is the train that we
22  refer to 238 made up?
23    A   In Austell.
24    Q   Prior to that change, was that train made up at Inman
25  Yard?

16 (Pages 58 - 61)

Page 62

1   A   Yes.
2   Q   So the cars that make up train 238 were actually
3   classified at Inman Yard and taken to Greenville, is that --
4   A   Before the change happened?
5   Q   Yes.
6   A   Yes.
7   Q   So in other words, the entire classification
8   operation moved from Inman Yard to Austell?
9   A   I would say no because it was a stop.  You had to
10  stop in -- back in Inman Yard to pick up more cars for that
11  train so it wasn't totally -- everything totally done over in
12  Austell.
13  Q   I think I understand.  Let me see if I have it
14  correct.  After the change that involved moving the origin or
15  termination of 237, 238 to Austell, the train would be made up
16  at Austell, but would pick up additional cars at Inman Yard?
17  A   Yes.
18  Q   Did the change involving the switch from Inman Yard
19  to Austell affect any of the crew members who performed that
20  work?
21  A   I would say yes.  I guess they had to learn from
22  Austell to Inman Yard.
23  Q   After the change, where did the crews report for
24  duty?  Did they report at Austell or did they report to Inman?
25  A   Reported to Austell.

Page 63

1   Q   Was there any reduction in the number of crews or the
2   number of starts as a result of the change?
3   A   No.
4   Q   Was there any concern or disagreement among crew
5   members about the change from Inman Yard to Austell?
6   A   No, I don't think so.  I think the people just did
7   it.  I can't give you what other people were thinking about it,
8   you know.
9   Q   Did it cause any crew members inconvenience to report
10  for duty at Austell rather than Inman Yard?
11  A   I don't know what on that one, you know.  You'd have
12  to ask the other crews, but people had to drive to Austell so I
13  don't know.
14  Q   And you don't believe that any crews or any
15  assignments were eliminated in connection with that change?
16  A   No.
17  Q   What types of commodities are shipped on the train
18  pair 237 and 238?
19  A   At that time, it was just intermodal.
20  Q   And when you say at that time, that would have been
21  in or about November of 2020?
22  A   Yes, but I believe it's switched now.  It's
23  intermodal and mixed freight now.
24  Q   For the time that you operated from Inman Yard to
25  Austell, it would have been solely intermodal freight?

Page 64

1   A   Yes.
2   Q   There would not have been any hazardous materials?
3   A   You also could have hazardous material when it comes
4   down to intermodal too now.
5   Q   What types of hazardous material are you familiar
6   with?
7   A   It could still be the same hazardous that you haul on
8   mixed freight.
9   Q   Are you familiar with any hazardous materials that
10  were transported between Inman Yard and Austell in or about
11  November 2020?
12  A   I can't recall the exact shipments or whatever, you
13  know what I'm saying.
14  Q   Are you familiar with any restrictions on how cars
15  were classified at Inman Yard in or about November of 2020?
16  A   No.
17  Q   And I think I asked you this earlier, but the track
18  between Austell and Inman Yard, you don't have a recollection
19  right now whether it's single or double track?
20  A   No, but you just told me it was double track all the
21  way.
22  Q   I think that's the case, but you're more in tune to
23  it than I am.
24  A   I don't know.
25  Q   For the record, your answer is I don't know.

Page 65

1   A   I don't know.
2   Q   I won't press it any further.  What, if any, unusual
3   conditions or hazards exist in the territory between Inman Yard
4   and Austell, Georgia?
5   A   I don't know the track well enough to give you that,
6   you know what I'm saying.
7   Q   Let me ask it this way:  Are you familiar with any
8   unusual hazards in the track segment between Inman Yard and
9   Austell, Georgia?
10  A   No.
11  Q   You would agree that you took at least two qualifying
12  trips over the territory between Inman Yard and Austell,
13  Georgia prior to November 27, 2020, correct.
14  A   You're saying -- what do you mean by two qualifying?
15  Is it the same direction or just on the train twice?
16  Q   I'll break the question down into subparts.
17  A   Okay.
18  Q   Before November 27, 2020, you traveled in the
19  territory between Inman Yard and Austell, Georgia twice,
20  correct?
21  A   Yes.
22  Q   And you traveled that territory in each direction?
23  A   Yes.
24  Q   Is it true that the signal locations on that trackage
25  are at the same location in both directions?

17 (Pages 62 - 65)

1    A   That is true but it could be different obstacles or
2  different characteristics of track in different directions.
3    Q   Let's break that down.  You would agree as to the
4  signal locations that they are at the same place whether you're
5  going in one direction or the other operating trains 237 and
6  238 between Inman Yard and Austell, Georgia?
7    A   Yes.
8    Q   You said that there could be different physical
9  characteristics depending on which direction of travel?
10   A   Yes.
11   Q   Please explain that.
12   A   You could be coming, I guess it would be south from,
13  let's say, Austell.  It could be downhill and you could be
14  coming uphill or vice versa, or it could be a tree in the way
15  hiding the signal.  I don't know.
16   Q   All right.  So let's take each of those separately.
17  If there is a hill between Austell and Inman Yard, by
18  definition, it would uphill in one direction and downhill in
19  the other, right?
20   A   Yes.
21   Q   And then you mentioned the possibility of a tree
22  hiding a signal.  Because of PTC and the integrated energy
23  management system, the locomotive engineer would know where the
24  signal is and the aspect of the signal at least five to
25  six miles before reaching the signal, correct?

1    A   Yes.
2    Q   Mr. Coston, I'm going to show you -- let me hit the
3  correct button here.  On the screen should be a document which
4  I've marked as Exhibit 8.  For the record purposes, there are
5  two screenshots on this and this is Exhibit 8 for the record.
6  Do you recognize this as an employee history record from
7  Norfolk Southern?
8    (Defendant's Exhibit No. 8 marked for identification.)
9    A   I don't see anything yet.
10   Q   My apologies.  There you go.
11   A   Okay.
12   Q   Is this a document that you are accustomed to seeing
13  as a Norfolk Southern employee?
14   A   Yes.
15   Q   And this document reflect that you took the following
16  trips 238 on 11/6/2020 and then 237 on November 12th and
17  November 15th.
18   A   Okay.
19   Q   Do you have any reason to disagree that you took
20  those trips on those dates?
21   A   No, I do not, but I also want to explain to you on
22  237, you don't always go to Austell.  237 is not a very
23  important train when it's coming south, and if I'm not
24  mistaken, I think I was taken off those trains twice and placed
25  on the trains that were a little more important that the crews

1  were long out for me to yard those trains at Inman Yard.  I'm
2  not sure exactly which trains it was, but I only went to
3  Austell once coming south out of Greenville before that
4  particular day.
5    Q   And you would agree that you also went to Austell
6  from Greenville going the other direction at least once?
7    A   Yes.
8    Q   So you would agree that you took two trips between
9  Inman Yard and Austell prior to November 27, 2020, correct?
10   A   Correct.
11   Q   You believe that on one of the occasions listed here,
12  you did not complete the trip from Inman Yard to Austell, but
13  you got off at Inman Yard?
14   A   Yes, it would actually be before Inman Yard, but yes.
15   Q   Where would you have disembarked the train?
16   A   I think it was either at Foremost one time and I
17  think it was a Goodwin, the signals.
18   Q   Would that have affected your pay in any regard?
19   A   No, it did not.
20   Q   All right.  So this is -- I'm going to show you the
21  bottom part of Exhibit 8, and this would be crew information.
22  Again, this is the type of document that you're accustomed to
23  seeing as a Norfolk Southern employee?
24   A   Yes.
25   Q   And this document relates to a trip on 11/5/2020,

1  true?
2    A   Yes.
3    Q   Do you remember working with a conductor named Jacob
4  Frankel?
5    A   Yes.
6    Q   Do you remember whether you worked with Mr. Frankel
7  on a trip that went between Inman Yard and Austell, Georgia?
8    A   Yes.
9    Q   I'll direct your attention now to a document that is
10  Exhibit 9.  Is Exhibit 9 an example of a screenshot that you're
11  accustomed to seeing as a Norfolk Southern employee?
12   (Defendant's Exhibit No. 9 marked for identification.)
13   A   Yes.
14   Q   And do you remember working with a conductor named
15  Jason Perdue?
16   A   No, I don't.  I'm trying to remember.
17   Q   Does this document refresh any recollections of you
18  working on November 11 into November 12 of 2020?
19   A   Yes.
20   Q   All right.  I know your time off duty is triple
21  (indiscernible), which would have made this a 2012 tie up,
22  right?
23   A   Okay, yes.
24   Q   It would have been November 12 tie up, not 2012.
25  It's 2020.  All right.  Last of those screenshots, again, the

Page 70

1  bottom part of Exhibit 9 is a separate screenshot.  Is this a
2  document that you would be accustomed to seeing as a Norfolk
3  Southern employee?
4      A  Yes.
5      Q  And do you remember working with a conductor named
6  Willie Walter?
7      A  Yes.
8      Q  And this occurred on November 27, 2020, correct?
9      A  Yes.
10     Q  And this is the incident after which you were taken
11 out of service, correct?
12     A  Yes.
13     Q  And then one more screenshot, which is Exhibit 10.
14 Again, this is a document that -- or a screenshot that you
15 would be accustomed to seeing as a Norfolk Southern employee?
16     (Defendant's Exhibit No. 10 marked for identification.)
17     A  Yes.
18     Q  And do you recall working with a conductor named
19 Alexander Walker?
20     A  Yes.
21     Q  Does this document refresh your recollection as to
22 operating a train with Mr. Walker, train symbol 237?
23     A  Yes.
24     Q  All right.  For the record, I have stopped screen
25 sharing for now.  Actually, let me go back while I'm at it to

Page 71

1  -- before I forget how to do it.  Directing your attention to a
2  document in which I'm going to need to rotate here.  Mr.
3  Coston, you're familiar with the Norfolk Southern published
4  rules for equipment operation and handling, are you not?
5      A  Yes.
6      Q  And what I've shown you is Exhibit -- a part of
7  Exhibit -- scroll down, that should be Exhibit 11.  This is a
8  part of that document, correct?
9      (Defendant's Exhibit No. 11 marked for identification.)
10     A  Yes.
11     Q  And you would agree with me that, as the locomotive
12 engineer, you are governed by the rules for equipment handling
13 and operation?
14     A  Yes.
15     Q  And again, I'm scrolling down.  You would agree that
16 in Section D, it requires that engineers must initialize the
17 energy management system on the lead locomotive and must then
18 utilize auto control any time conditions permit in order to
19 maximize fuel savings.  And to accurately calculate energy
20 management utilization, engineers must log out of the energy
21 management system at the completion of their trip.  You would
22 agree with me that that's a rules that applied to you, right?
23     A  Yes.
24     Q  Before you -- before November 27, 2020, you had a
25 least two trips between Inman Yard and Austell where you had a

Page 72

1  pilot?
2      A  Yes.
3      Q  Who was the pilot on those occasions?
4      A  I don't remember.  I think one was named -- last name
5  was Wolf.  He was a division road foreman, and the other guy
6  that was going -- that I -- Wolf was one that -- when we
7  originated in Austell going to Greenville.  And once I had a
8  road foreman -- and I don't remember his name, but he was from
9  Atlanta to Austell.
10     Q  Can you describe the road foreman who rode with you
11 from Atlanta to Austell?
12     A  Young black guy, did not know the -- did not know the
13 territory.  That's about it, and I will tell you he told me to
14 run restrictive speed.
15     Q  You said what?
16     A  It was a young black guy that did not know the
17 territory, and they told -- he told me to run restrictive speed
18 over there.
19     Q  All right.  Well, I'll ask you a few questions about
20 that.  What is your basis to say the road foreman who rode with
21 you from Atlanta to Austell didn't know the territory?
22     A  Because he didn't know the next signal.
23     Q  Is there any other reason why you think he did not
24 know the territory?
25     A  Because it wasn't his territory.

Page 73

1      Q  Do you know whether he was qualified over that
2  territory?
3      A  No, I'm not sure.
4      Q  Second question I have about that trip:  When the
5  road foreman told you to run at restrictive speed, he knew that
6  you were qualifying on that territory, did he not?
7      A  He knew I was not qualified.
8      Q  And he knew that the purpose of you being there was
9  to become familiar with the physical characteristics of the
10 territory, correct?
11     A  Yes.
12     Q  So when he told you to run a restrictive speed, he
13 was assisting you in going slowly so that you could observe the
14 physical characteristics of the territory you were learning,
15 correct?
16     A  I wouldn't agree with that.  I would say that he
17 didn't know it so he couldn't tell me.
18     Q  And the basis of your comment that he didn't know the
19 territory either is that he didn't know the next signal as you
20 just spoke about earlier?
21     A  He didn't know the characteristics of that track
22 going from Atlanta to Austell.
23     Q  When the road foreman instructed you to run at
24 restricted speed, that permitted you additional time to observe
25 the physical characteristics of the territory between Inman

19 (Pages 70 - 73)

Page 74

1  Yard and Austell, did it not?
2     A   Yes.
3     Q   When you rode with the road foreman Wolf, did you run
4  at restricted speed?
5     A   No, we did not.
6     Q   You ran at full track speed?
7     A   No.
8     Q   At what speed did you operate?
9     A   I don't remember the exact speed, but he told me to
10 operate at the speed that was comfortable for me.
11    Q   When you rode with road foreman Wolf, did you engage
12 the energy management system?
13    A   No.
14    Q   So when you rode with road foreman Wolf, you had to
15 actually operate the throttle and other devices on the
16 locomotive?
17    A   Yes.
18    Q   So you were in full control of the locomotive and not
19 simply monitoring the energy management system when you rode
20 with road foreman Wolf, correct?
21    A   Yes.
22    Q   When you rode with the road foreman that you can't
23 identify from Atlanta to Austell, did you use the energy
24 management system?
25    A   No.

Page 75

1     Q   So on that trip, you as the locomotive engineer had
2  full control of the locomotive, correct?
3     A   Yes.
4     Q   And you did not rely on the energy management system
5  to operate the train for you when you rode from Atlanta to
6  Austell, correct?
7     A   No.
8     Q   Am I correct or not correct?
9     A   You're correct.
10    Q   Can you estimate the speed in which you operated when
11 you rode with road foreman Wolf?
12    A   I really can't, to be honest with you.
13    Q   You operated at a speed that was comfortable for you
14 to learn the territory?
15    A   Yeah, that was basically it.
16    Q   At any time during your runs to or from Austell with
17 road foreman Wolf or the other road foreman that you can't
18 identify, did you identify or report any problems with the
19 operation of the PTC or the automated energy management system?
20    A   No, we did not report anything.
21    Q   Did you observe any problems when you rode on that
22 territory, the 12 miles between Austell and Inman Yard.
23    A   You saying problems with the PT trip or energy
24 management?
25    Q   Yes.

Page 76

1     A   No, we did not use it.
2     Q   And it's also true that you did not use or engage the
3  energy management system on November 27, 2020, correct?
4     A   From Atlanta to Austell, I did not.
5     Q   Correct.  Let me direct your attention to the
6  incident on November 27, 2020.  You were the assigned engineer
7  on train 237, correct?
8     A   Yes.
9     Q   How did you receive that assignment?
10    A   From crew call out of -- out of Greenville, South
11 Carolina.
12    Q   Do you remember who the crew caller was?
13    A   No.
14    Q   Were you on an extra board or in a pool?
15    A   In a pool.
16    Q   Where did that pool operate?
17    A   Atlanta to Greenville and Greenville to Atlanta.
18    Q   When you received the assignment to operate from
19 Greenville to Atlanta, did you realize that the train
20 terminated at Austell, Georgia?
21    A   Yes.
22    Q   Did you refuse the assignment?
23    A   No.
24    Q   Was Greenville your away from home terminal?
25    A   Yes.

Page 77

1     Q   So you had taken rest there lodging in the local
2  area, right?
3     A   Yes.
4     Q   Where did you go on duty that night?
5     A   Where did I go on duty --
6     Q   That night, that evening?
7     A   In Greenville, South Carolina.
8     Q   Is that a rail yard?
9     A   Yes.
10    Q   Did you have any conversation with the crew caller as
11 to your assignment or whether you were qualified for the
12 assignment?
13    A   No.
14    Q   Was the lead locomotive on the 237 that night
15 locomotive 1177 -- 1177?
16    A   I don't remember the numbers on the locomotive.
17    Q   The locomotive was equipped with the automated train
18 management system, energy management system, was it not?
19    Q   And you are also familiar with the fact that positive
20    Q   And you are also familiar with the fact that positive
21 train control technology is installed on the entire rail line
22 from Inman Yard to Austell, correct?
23    A   Yes, I assume it is.
24    Q   If a locomotive engineer fails to slow or stop a
25 train as required on a territory that is PTC, what happens with

Veritext Legal Solutions

Page 78

1  the PTC system?
2      A   The PTC will apply the brakes and stop the train.
3      Q   Is that known as enforcing the engine?
4      A   Yes, yes.
5      Q   Are engineers concerned about any disciplinary
6  consequences that might flow from enforcing the engine?
7      A   Yes.
8      Q   Please explain why.
9      A   Norfolk Southern will -- well, they discipline you.
10  It's kind of like running a stop signal.
11     Q   However, if an engineer is enforced, the train itself
12  will not run the stop signal, but the PTC would be the reason
13  why it didn't get run?
14     A   Yes.
15     Q   So on the night of the incident, November 27, 2020,
16  you operated the train from Greenville through to Inman Yard,
17  correct?
18     A   Yes.
19     Q   Is Inman Yard, did you make any pickups or set offs
20  or perform any work?
21     A   No.
22     Q   Did you stop at Inman Yard?
23     A   We stopped before Inman Yard.
24     Q   Where and why?
25     A   We stopped at -- was that McCaston Street.  And

Page 79

1  that's where the dispatcher stopped us at and that's where I
2  requested a pilot at.
3      Q   Why does the train stop at that particular location?
4      A   You have to wait to go into the yard or to cross the
5  CSX tracks.
6      Q   You're running over CSX tracks to get into Inman Yard
7  or at Inman Yard?
8      A   To get over the tracks to get into Inman Yard.
9      Q   So you're not running over track; you're running
10  over -- you're crossing CSX tracks?
11     A   You're crossing CSX tracks.
12     Q   So the only reason to stop is to verify that there is
13  no approaching CSX train or a blockage from the CSX?
14     A   Well, it's heavy traffic.  So you -- it could be
15  other trains coming.  You've got to cross over to another track
16  anyway to go to Austell, so it could be heavy traffic.  You
17  don't know how many trains they're going to run before you.
18  You know, you just got to wait your turn.
19     Q   And the dispatcher controls and will order you as to
20  when you are free to proceed into Inman Yard?
21     A   Yes.
22     Q   Please describe the configuration once you get to
23  Inman Yard.  You're not going into a class yard?  Is this a run
24  around track or a straight through track?
25     A   You're talking about stopped at Inman Yard and

Page 80

1  yarding a train?
2      Q   Yes.  You didn't yard the train at Inman Yard?
3      A   No, no, no.
4      Q   Is there a track that circumvents the yard?
5      A   Yes.
6      Q   What track is that?
7      A   That would be the main line.  I don't know -- what do
8  you mean by describing it to you?
9      Q   I think you have.  There is a track known as the main
10  line that is not part of the class yard?
11     A   Yes, that you could --
12     Q   Go ahead.
13     A   That you could circle around Inman Yard.
14     Q   Right.  So you don't have to go through the
15  classifications tracks to come out on the other end?
16     A   Correct.
17     Q   And at that point, you had a conversation with the
18  dispatcher?
19     A   Yes.
20     Q   Who was the dispatcher?
21     A   I don't know his name.  I don't remember.
22     Q   Do you remember anything about the dispatcher?
23     A   No, not really, I mean, other than just talking to
24  him on the radio.  He seemed like he was a pretty nice guy.
25     Q   Tell us everything you can recall about your

Page 81

1  conversation with the dispatcher.
2      A   I don't remember word for word, but I remember when
3  we got down there, I just let him know that I needed a pilot to
4  get from Atlanta to Austell.  He said no problem and he said he
5  would get back with me.  He said that -- that I probably would
6  get the pilot off of 238 that was coming from Austell to
7  Atlanta.  And so we sat there and sat there and sat there and
8  then finally called back and said that road foreman Bailey,
9  Travis Bailey said that I was qualified already.  And I
10  explained to him that I was not qualified -- wasn't qualified
11  to go over there.
12     Q   What, if anything, did the dispatcher say in reply to
13  you?
14     A   Like I said he said that basically, Travis Bailey
15  said that I was qualified, and I was telling him that I wasn't,
16  and he said that if he had any questions that -- to call Travis
17  Bailey.  And I explained to him I didn't have Travis Bailey's
18  number, and he said that he would get Travis Bailey's number
19  for me.  And so we sat there and sat there and sat there.  I
20  don't know -- I don't remember the time-wise, but it seemed
21  like it was forever, and I toned him back up and then told him
22  what was going on, and he said that he was still waiting on
23  Travis.  I'm assuming Travis was on the other train coming
24  towards us or whatever.  I don't know.  But anyway, I told him
25  that I would take the train over there.  I said I'm not sure

21 (Pages 78 - 81)

1 where I'm going, and I said I would be super slow going over
2 there and the dispatcher said I understand.  He said I would be
3 too.  He said when the time comes, he'll let us know and he'll
4 give us a signal to cross.
5    Q   Did the dispatcher give you Mr. Bailey's telephone
6 number?
7    A   No, never did.
8    Q   So you never telephoned Mr. Bailey?
9    A   No, he never gave me the number.
10    Q   Did you contact any management official that night?
11    A   To me I did with the dispatcher.  The dispatcher and
12 the supervisor and the chief were all together.
13    Q   But you did not contact anyone other than the
14 dispatcher?
15    A   I'm assuming when I contact that dispatcher, I'm
16 contacting the chief and the supervisor.
17    Q   My question is:  Did you contact anyone other than
18 the dispatcher the night of the 27th?
19    A   No, I did not.
20    Q   Did you tell the dispatcher that you would refuse to
21 operate the train from Inman Yard to Austell unless you had a
22 pilot?
23    A   No, I never told him I refuse to operate.
24    Q   If there are emergencies on the railroad such as a
25 derailment, an accident, things of that nature, do you have

1 available to you phone numbers that you can call other than the
2 dispatchers?
3    A   As far as management?
4    Q   Yes.
5    A   You could call the supervisors or the chiefs or
6 whatever.
7    Q   Explain that to me, please?
8    A   The supervisor.
9    Q   Yes, who?
10    A   Depending on who your train master is or the chief
11 dispatcher's office.
12    Q   All right.  Let me break that down.  Are you able to
13 contact the train master, if necessary, during an emergency?
14    A   Yes.
15    Q   How would you contact the train master?
16    A   I would have to use the telephone to go through the
17 dispatcher.
18    Q   Would you have the train master's telephone number
19 available to you?
20    A   Yes.
21    Q   At any night -- at any time on November 27th, 2020
22 did you telephone the train master on duty?
23    A   No, I did not telephone the train master.
24    Q   You also mentioned a supervisor.  Is that the same
25 person?  Is that the train master?

1    A   Yes.
2    Q   Are there any other management officials that you are
3 able to contact in the event of an emergency?
4    A   Other than them, that's it.
5    Q   Isn't there an 800 number in the event of a
6 derailment or an emergency?
7    A   I don't know if there is one.
8    Q   Did you have a conversation on November 27, 2020 with
9 the dispatcher about Mr.-- the possibility that Mr. Bailey
10 could act as your pilot?
11    A   Yes, that was the original plan.
12    Q   Did you tell the dispatcher that you did not want
13 Mr. Bailey out there that night?
14    A   No, I asked for a pilot and he said that Travis
15 Bailey was coming in over off of 238.
16    Q   Did you tell the dispatcher that you didn't want to
17 deal with Mr. Bailey that night?
18    A   I don't remember that.
19    Q   You don't remember or you didn't say it?
20    A   I don't remember saying it.
21    Q   Is there any reason why you would not have wanted to
22 deal with Mr. Bailey?
23    A   No, I just needed a pilot.  I mean --
24    Q   Prior to November 27th,m had you ever dealt with
25 Mr. Bailey?

1    A   No, not really.  I never met him before other than
2 hearing conversations about him or -- through the road foreman,
3 that's about it.
4    Q   What conversations had you heard about Mr. Bailey?
5    A   Other than Mr. Bailey said we'll do this and we'll do
6 that.  No specific thing about Travis Bailey.
7    Q   So why would you have any reluctance to deal with
8 Mr. Bailey on the night of November 27th?
9    A   Other than he official?  Other than him being an
10 official, that's about it.
11    Q   In other words, as an official -- in most industries,
12 officials are called supervisors.  In the railroad industry
13 officials are -- officials are officers?
14    A   Yeah.
15    Q   That's the term.  And Mr. Bailey is an official,
16 right?
17    A   Yes.
18    Q   He is a supervisor.  Is it your testimony you would
19 be reluctant to have him serve as your pilot because he was an
20 official?
21    A   No, I would say no.  I would have took him as a pilot
22 to get over there, yes.
23    Q   Why was it a concern --
24    A   I will explain this to you.  That's a general term on
25 the railroad.  If you ask any employee do you want a supervisor

Page 86

1  to ride with you, they're going to tell you no.  The same way
2  that road foreman Wolf rode with us.  Would I want him to ride
3  with me?  No, I would have took another qualified engineer.
4  That's just how it is on the railroad.  Nothing against Wolf,
5  nothing against Bailey, any train master.  That's just the norm
6  out on the railroad.
7      Q   So when there was conversation between you and the
8  dispatcher about Mr. Bailey riding with you, you would have
9  had -- you had some concern because he was an official?
10     A   Yes, that's just a general term.
11     Q   And the reason why you would be more concern about
12  riding with an official is an official can assess discipline --
13  or initiate the discipline process, right?
14     A   Yeah, that would be pretty much the norm.  Yes.
15     Q   By contrast, if you rode with a qualified locomotive
16  engineer who could serve as your pilot, that person cannot
17  initiate the disciplinary process, right?
18     A   That is correct.  He wouldn't be looking for anything
19  wrong.
20     Q   And he would be a member of the same union that
21  you're a member of, right?
22     A   Not so much as the same union I am, but he would be
23  looking for something wrong.
24     Q   He wouldn't be looking for something wrong?
25     A   Yes.

Page 87

1      Q   Let me ask you a few questions about the conductor
2  who was with you on November 27th.  And when I refer to
3  November 27, we're referring to the incident that gave rise to
4  you being held out of service.  I assume that you understand
5  that.  You nodded your head?
6      A   Yes, yes.
7      Q   And you've been perfect at that, at not nodding your
8  head, but it's a natural human instinct and it doesn't help our
9  court reporter.  Your conductor was Mr. Willie Walter, was he
10  not?
11     A   Yes.
12     Q   Do you have any idea whether Mr. Walter was qualified
13  on the physical characteristics of the line segment between
14  Inman Yard and Austell, Georgia?
15     A   No, he was not.
16     Q   How do you know that?
17     A   Because I think he told me.
18     Q   What did he tell you?
19     A   Basically said that he was not qualified.
20     Q   What else did he say to you other than saying he was
21  not qualified?
22     A   That's about it.  I mean, I don't know exactly --
23  exactly what he was saying.  You know, everything that was
24  said.
25     Q   Do you know how many trips Mr. Walter had taken on

Page 88

1  the territory between Inman Yard and Austell, Georgia prior to
2  November 27, 2020?
3      A   No.
4      Q   So for all you know, he couldn't taken ten trips
5  between those two locations and you wouldn't know it, right?
6      A   That's correct.
7      Q   As a locomotive engineer, you're not permitted to
8  operate over a trackage unless you are qualified on the
9  physical characteristics of the territory, correct?
10     A   Correct.
11     Q   Is it your testimony that, on November 27, 2020, you
12  did operate over territory as to which you were not qualified
13  on the physical characteristics?
14     A   Yes.
15     Q   As a locomotive engineer, you are not permitted to
16  operate a train with a conductor that you know is unqualified
17  on the physical characteristics of your territory, correct?
18     A   Yes.
19     Q   And to the best of your knowledge, on 11/27/2020,
20  you operated with a conductor who was not qualified on the
21  physical characteristics on the line between Inman Yard and
22  Austell, Georgia, correct?
23     A   Yes.
24     Q   All right.
25         MR. HAWKINS:  May I suggest a five-minute break and I

Page 89

1  will switch to some other topics.
2             (BREAK TAKEN)
3  BY MR. HAWKINS
4      Q   Mr. Coston, you had identified in your earlier
5  discussion three trips involving the 237 and 238, and you said
6  on one of them you were instructed to get off before proceeding
7  to Austell and stopped at Inman Yard.  Who was the person who
8  would have been your pilot on that occasion?
9      A   As far as the train I got instructed to get off of?
10     Q   Yes.
11     A   There was never a discussion about a pilot because it
12  never made it down toward Inman Yard.  They notified us before
13  we got down that they were going to be re-crewing -- well,
14  switching trains with another crew.
15     Q   Switching trains or re-crewing?
16     A   Well, switching, re-crewing.  The crew that was
17  coming in was running out of time and we were going to take
18  their train on in and yard it in Inman Yard.
19     Q   Where did you pick up the other -- I think you
20  referred to it earlier as higher priority train?
21     A   I think this was at Foremost.  It's a signal called
22  Foremost.
23     Q   So your understanding was that the crew who was
24  taking the train that you picked up at Foremost was about to
25  outlaw?

23 (Pages 86 - 89)

Page 90

1     A   I'm not exactly sure what the reasoning was, but I do
2   know that we switched trains with them, and I'm assuming that
3   was the normal reason why we switched trains with them.
4     Q   And so you got off of which one, the 237 or the 238?
5     A   The 237.
6     Q   And you would have boarded a different train?
7     A   Yes.
8     Q   Obviously a different locomotive, different
9   everything?
10    A   Yes.
11    Q   And what train symbol was that?
12    A   I'm not sure.  I can give you a couple of number,
13  that is possibly was.  It would have been maybe 211 or 203, one
14  of those trains there.  It could have even been 213.  I do know
15  the crew that was on it.
16    Q   Okay.  Who was the crew?
17    A   One was Danny Tucker, the engineer, and the conductor
18  was Tim Murphy.
19    Q   Okay.  What officers would have been familiar with
20  that swap?
21    A   Other than the dispatcher and the chief, that's the
22  only person I know.  I don't know what the dispatcher name and
23  who the chief was, but the chief makes that call.
24    Q   So instead of proceeding to Austell, you would have
25  yarding the train at Inman Yard and gone off duty there?

Page 91

1     A   Yes -- well, actually we would have -- I don't know
2   if we would have went off duty or not, but we would have been
3   driven from Inman Yard in a shuttle van to Austell, and I think
4   we go off duty at Austell once we got over there.  I can't
5   remember for 100 percent on that.
6     Q   And that's where your personal vehicle would have
7   been?
8     A   Yes.  No, no, no, not necessarily.  I'm not sure
9   exactly what -- because it doesn't matter once you get the --
10  if you take 238 to Greenville, you might not come back on 237.
11  You could come back on another train.  You get what I'm saying?
12    Q   Yeah.
13    A   So it just -- when you go in there, you go to pool
14  service over there.  So I'm not sure, that particular day, if
15  our car was at Inman Yard or Austell.  I don't remember.
16    Q   Okay.  So you could have went off duty either at
17  Inman or Austell?
18    A   Correct.
19    Q   You would have begun your tour of duty -- it had to
20  be Austell, right, if it's pool service?
21    A   I'm not sure.  You said my --
22    Q   You would have had to go on duty originally at
23  Austell for the first leg of the trip?
24    A   Not necessarily, no.  That's what I'm saying.
25    Q   So it could have been a different train that

Page 92

1   terminated in Greenville and then you turn around and bring 238
2   back?
3     A   237 bank.
4     Q   All right.  All right.  On the night of November
5   27th, your tour of duty was in the evening, right?
6     A   Yes.
7     Q   So it was dark outside?
8     A   Yes.
9     Q   And I think I asked you earlier was it the 1177 and
10  you weren't really sure, but you do agree that the train was
11  equipped with the energy management system?
12    A   Yes.
13    Q   And it's fair to say that at no point on that night,
14  that tour of duty, did you report any problems with the
15  operation of the energy management system or the PTC?
16    A   No.
17    Q   No, you did not report any --
18    A   No, no.
19    Q   The territory between Inman Yard and Austell, there
20  are parts of it that are rated at 60 miles an hour for tracks
21  speed, right?
22    A   Yes.
23    Q   If you would allow the energy management system to
24  operate when you were prompted, what would have occurred in
25  terms of the speed of your train?

Page 93

1     A   I don't know exactly what energy management would
2   have did, but I assume it would have probably tried to run
3   track speed.
4     Q   The energy management system would typically prompt
5   the train to operate at track speed unless there were other
6   reasons, right?
7     A   Yes.
8     Q   So, for example, if a train is going downhill, the
9   energy management system may tell the locomotive not to apply
10  power, just use gravity, so as to conserve fuel, right?
11    A   It would do it itself.  It wouldn't tell the engineer
12  to do that.
13    Q   Right.  It wouldn't tell the engineer; it would do it
14  by itself?
15    A   Yes.
16    Q   And if the train is otherwise operating on level
17  ground, the energy management system would typically, by
18  itself, cause the train to operate at or about track speed,
19  right?
20    A   Yes.
21    Q   And that would include reducing the speed for any
22  curves, true?
23    A   Yes.
24    Q   The engineer's role with regard to the energy
25  management system is to monitor the system until it's time to

24 (Pages 90 - 93)

Page 94

1 stop the train, correct?

2   A   Yes.

3   Q   You would agree that during your tour of duty on
4 November 27th, 2020, the energy management system prompted
5 you multiple times to engage that system when you were
6 operating between Inman Yard and Austell, correct?

7   A   I don't remember that to be honest with you.  I don't
8 remember that.

9   Q   Let me make sure I ask this question correctly.  Is
10 it your testimony that you don't remember the train prompting
11 you to engage the energy management system on the night of 11
12 --

13   A   It could have, I just don't remember it.

14   Q   Okay.  Mr. Coston, you had a chance to review the
15 transcript of the investigation before today, right?

16   A   Yes, some of it.

17   Q   And I'm going to show you a segment of your testimony
18 in response to question by your union official who was Tommy
19 Goldstein.

20   A   Okay.

21   Q   And then on Questions 221, I'll represent he asked
22 you:  Do you engage -- did you engage a what you call it --
23 that was his term for it -- the energy management?  Your
24 response:  Energy management, did you do that?  No, I didn't
25 disengage it, I just didn't activate it.  And then skipping

Page 95

1 down to 224.  So it was instructing you to engage it?  Correct.
2 It was.  Did you see those props?  Yes, I did.

3       Do you remember testifying in that fashion during
4 your investigation?

5   A   Well, it says yes.  I don't remember exactly like
6 you're saying -- asking me how many times did it prompt me.  I
7 just said I don't remember.  I really don't.

8   Q   You would agree thought that the energy management
9 system did prompt you on several occasions to engage it?

10   A   Yes, it was saying that, yes.

11   Q   And you did not engage the system, correct?

12   A   Yes.

13   Q   And you did not engage the system because if you had,
14 it would have caused the train to operate at track speed,
15 correct.

16   A   Ask the question again.

17   Q   You did not engage the energy management system
18 because if you had engaged it, the system would have caused the
19 train to operate at or about track speed. correct?

20   A   Yes.

21   Q   You operated the train between Inman Yard and Austell
22 at approximately eight miles per hour, correct?

23   A   Not the whole time.

24   Q   You would agree that for approximately 19 minutes,
25 you operated it at eight miles per hour or less?

Page 96

1   A   Okay.  Yes, I will say that.  I try to stay between
2 ten to 15 miles an hour.

3   Q   But in fact, you operated below eight miles an hour
4 for almost 20 minutes, true?

5   A   I'm not sure the time, but that was me trying to stay
6 at ten miles an hour.

7   Q   So you were trying to operate at about ten miles an
8 hour a track that is rated for 60 miles an hour, correct?

9   A   That is correct.  I was trying to stay between ten
10 and 15 miles per hour.

11   Q   Now, on the date of the incident, you were held out
12 of service, correct?

13   A   Yes.

14       MR. SHUPING:  Bob, hang on a second.  I don't want to
15 interrupt you.

16 BY MR. HAWKINS:

17   Q   All right.  You are familiar with the arbitration
18 award that ordered your reinstatement without backpay?

19   A   Yes.

20   Q   I'm not going to bother to introduce that as an
21 exhibit since we all have copies of it.  Is it fair to say that
22 you were actually reinstated approximately 30 days after the
23 award was issued in February?

24   A   Yes.

25   Q   So you went back to work on or about March 17th of

Page 97

1 this year, right?

2   A   Yes.

3   Q   During the time when you were out of service and your
4 claim was pending before the public law board -- let me unpack
5 that.  You were familiar that when you protest discipline or
6 dismissal, that that goes through a grievance process under
7 your collective bargaining agreement, right?

8   A   Yes.

9   Q   And in that process, you are represented by SMART-TD?

10   A   Yes.

11   Q   You also familiar, having been through the process a
12 few times, that if the parties don't reach an agreement during
13 the grievance procedure, there is a public law board that
14 serves as an arbitrator, right?

15   A   Yes.

16   Q   And in this case, your claim or grievance went to the
17 public law board and the public law board issued the decision,
18 right?

19   A   Yes.

20   Q   And as a result of that decision, you had been
21 reinstated to service with Norfolk Southern?

22   A   Yes.

23   Q   And you have worked continuously and -- you have
24 worked continuously since being reinstated, correct?

25   A   Yes.

25 (Pages 94 - 97)

Page 98

1    Q   And when you're reinstated, you are reinstated to
2  your same position on the seniority roster, correct?
3    A   Yes.
4    Q   So in the verbiage of the arbitrations, you are
5  reinstated with seniority unimpaired?
6    A   Yes.
7    Q   So all the same ranking you did as a locomotive
8  engineer and a conductor when you -- you did when you were held
9  out of service?
10    A   Yes.
11    Q   You didn't move down on the seniority roster or
12  anything?
13    A   No.
14    Q   So the assignments that you are able to select today
15  are the same ones that you could've selected had you never been
16  held out of service?
17    A   Yes.
18    Q   During the period of time that you were out of
19  service, did you receive any financial benefits from SMART-TD?
20    A   Yes.
21    Q   What benefits were they?
22    A   That would be the discipline income.
23    Q   And how much did you receive and for how long?
24    A   I received it for a year and $200 a day.
25    Q   And the $200 a day, is that seven days a week or five

Page 99

1  days a week?
2    A   Seven days a week.
3    Q   So you received, from SMART-TD, $1400 a week during
4  the period of time that you were held out of service?
5    A   Yes.
6    Q   Did you receive any income from the railroad
7  retirement board while you were held out of service?
8    A   Yes, I did.
9    Q   What income did you receive from the RRB?
10    A   I think it's like 62 or $64 a day for five days a
11  week.
12    Q   Sixty --
13    A   I'm not sure if it's either 62 or $64 a day for five
14  days per week, somewhere in there.  I don't know the exact
15  amount.
16    Q   All right.  Let me go back to the benefits from
17  SMART-TD.  Your union has a benefit that if an employee is held
18  out of service for disciplinary reasons, the employee receives
19  pay from the union itself, right?
20    A   From the union itself?
21    Q   Yes.
22    A   No, I think it's like an insurance policy.
23    Q   It's an insurance policy that is --
24    A   Through the union?  Okay.  Well, in that case, yeah.
25    Q   In any event --

Page 100

1        MR. SHUPING:  I'll object to the foundation.
2        MR. HAWKINS:  Sorry?
3        MR. SHUPING:  I said I'll object to the foundation.
4  BY MR. HAWKINS:
5    Q   You received $1400 a week through the insurance
6  policy whether it was from SMART itself or as the insurance
7  policy arranged by SMART, correct?
8    A   Correct.
9    Q   And how long -- when did that start and when did it
10  stop?
11    A   I think it started a month after I was -- well, it
12  started probably two weeks after I received my letter saying I
13  was dismissed, and that would be probably February of 2 -- 2021
14  when I first got the first check.  But it's total for a year.
15  Now, which -- the pay would have actually started November
16  the 28th, I believe, of 2020.
17    Q   So when you first started receiving money from the
18  SMART-TD insurance, did that cover you back to the day after
19  you were held out of service?
20    A   Yes.
21    Q   So did you get a lump sum up front to cover the back
22  wages?
23    A   Yes, I did.
24    Q   When did that payment stop?
25    A   It would have stopped on year after that, which would

Page 101

1  have probably been November 27th of 2021.
2    Q   And then you went back to work two weeks later on
3  March 17th?
4    A   No, that would have been a few months in there.  I
5  went back --
6    Q   You're right, you're right.  Sorry.  So it stopped
7  one year after you were held out of service.  In other words,
8  it was one year of $200 a day?
9    A   Yes.
10    Q   Seven days a week?
11    A   Yes.
12    Q   Okay.  And then the RRB payments, when did they begin
13  and when did they stop?
14    A   I think they started probably -- I probably received
15  a check probably a month after that.
16    Q   After what?
17    A   After I was taken out of service.
18    Q   When did those payments stop, if they have?
19    A   They stopped -- gee, I don't know when.  It would
20  have been in November some time.
21    Q   November?
22    A   Yes, I think it -- I'm not sure.  No, I think they
23  continued.  I think they continued to -- don't quote me on
24  this.  I think they continued until February, I believe.
25    Q   All right.  Do you have records of the payments from

26 (Pages 98 - 101)

Page 102

1 SMART insurance and the RRB?
2   A   Yes, I do.
3   Q   Don't throw them away.
4   A   Okay.
5   Q   We'll be asking your lawyer for them.  How long did
6 you remain covered by the national medical program for the
7 union and the carriers?
8   A   Four months after I was taken out of service.
9   Q   Did you say four months?
10   A   Yeah, that's right, four months.
11   Q   Did you arrange for any substitute medical insurance
12 coverage?
13   A   We ended up applying for the Affordable Healthcare
14 Act.
15   Q   Did you enroll in that?
16   A   Yes.
17   Q   What premium did you pay for that?
18   A   I don't remember the exact amount.  I would have to
19 get with my wife.
20   Q   Did you apply for coverage under the Affordable Care
21 Act before your union coverage lapsed?
22   A   Yes, I did.
23   Q   So at all times you've had healthcare insurance?
24   A   Yes.  I'm not exactly -- I can't give you the exact
25 dates when it started.

Page 103

1   Q   The union plan cost you $228 per month to
2 participate, correct?
3   A   Yes.
4   Q   How much was the premium for the Affordable Care Act
5 insurance?
6   A   I don't know.  I'm not sure.
7   Q   During the period you were held out of service until
8 March of 2022, did you incur any medical expenses that were not
9 reimbursed that would have been reimbursed or paid for the
10 union plan?
11   A   No.
12   Q   In your present condition as a locomotive engineer,
13 you are fully able to work, are you not?
14   A   Yes.
15   Q   And you're working full-time?
16   A   Yes.
17   Q   You are able to perform safely the duties of a
18 conductor or an engineer as qualified?
19   A   Yes.
20   Q   Are you still qualified to protect your conductor so
21 you (indiscernible) at any time?
22   A   Yeah, they still call me, yes.
23   Q   And when you are -- are there times when you have
24 assignments as a conductor?
25   A   No.  When they call me, it's my -- it's an option.

Page 104

1 I'm not forced to be a conductor.
2   Q   So there are times when you're called as a conductor
3 but you decline the assignments?
4   A   Yes.
5   Q   Now, in looking at your answers to interrogatories, I
6 think I know the answer to a couple of these questions, but I
7 have to ask them anyway.  Have you seen any medical or other
8 healthcare professional, including mental health professionals,
9 since you were held out of service as a result of anything that
10 you attribute to your being held out of service?
11   A   No.
12   Q   You have not been diagnosed with depression or
13 anxiety or any other mental health disorder?
14   A   No.
15   Q   You haven't been prescribed any prescription
16 medicines for anxiety, depression, or any other emotional or
17 mental health disorder?
18   A   No.
19   Q   What, if any, other damages do you claim as a result
20 of being held out of service in connection with this incident?
21   A   I'm not sure exactly what you're asking.
22   Q   Let me -- I'll ask it in a different way.  I'm
23 looking for some documents here.  Mr. Coston, I'm going to show
24 you a document that is your complaint in the case that's still
25 pending in federal court, and I want to show you just a couple

Page 105

1 of paragraphs of the complaint.  In Paragraph 34 and 35, you
2 say that, on November 12 or 15th of 2020, but not both, you
3 were the engineer with an inbound train and ended your trip at
4 Austell, and Norfolk Southern provided you a pilot between
5 Inman Yard at Austell on the inbound trip.  The following
6 Paragraph 35 says on November 12 or 15th, 2020, but not both,
7 you were the engineer on an inbound train that was scheduled to
8 end your trip at Austell, but instead was told to end your work
9 in Inman.  Do you have any more information about which of
10 these days applied to Paragraph 34 or 35?
11   A   I'm not sure, like I said, which one I came in on and
12 went over there or which one I was what was taken -- I'm not --
13 I'm not 100 percent sure.
14   Q   Okay.  Let me direct your attention back to November
15 27th.  When you realized that you were not going to have a
16 pilot to go from Inman Yard to Austell, you decided to operate
17 the train, correct?
18   A   Yes.
19   Q   What other alternatives did you have that night?
20   A   I felt I didn't have an alternative other than
21 receive some type of discipline.
22   Q   If you had refused to operate the train, what would
23 you have done?
24   A   If I refused?
25   Q   Right.

27 (Pages 102 - 105)

Page 106

1    A   I'm pretty sure I would have been taken out of
2   service.
3    Q   How would you go about notifying the company that you
4   were refusing to operate the train because it was unsafe?
5    A   Probably just tell them.
6    Q   You would contact who?
7    A   I would notify the dispatcher.
8    Q   You wouldn't contact the train master?
9    A   No, no.  Most of the time, everything is done through
10   the dispatcher and the chief.  Train master's or the
11   supervisors really don't have much say so in something like
12   that, you know.
13    Q   If you had a train that had, say, a hot wheel or some
14   other imminent physical danger, what would you do if you
15   decided the train was to unsafe to operate?
16    A   Once again, go through the -- notify the dispatcher
17   and the dispatcher notifies the chief then they make a
18   decision.  And, you know, very seldom will you -- a train
19   master is involved or sometimes the chief will come over the
20   radio, but most of the time, you communicate through the
21   dispatcher.
22    Q   You are able to contact the train master on duty if
23   you choose to do so, correct?
24    A   Correct.
25    Q   So if you had refused to operate the train on

Page 107

1   November 27th and Norfolk Southern thought you did so without
2   good reason, you could face discipline, correct?
3    A   Yes.
4    Q   So it's fair to say that instead of facing possible
5   discipline, you chose to operate the train?
6    A   Yes.
7    Q   Other than the loss of wages, do you claim any other
8   noneconomic damages against Southern in this case?
9    A   Other than --
10    MR. SHUPING:  Let me -- I'll object to foundation and
11   that notably is going to invade the attorney-client
12   privilege.
13    MR. HAWKINS:  What are you claiming?  What are you
14   asking the court for?
15    MR. SHUPING:  For the damages?  In terms of
16   noneconomic?  For the -- well, for the noneconomic damages
17   allowed under the FRSA, which would include things like
18   embarrassment, humiliation, anger, distress.  If we're
19   sticking to noneconomic, there would be sort of the
20   equitable type things.
21    MR. HAWKINS:  All right.  You've testified enough,
22   Counselor.  I'll file my motion.
23   BY MR. HAWKINS:
24    Q   Mr. Coston, in your answers to interrogatories, you
25   identified some people that you think may have information

Page 108

1   relating to your claims.  Willie Walter is the conductor?
2    A   Yes.
3    Q   What information do you believe he has about your
4   claims?
5    A   Other than being on the train, nothing.  I think --
6   nothing, I mean --
7    Q   Mr. Rodney Moore, what information do you believe he
8   has?
9    A   Rodney Moore, the superintendent?
10    Q   He's listed in your interrogatory answers.
11    A   Rodney Moore?  Did I just said it?
12    Q   Did you --
13    A   Rodney Moore, the superintendent, I guess he probably
14   knows everything about the case.
15    Q   Okay.
16    A   He probably knows people I couldn't think of as far
17   as the dispatcher and the chiefs.
18    Q   Do you have any documents other than Norfolk Southern
19   rule books and NS publications that relate in any way to this
20   claim that you filed?
21    A   No.
22    Q   Journals, books, anything of that nature?
23    A   No.
24    MR. HAWKINS:  All right.  Those are my questions.
25    MR. SHUPING:  All right.  I don't have any questions.

Page 109

1    (Deposition concluded at 1:24 p.m.)
2   (Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure
3   and/or O.C.G.A. 9-11-30(e), signature of the witness has been
4   waived.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

28 (Pages 106 - 109)

Page 110

1  Job #: 5559351
2          REPORTER DISCLOSURES
3  The following representations and disclosures are made in
4  compliance with Georgia Law, more specifically:
5  • Article 10(B) of the Rules and Regulations of the Board of
6  Court Reporting (disclosure forms)
7  • OCGA 9-11-28(c) (disqualification of reporter for financial
8  interest)
9  • OCGA 15-14-37(a) and (b) (prohibitions against contracts
10  except on a case-by-case basis)
11  • I am a certified court reporter in the State of Georgia.
12  • I am a subcontractor for Veritext Legal Solutions.
13  • I have been assigned to make a complete and accurate record
14  of these proceedings.
15  • I have no relationship of interest in the matter on which I
16  am about to report, which would disqualify me from making a
17  verbatim record or maintaining my obligation of impartiality
18  in compliance with the Code of Professional Ethics.
19  • I have no direct contract with any party in this action and
20  my compensation is determined solely by the terms of my
21  subcontractor agreement.
22          FIRM DISCLOSURES
23  • Veritext Legal Solutions was contacted to provide reporting
24  services by the noticing or taking attorney in this matter.
25  • There is no agreement in place that is prohibited by OCGA

Page 111

1  15-14-37(a) and (b). Any case-specific discounts are
2  automatically applied to all parties, at such time as any party
3  receives a discount.
4  • Transcripts: The transcript of this proceeding as produced
5  will be a true, correct, and complete record of the colloquies,
6  questions and answers as submitted by the certified
7  court reporter.
8  • Exhibits: No changes will be made to the exhibits as
9  submitted by the reporter, attorneys or witnesses.
10  • Password-Protected Access: Transcripts and exhibits relating
11  to this proceeding will be uploaded to a password-protected
12  repository, to which all ordering parties will have
13  access.
14
15
16  Signature                    Date
             December 16, 2022
17
18
19
20
21
22
23
24
25

Page 112

1              CERTIFICATE
2
3  STATE OF GEORGIA:
4  COUNTY OF FULTON:
5      I hereby certify that the foregoing transcript was taken
6  down, as stated in the caption, and the colloquies, questions
7  and answers were reduced to typewriting under my direction;
8  that the  transcript is a true and correct record of the
9  evidence given upon said proceeding.
10      I further certify that I am not a relative or employee or
11  attorney of any party, nor am I financially interested in the
12  outcome of this action.
13      I have no relationship of interest in this matter which
14  would disqualify me from maintaining my obligation of
15  impartiality in compliance with the Code of Professional
16  Ethics.
17      I have no direct contract with any party in this action
18  and my compensation is based solely on the terms of my
19  subcontractor agreement.
20      Nothing in the arrangements made for this proceeding
21  impacts my absolute commitment to serve all parties as an
22  impartial officer of the court.
23
24              This the 16th day of December, 2022.
25

Veritext Legal Solutions
800-567-8658                                    973-410-4098

**[01304 - 6]**

### 0

**01304**   1:8
**0853**   49:15

### 1

**1**   4:5,18 13:13,20
**10**   2:13 4:13
   70:13,16 110:5
**100**   58:8 91:5
   105:13
**11**   4:14,18 69:18
   71:7,9 94:11
**11/27/2020**
   88:19
**11/5/2020**   68:25
**11/6/2020**   67:16
**1177**   77:15,15
   92:9
**12**   69:18,24
   75:22 105:2,6
**12/18/2005**
   13:22
**12th**   67:16
**13**   4:5
**1400**   99:3 100:5
**15**   14:7 50:17
   96:2,10
**15-14-37**   110:9
   111:1
**15th**   67:17 105:2
   105:6
**16**   111:16
**1650**   2:10
**16th**   112:24
**17th**   96:25 101:3
**18**   28:2
**18th**   28:21

**19**   95:24
**19103**   2:10
**1982**   14:16
**1:22**   1:8
**1:24**   109:1

### 2

**2**   4:17 14:19,19
   100:13
**20**   57:21,23 96:4
**200**   98:24,25
   101:8
**2000**   16:5,5,7
**2005**   13:23 17:1
**2006**   13:9 16:1
**2009**   15:23
**2012**   23:24 26:22
   26:23 29:2
   69:21,24
**2014**   27:1,23
   28:2 29:5
**2015**   29:7,10
   32:15
**2016**   47:14 48:19
   49:24,24
**2019**   9:6
**2020**   7:10 8:23
   9:17,25 12:3,6
   34:20 63:21
   64:11,15 65:13
   65:18 68:9
   69:18,25 70:8
   71:24 76:3,6
   78:15 83:21
   84:8 88:2,11
   94:4 100:16
   105:2,6

**2021**   13:1 100:13
   101:1
**2022**   1:16 4:10
   52:1,3 103:8
   111:16 112:24
**203**   90:13
**20th**   13:9
**211**   90:13
**213**   90:14
**215.665.2015**
   2:11
**221**   94:21
**224**   95:1
**228**   103:1
**22cv01304**   5:4
**237**   59:10,16,18
   59:21 60:6,18
   61:12,19 62:15
   63:18 66:5
   67:16,22,22
   70:22 76:7
   77:14 89:5 90:4
   90:5 91:10 92:3
**238**   59:10,14,18
   59:24 60:1,24
   61:7,12,19,22
   62:2,15 63:18
   66:6 67:16 81:6
   84:15 89:5 90:4
   91:10 92:1
**24**   4:6
**25**   4:7 24:5,11
**25556**   111:15
   112:23
**27**   12:2,6 28:20
   65:13,18 68:9
   70:8 71:24 76:3
   76:6 78:15 84:8

   87:3 88:2,11
**2740**   1:20 2:5
**27th**   7:10 82:18
   83:21 84:24
   85:8 87:2 92:5
   94:4 101:1
   105:15 107:1
**28**   1:16 4:8
**2800**   2:10
**28th**   100:16

### 3

**3**   4:6 24:14,18
**30**   24:8,10 36:23
   36:24 37:3,4,11
   37:12 45:21
   46:14 96:22
   109:2
**30339**   1:21 2:5
**30th**   13:1
**31st**   47:14
**34**   105:1,10
**35**   24:8,10 105:1
   105:6,10

### 4

**4**   4:7 25:2,5 27:6
   27:19 28:19
**404.892.1020**   2:6
**404.892.4900**   2:6
**48**   4:9

### 5

**5**   3:6 4:8 28:4,7
**52**   4:10
**5559351**   110:1

### 6

**6**   4:9 48:19,23

| | |
|---|---|
| **60** 92:20 96:8 | **accelerate** 35:14 |
| **62** 99:10,13 | **accept** 46:23 |
| **64** 99:10,13 | **accepted** 48:7 |
| **67** 4:11 | 52:14 |
| **69** 4:12 | **accepts** 52:18 |
| **6929** 14:4 | **access** 111:10,13 |
| **697** 47:6,7 | **accesses** 27:15 |

**60** 92:20 96:8
**62** 99:10,13
**64** 99:10,13
**67** 4:11
**69** 4:12
**6929** 14:4
**697** 47:6,7

**7**

**7** 4:10 52:2,4
**70** 4:13
**700** 47:7
**71** 4:15
**7199** 1:24

**8**

**8** 4:11 67:4,5,8
68:21
**800** 84:5

**9**

**9** 4:12 69:10,10
69:12 70:1
**9-11-28** 110:7
**9-11-30** 109:3
**90** 16:2 17:19
**99** 16:3
**9:40** 1:17

**a**

**a.m.** 1:17
**ability** 58:2
**able** 6:14 19:2
41:17 45:9
83:12 84:3
98:14 103:13,17
106:22
**absolute** 112:21
**academic** 14:13

**accelerate** 35:14
**accept** 46:23
**accepted** 48:7
52:14
**accepts** 52:18
**access** 111:10,13
**accesses** 27:15
**accident** 82:25
**accurate** 56:8
110:13
**accurately** 14:10
71:19
**accustomed**
67:12 68:22
69:11 70:2,15
**acknowledge**
12:23
**acronym** 53:6
**act** 84:10 102:14
102:21 103:4
**action** 1:7 5:3
110:19 112:12
112:17
**activate** 94:25
**activities** 9:16,19
9:20,21,24
**activity** 11:14
**actual** 49:16
**adams** 1:20 2:5
**add** 60:11,13
**additional** 31:23
62:16 73:24
**address** 13:6,25
14:1
**adjusted** 48:22
**admitted** 24:7
**advance** 36:21
55:21,24 56:21

56:22
**advised** 25:3
**advises** 28:4
**affect** 23:12
39:13,15 40:25
58:1 62:19
**affordable**
102:13,20 103:4
**agent** 16:11,12
**agree** 58:23,25
65:11 66:3 68:5
68:8 71:11,15,22
73:16 92:10
94:3 95:8,24
**agreement** 27:14
29:19 52:23
97:7,12 110:21
110:25 112:19
**ahead** 80:12
**air** 15:12 16:6,7
16:10,23 38:11
38:13,16 39:5
41:18,21 51:20
52:7,7
**aircraft** 16:15
**airline** 8:16
**alabama** 15:3,7
**alexander** 70:19
**allow** 92:23
**allowed** 107:17
**alternative**
105:20
**alternatives**
105:19
**amount** 99:15
102:18
**anger** 107:18

**announcing**
24:24
**annoying** 10:9
10:11,11,12,13
**answer** 6:1,3,15
9:17 10:19 29:8
38:24 64:25
104:6
**answers** 6:1
104:5 107:24
108:10 111:6
112:7
**anthony** 29:6
**anxiety** 104:13
104:16
**anybody** 23:16
**anyway** 40:15
79:16 81:24
104:7
**apart** 9:12
**apologies** 67:10
**appear** 36:19
**appearances** 2:1
**appears** 36:13
36:15
**application** 7:6
12:16 13:17
15:23
**applied** 14:1
16:17 17:1,4
21:18 35:16
52:7 71:22
105:10 111:2
**apply** 13:23
37:14 38:16
78:2 93:9
102:20

**applying**   35:13
37:24 38:4 39:4
51:6 102:13
**approach**   35:19
36:4,7,8,13,22
36:24 37:2 41:7
41:11 44:15,17
44:20 45:19
46:1,5
**approaches**
45:19 46:20
**approaching**
35:5 47:22
53:17 54:10,16
79:13
**approximately**
15:23 26:23
43:21 95:22,24
96:22
**arbitration**
96:17
**arbitrations**
98:4
**arbitrator**   97:14
**area**   54:10 60:6
60:16,17 61:6
77:2
**areas**   42:8,11
**arrange**   102:11
**arranged**   100:7
**arrangements**
112:20
**article**   2:13
110:5
**ashley**   1:24
**asked**   41:4 64:17
84:14 92:9
94:21

**asking**   5:9,20
95:6 102:5
104:21 107:14
**aspect**   66:24
**assess**   86:12
**assessed**   28:5,10
28:13
**assigned**   76:6
110:13
**assignment**
18:23 19:3,4,6
19:18 33:5,8
34:1,7 76:9,18
76:22 77:11,12
**assignments**
18:22 19:7
32:15 33:24
34:12 59:10
63:15 98:14
103:24 104:3
**assisting**   73:13
**assume**   7:13,22
77:23 87:4 93:2
**assuming**   81:23
82:15 90:2
**atlanta**   1:3,21
2:5 5:5 12:8
15:4,6 18:7,8,17
18:18,19,20,21
19:11,18 20:16
21:4,12,20 30:20
31:2,25 32:2,2
33:11,12,16,19
34:2,23 59:14,15
59:17,20,24
60:19,22,25 61:6
72:9,11,21 73:22
74:23 75:5 76:4

76:17,17,19 81:4
81:7
**attached**   60:3
**attendance**
12:10
**attended**   14:9
25:16
**attention**   23:23
24:13 26:25
28:1 29:7 47:6
48:18,19 52:1
69:9 71:1 76:5
105:14
**attorney**   107:11
110:24 112:11
**attorneys**   111:9
**attribute**   104:10
**august**   48:19
49:24
**austell**   12:8,8
42:22 43:5
61:12,19,23 62:8
62:12,15,16,19
62:22,24,25 63:5
63:10,12,25
64:10,18 65:4,9
65:12,19 66:6,13
66:17 67:22
68:3,5,9,12 69:7
71:25 72:7,9,11
72:21 73:22
74:1,23 75:6,16
75:22 76:4,20
77:22 79:16
81:4,6 82:21
87:14 88:1,22
89:7 90:24 91:3
91:4,15,17,20,23

92:19 94:6
95:21 105:4,5,8
105:16
**auto**   54:25 71:18
**automated**   43:9
75:19 77:17
**automatically**
35:14 37:24
111:2
**available**   34:17
83:1,19
**avenue**   14:1
**award**   96:18,23
**aware**   5:22
54:21

## b

**b**   2:13 110:5,9
111:1
**back**   12:9 20:14
20:25 21:1
23:20 25:14
33:13 39:12
40:12 44:24
50:24 54:8,8
55:16 56:15
62:10 70:25
81:5,8,21 91:10
91:11 92:2
96:25 99:16
100:18,21 101:2
101:5 105:14
**background**
12:13
**backpay**   96:18
**backwards**
14:18

**bail** 52:7
**bailey** 81:8,9,14
  81:17 82:8 84:9
  84:13,15,17,22
  84:25 85:4,5,6,8
  85:15 86:5,8
**bailey's** 81:17,18
  82:5
**bank** 92:3
**bargaining**
  27:14 29:19
  52:23 97:7
**based** 14:13
  33:20 112:18
**basically** 8:19
  12:7 24:4 47:15
  52:8 55:7 75:15
  81:14 87:19
**basis** 19:8 26:14
  34:5 72:20
  73:18 110:10
**bates** 47:7 49:15
**becoming** 9:1
  10:9,10,12
**began** 20:18
**begins** 27:20
**begun** 91:19
**behalf** 2:3,8
**belief** 59:1
**believe** 9:6 18:8
  30:22 63:14,22
  68:11 100:16
  101:24 108:3,7
**benefit** 99:17
**benefits** 9:7,13
  98:19,21 99:16
**bert** 1:20 2:5

**best** 88:19
**better** 15:2 27:3
**big** 46:18
**birth** 13:11
**bit** 31:18 53:9
**black** 72:12,16
**blet** 17:24
**blockage** 79:13
**board** 2:14 19:1
  32:16,25 33:5,14
  76:14 97:4,13,17
  97:17 99:7
  110:5
**boarded** 90:6
**boards** 18:23
**bob** 96:14
**books** 108:19,22
**bother** 96:20
**bottom** 14:18
  68:21 70:1
**brake** 27:2,2,8
  27:24 28:11
  29:5
**brakes** 28:5
  38:11,13,15,16
  39:5,5 41:18,20
  41:21 49:2
  50:23 51:20,22
  52:7 78:2
**braking** 35:16
  37:14 39:4
**break** 6:8,10,12
  23:16,18 37:21
  41:19 52:25
  53:3 61:15
  65:16 66:3
  83:12 88:25
  89:2

**breaks** 49:8 50:6
**bridges** 42:6
**bring** 25:14
  41:10 92:1
**bringing** 55:11
**brotherhood**
  17:22
**brought** 5:3,10
**built** 55:1
**bulletins** 22:13
**button** 67:3

### c

**c** 110:7
**c102** 49:2
**cab** 36:19
**calculate** 71:19
**calculations**
  26:21
**call** 11:10,15
  28:15 32:16,17
  32:18,20,22,23
  56:14,16,19
  58:13,15 76:10
  81:16 83:1,5
  90:23 94:22
  103:22,25
**called** 11:18,19
  11:21 17:18,21
  27:4 36:4 81:8
  85:12 89:21
  104:2
**caller** 76:12
  77:10
**calls** 57:24,25
  58:13
**caps** 25:25,25

**caption** 112:6
**car** 47:15,16
  48:22 49:1,3,3,5
  49:8 50:6,8,25
  51:2 91:15
**care** 102:20
  103:4
**career** 12:15
**carlos** 11:25
**carolina** 18:17
  18:19 19:11
  30:20 59:16,22
  59:23 76:11
  77:7
**carriers** 102:7
**carry** 20:3,5
**cars** 19:13,19,23
  19:25 20:2,9,14
  50:10,13,17,18
  50:18,19,20,23
  51:1,7,9,14,18
  51:19,22,23 60:3
  60:12,13,14 61:5
  62:2,10,16 64:14
**case** 14:21 58:19
  64:22 97:16
  99:24 104:24
  107:8 108:14
  110:10,10 111:1
**cause** 22:15 63:9
  93:18
**caused** 95:14,18
**ccr** 1:24
**cease** 35:13
**certain** 10:3 21:8
  30:15 47:2
  50:10

**certificate** 112:1
**certified** 110:11
  111:6
**certify** 112:5,10
**chamblee** 32:3
  33:17
**chance** 94:14
**change** 44:11
  56:9 61:10,11,18
  61:24 62:4,14,18
  62:23 63:2,5,15
**changed** 9:24
  10:1 22:12
**changes** 111:8
**characteristics**
  23:5,13 34:24,25
  37:17,22 38:1
  66:2,9 73:9,14
  73:21,25 87:13
  88:9,13,17,21
**charges** 27:16
**charlene** 42:5
**charleston** 59:22
  60:1,6,7,19
**charlotte** 18:5
  30:17,18 31:1,21
  33:15,22 42:3,3
  42:5,8,11,14
  50:1 59:23
**check** 100:14
  101:15
**chief** 58:20 59:4
  82:12,16 83:10
  90:21,23,23
  106:10,17,19
**chiefs** 83:5
  108:17

**chlorine** 20:7,8
**choice** 39:15
**choose** 106:23
**chose** 107:5
**circle** 80:13
**circumstances**
  57:1
**circumvents**
  80:4
**cities** 33:21
**city** 47:20
**civil** 1:7 5:3
  109:2
**claim** 97:4,16
  104:19 107:7
  108:20
**claiming** 107:13
**claims** 5:3,9,21
  108:1,4
**class** 79:23 80:10
**classes** 30:8
**classification**
  62:7
**classifications**
  80:15
**classified** 19:22
  20:10 61:5 62:3
  64:15
**clear** 12:20
  31:19 33:3
  44:16,21 46:19
**clearances** 35:1
**clearly** 31:18
**clevenger** 48:15
**client** 107:11
**clients** 15:15
**close** 35:1

**code** 110:18
  112:15
**collective** 27:14
  29:19 52:23
  97:7
**colloquies** 111:5
  112:6
**columbia** 18:19
**combination**
  32:9 60:4,5
**come** 21:1 25:7
  25:10 29:7
  35:12 37:14,20
  48:20 56:14
  59:16 80:15
  91:10,11 106:19
**comes** 45:25
  64:3 82:3
**comfortable**
  43:24 74:10
  75:13
**coming** 39:1
  56:11 66:12,14
  67:23 68:3
  79:15 81:6,23
  84:15 89:17
**comment** 73:18
**commerce** 30:22
  33:12,18 49:25
**commitment**
  112:21
**commodities**
  19:12 63:17
**communicate**
  106:20
**communication**
  59:3

**company** 1:8 5:2
  8:16 26:9,13,18
  27:15 29:20
  106:3
**compelled** 29:17
  29:18
**compensation**
  110:20 112:18
**complaint**
  104:24 105:1
**complete** 68:12
  110:13 111:5
**completion**
  71:21
**compliance**
  110:4,18 112:15
**complications**
  21:5
**comply** 54:11
**concern** 63:4
  85:23 86:9,11
**concerned** 78:5
**concluded** 109:1
**condenser** 23:1
  23:5
**condition** 103:12
**conditions** 58:13
  65:3 71:18
**conductor** 17:4
  17:7,8,11,12,15
  18:3,22,24 19:17
  20:3 22:4,7,20
  22:23 23:11
  32:10 48:3,16
  49:1,18 69:3,14
  70:5,18 87:1,9
  88:16,20 90:17
  98:8 103:18,20

103:24 104:1,2
108:1
**conductors**
29:20
**configuration**
79:22
**connected** 19:25
49:5
**connecting**
19:23
**connection**
23:25 27:8
28:11 48:7,20
49:15 63:15
104:20
**connector** 18:16
**consequences**
78:6
**conserve** 93:10
**considered**
33:22
**contact** 82:10,13
82:15,17 83:13
83:15 84:3
106:6,8,22
**contacted**
110:23
**contacting** 82:16
**content** 20:9
**continuation**
59:18 61:2
**continued**
101:23,23,24
**continues** 44:20
45:20
**continuously**
97:23,24

**contract** 16:12
110:19 112:17
**contracts** 110:9
**contractual** 34:8
**contrast** 86:15
**control** 21:18
44:10 53:6
71:18 74:18
75:2 77:21
**controls** 44:7,9
79:19
**conversation**
77:10 80:17
81:1 84:8 86:7
**conversations**
26:17 85:2,4
**cook** 25:20 26:4
26:5
**copies** 96:21
**cordel** 11:25
**correct** 7:10
8:15 13:7 15:16
15:16 16:16
17:2 19:19
21:22,25 23:7
25:17 26:21,23
27:11 28:15
29:10 31:11
35:20 36:1,14
37:6,8 40:24
41:5 44:8,22,23
45:13 49:16
51:8 54:13,16,22
55:5 61:3,8,13
61:19 62:14
65:13,20 66:25
67:3 68:9,10
70:8,11 71:8

73:10,15 74:20
75:2,6,8,8,9 76:3
76:5,7 77:22
78:17 80:16
86:18 88:6,9,10
88:17,22 91:18
94:1,6 95:1,11
95:15,19,22 96:8
96:9,12 97:24
98:2 100:7,8
103:2 105:17
106:23,24 107:2
111:5 112:8
**correction** 31:1
**correctly** 12:17
13:11 23:9 37:1
49:4 50:9 52:14
94:9
**cost** 103:1
**coston** 1:5,13 3:3
5:3,8,14,16,19
5:20 7:16 9:16
12:1,12 23:24
28:25 53:5 59:9
67:2 71:3 89:4
94:14 104:23
107:24
**could've** 98:15
**counsel** 2:1,15
4:18
**counselor**
107:22
**county** 112:4
**couple** 7:1 10:6
12:15 61:15
90:12 104:6,25
**coupled** 20:11
50:14,18

**course** 14:12
30:23 52:21
**court** 1:1 2:14,15
5:4,13,24 6:2
23:9,20 25:24
28:18 87:9
104:25 107:14
110:6,11 111:7
112:22
**cover** 100:18,21
**coverage** 102:12
102:20,21
**covered** 54:10
54:14 102:6
**coverture** 55:19
**coworkers** 10:6
10:8,15,16 11:7
**cozen** 2:9
**cozen.com** 2:11
**crew** 32:22,23
58:14 60:12,13
62:19 63:4,9
68:21 76:10,12
77:10 89:14,16
89:23 90:15,16
**crewed** 59:22,24
**crewing** 89:13
89:15,16
**crews** 59:23
62:23 63:1,12,14
67:25
**cross** 3:5 5:6
56:12,18 79:4,15
82:4
**crossing** 79:10
79:11
**crossover** 45:7
45:10 56:10,17

56:19
**cs5559351** 1:25
**csr** 4:5 12:15
  13:6
**csx** 79:5,6,10,11
  79:13,13
**current** 7:20 8:5
  8:10
**currently** 7:22
  21:17
**curve** 35:5,19
  40:8,9 45:10
  53:14 54:4,4,6
  54:16,17
**curves** 21:11,21
  34:21,23 35:3
  36:1 41:5 42:6
  55:22 93:22
**customer** 50:11
  51:9
**customers** 60:15
  60:17
**cut** 6:22 10:3,5,7
  10:15 11:1 12:9
  16:20 36:10
  48:22 49:3
  55:25 56:2
**cuts** 29:13
**cv** 1:8
**cvr** 1:24

---

**d**

---

**d** 71:16
**damaged** 51:22
**damages** 104:19
  107:8,15,16
**danger** 106:14

**danny** 90:17
**dark** 40:4 92:7
**dash** 25:25
**date** 13:9,11,22
  96:11 111:16
**dated** 13:1 28:2
**dates** 67:20
  102:25
**day** 11:10 32:7
  43:6 49:16 68:4
  91:14 98:24,25
  99:10,13 100:18
  101:8 112:24
**daylight** 39:24
  40:3
**days** 17:19 24:23
  48:11 49:20
  96:22 98:25
  99:1,2,10,14
  101:10 105:10
**deal** 84:17,22
  85:7
**dealing** 9:21
**dealt** 8:14 84:24
**december**
  111:16 112:24
**decide** 44:14
  57:9,12,15 58:11
**decided** 61:11,17
  105:16 106:15
**decides** 45:11
  57:7 58:4
**deciding** 41:20
**decision** 97:17
  97:20 106:18
**decline** 104:3
**deep** 27:13

**defect** 22:17
**defendant** 1:9
  2:8 4:4
**defendant's** 4:17
  4:18 13:20
  24:18 25:5 28:7
  48:23 52:4 67:8
  69:12 70:16
  71:9
**deferred** 48:10
**define** 57:18
**definition** 66:18
**degree** 10:3
**delivery** 51:15
**delta** 8:13,18 9:1
  15:12 16:6,7,10
**department** 15:1
**depend** 40:10
**depending** 35:6
  37:22 38:1 40:9
  53:15 54:17
  57:10 66:9
  83:10
**depends** 35:6
  37:13,17 38:17
  38:21,22,23
  41:13 57:3
  60:14
**deposited** 51:14
**deposition** 1:12
  6:18 10:20
  13:13 14:19
  109:1
**depression**
  104:12,16
**derail** 47:16,25
  48:6 49:3,12
  50:25 51:3

**derailed** 47:15
  47:16
**derailment**
  49:24 51:23
  82:25 84:6
**descending**
  35:23
**describe** 17:6
  18:15 21:3 24:2
  30:1 31:18,23
  34:19 37:10
  42:4,17 55:4,17
  56:1 72:10
  79:22
**described** 39:13
  53:9
**describing** 80:8
**description** 4:3
**desire** 12:11
**details** 27:13
**determined**
  110:20
**devices** 74:15
**diagnosed**
  104:12
**difference** 39:18
  39:25 40:16,19
  40:21 42:17
  46:16
**differences**
  46:18
**different** 18:9
  21:21 22:24
  23:13 30:6 33:5
  34:23 35:7
  37:19 38:20
  46:20,21 47:5
  57:7 66:1,2,2,8

90:6,8,8 91:25
104:22
**direct**  23:23
26:25 28:1 29:7
48:18 69:9 76:5
105:14 110:19
112:17
**directing**  24:13
47:6 48:4,19
52:1 71:1
**direction**  20:25
21:2 34:17 43:7
60:24 65:15,22
66:5,9,18 68:6
112:7
**directions**  42:21
60:4 65:25 66:2
**disadvantages**
29:12
**disagree**  67:19
**disagreement**
63:4
**disciplinary**
78:5 86:17
99:18
**discipline**  27:15
27:20 28:9,13,16
28:16 47:9
52:18 78:9
86:12,13 97:5
98:22 105:21
107:2,5
**disciplined**  27:1
48:20 49:18
**disclosure**  2:14
110:6
**disclosures**
110:2,3,22

**discount**  111:3
**discounts**  111:1
**discretion**  58:11
**discussion**  89:5
89:11
**disembarked**
68:15
**disengage**  55:12
94:25
**disengages**
55:11
**dismissal**  4:7
25:4,15,16 97:6
**dismissed**  11:16
11:18,19 23:24
100:13
**disorder**  104:13
104:17
**dispatcher**  58:19
58:20,23 59:1,3
59:4 79:1,19
80:18,20,22 81:1
81:12 82:2,5,11
82:11,14,15,18
82:20 83:17
84:9,12,16 86:8
90:21,22 106:7
106:10,16,17,21
108:17
**dispatcher's**
59:6 83:11
**dispatchers**  59:6
83:2
**disqualification**
110:7
**disqualify**
110:16 112:14

**distance**  53:13
57:24
**distress**  107:18
**district**  1:1,2 5:4
5:5 18:12,13,21
30:17,18
**division**  1:3 5:5
72:5
**divisions**  18:4
30:25
**document**  12:14
13:3,15,17,19
24:12,13 28:2,19
47:5,6 49:14
52:1,2,14,17
67:3,12,15 68:22
68:25 69:9,17
70:2,14,21 71:2
71:8 104:24
**documents**  6:17
6:20,25 7:1
12:23 104:23
108:18
**doing**  29:12
41:14 50:4,5
52:11 58:6
**double**  40:23
42:6,9,18,20,23
42:24,25 43:1
56:14,17,18
64:19,20
**doug**  11:23
**downgrades**
34:21
**downhill**  21:22
37:19 38:6 45:8
45:9 66:13,18
93:8

**drive**  63:12
**driven**  91:3
**driving**  55:14
**drop**  36:23
**duly**  5:17
**duties**  19:17
103:17
**duty**  20:24 62:24
63:10 69:20
77:4,5 83:22
90:25 91:2,4,16
91:19,22 92:5,14
94:3 106:22
**dynamic**  38:10
38:13,15 41:19

**e**

**e**  2:7,11 109:2,3
**earlier**  14:6 41:4
44:24 53:9
55:25 64:17
73:20 89:4,20
92:9
**east**  18:10,20,21
31:3 32:1,3
33:19
**educational**
12:13
**eight**  43:21,25
44:2 95:22,25
96:3
**eighty**  14:16
**either**  7:12 32:10
35:19 39:5 56:9
68:16 73:19
91:16 99:13
**eliminated**  63:15

eliminating   39:1
ellis   1:24
embarrassment
   107:18
emergencies
   82:24
emergency   39:9
   83:13 84:3,6
emotional
   104:16
employed   8:8,25
   9:1
employee   4:11
   52:18 67:6,13
   68:23 69:11
   70:3,15 85:25
   99:17,18 112:10
employees   12:1
   19:7 31:13 32:5
   34:11 59:6
employment
   9:12 12:16,24
   13:17,23 14:2
   16:17 17:20
   32:9 52:21
empties   60:4
ended   102:13
   105:3
energy   43:9,15
   44:6,12,19,25
   45:4,11,18,25
   46:3,6,8,9,17,22
   47:1 53:9 54:22
   54:25 55:6,10,12
   66:22 71:17,19
   71:20 74:12,19
   74:23 75:4,19,23
   76:3 77:18

92:11,15,23 93:1
   93:4,9,17,24
   94:4,11,23,24
   95:8,17
enforced   78:11
enforcing   78:3,6
engage   44:4,5
   46:20,23 47:2
   74:11 76:2 94:5
   94:11,22,22 95:1
   95:9,11,13,17
engaged   44:3,25
   45:4,25 46:22
   95:18
engages   43:20
engine   29:16,20
   38:15 78:3,6
engine's   39:5
engineer   24:5
   25:14 26:14
   29:8,10,15,24
   30:2,3,7,12,15
   30:24 31:8,10,21
   31:24 32:10,14
   33:1,6,25 34:20
   35:4,11,22 36:3
   36:14,16 37:11
   38:14 39:8,13
   40:6,7,14,17
   41:21,24,25 42:1
   42:16 44:13,21
   45:3,11,12,15,24
   46:23 47:1,10
   50:5 53:12,24
   54:3,5,11,14,15
   54:24 55:4,18
   57:1,9,11,13,14
   57:19 58:4,5,10

58:14,16 66:23
   71:12 75:1 76:6
   77:24 78:11
   86:3,16 88:7,15
   90:17 93:11,13
   98:8 103:12,18
   105:3,7
engineer's   38:25
   39:15 93:24
engineers   17:22
   29:20 32:25
   33:4 34:2 71:16
   71:20 78:5
engines   20:15
   41:20 50:18
   52:8
enroll   102:15
ensure   22:4 45:5
   48:22
entire   23:4 37:3
   62:7 77:21
equipment   4:14
   71:4,12
equipped   77:17
   92:11
equitable   107:20
eric   11:22
esquire   2:4,9
estimate   75:10
ethics   110:18
   112:16
evening   9:22
   77:6 92:5
event   84:3,5
   99:25
evidence   112:9
exact   8:11 26:15
   32:21 51:23

64:12 74:9
   99:14 102:18,24
exactly   15:8 24:6
   31:4 33:10
   51:21 68:2
   87:22,23 90:1
   91:9 93:1 95:5
   102:24 104:21
examination   3:5
   5:6
examinations
   3:1
example   69:10
   93:8
exceed   22:5
excess   37:4,12
excuse   28:20
exercise   32:12
   34:8
exhibit   4:3,5,6,7
   4:8,9,10,11,12
   4:13,14,17 13:13
   13:20 14:19
   24:14,18 25:2,5
   27:6,19 28:3,3,4
   28:7,19,21 48:19
   48:23 52:2,4
   67:4,5,8 68:21
   69:10,10,12 70:1
   70:13,16 71:6,7
   71:7,9 96:21
exhibits   4:1,18
   28:22 111:8,8,10
exist   65:3
expected   22:21
expenses   103:8
experience   60:11

**explain** 36:6 38:12 40:2 41:10 43:15 44:11 52:6 57:14 59:13 66:11 67:21 78:8 83:7 85:24
**explained** 81:10 81:17
**extra** 18:23 19:1 32:16,25 33:4,13 76:14

**f**

**face** 107:2
**facing** 107:4
**fact** 41:11 59:5 77:20 96:3
**factors** 39:13 58:1
**failed** 49:1 52:7
**failing** 27:1
**fails** 77:24
**failure** 48:21
**fair** 53:7,24 92:13 96:21 107:4
**familiar** 36:3 43:9 56:23 59:5 59:9 61:10 64:5 64:9,14 65:7 71:3 73:9 77:20 90:19 96:17 97:5,11
**family** 10:8 11:5
**far** 24:9 31:4 33:16 36:21 40:3 46:19 49:20 58:8 83:3 89:9 108:16
**fashion** 95:3
**fast** 45:12 51:25
**faster** 36:23 40:5
**fax** 2:6
**features** 21:24
**february** 96:23 100:13 101:24
**federal** 104:25 109:2
**feel** 47:12,13
**felt** 105:20
**field** 15:18
**fifteen** 7:21
**file** 1:8 107:22
**filed** 108:20
**finally** 81:8
**financial** 98:19 110:7
**financially** 112:11
**find** 13:15 22:7
**fine** 23:17
**firm** 110:22
**first** 5:17 11:15 13:16 14:1,24,25 15:10 19:7,7 30:12 32:14 34:4,4 53:10 54:7,7,12 91:23 100:14,14,17
**five** 7:25 8:1,2 23:16 52:25 53:25 57:23 66:24 88:25 98:25 99:10,13
**flat** 20:20
**flow** 78:6
**foggy** 57:16
**folks** 10:7 31:16
**follow** 7:3 46:13
**following** 28:2 41:11 55:8 67:15 105:5 110:3
**follows** 5:18 45:5
**forced** 104:1
**foregoing** 112:5
**foreman** 72:5,8 72:10,20 73:5,23 74:3,11,14,20,22 75:11,17,17 81:8 85:2 86:2
**foremost** 68:16 89:21,22,24
**forever** 81:21
**forget** 71:1
**forgot** 24:5,7,7
**form** 7:3
**formal** 4:6 15:17 15:19 24:16,24 25:16,19 52:18
**format** 13:18
**forms** 110:6
**forward** 51:25
**foundation** 100:1,3 107:10
**four** 17:10 19:2 30:4 102:8,9,10
**frankel** 11:25 69:4,6
**free** 47:12 79:20
**freely** 49:9,11
**freight** 19:14,16 63:23,25 64:8
**front** 100:21
**frsa** 107:17
**fuel** 19:13 71:19 93:10
**full** 5:12 74:6,18 75:2 103:15
**fully** 103:13
**fulton** 112:4
**function** 45:3 55:4
**further** 65:2 112:10

**g**

**gainesville** 18:12 18:13,21 30:21 33:17,21 52:10
**gee** 101:19
**general** 14:14 85:24 86:10
**generally** 32:22
**geographic** 30:19 42:4
**geographically** 18:15
**georgia** 1:2,21 2:5,14 5:5 7:17 9:4,5,8 15:9,11 15:12,14 17:9 30:4,22,22,22 31:3 32:1,3,4 33:12 42:22 47:18,19,20,22 49:25 52:10 61:12,19 65:4,9 65:13,19 66:6

69:7 76:20
87:14 88:1,22
110:4,11 112:3
**gestures** 6:3
**gholston** 25:20
25:21 26:2,5
**give** 27:15 32:17
32:20 37:16
51:21,23 53:11
54:7,8 55:16,21
55:22,23 56:20
58:21 63:7 65:5
82:4,5 90:12
102:24
**given** 28:14
112:9
**gives** 53:13,14
53:14 54:3
55:19
**giving** 36:8,11
**global** 8:13,14
8:18 9:1
**go** 9:22 14:18,21
18:18 27:16
31:2 38:10
39:12 40:12
42:19 44:24
54:8 59:15
60:24 67:10,22
70:25 77:4,5
79:4,16 80:12,14
81:11 83:16
91:4,13,13,22
99:16 105:16
106:3,16
**goes** 40:8 97:6
**going** 10:4 11:23
12:8,12,14,19

14:19 16:5
18:21 21:22
23:15,23 24:12
24:19 34:17
37:4,18,20 38:3
38:6 40:15
42:21 45:12
47:8 48:18
50:19,20 51:25
52:18 53:1
56:10,12,15,16
56:18 57:5
59:15 60:14
66:5 67:2 68:6
68:20 71:2 72:6
72:7 73:13,22
79:17,23 81:22
82:1,1 86:1
89:13,17 93:8
94:17 96:20
104:23 105:15
107:11
**goldstein** 94:19
**good** 5:8 28:22
32:9 107:2
**goodman** 48:17
**goodwin** 68:17
**gossip** 10:14
11:7,9,13
**governed** 71:12
**grade** 53:16
55:19,22,22
**grades** 21:22
35:23
**graduated** 14:15
**graduating**
14:17

**gravity** 93:10
**greenville** 19:11
19:19 20:17
21:4,12,21 30:20
30:23 33:11
34:3,23 59:14,14
59:15,16,19,23
59:25 60:9,12,14
60:16,17,19,22
61:7 62:3 68:3,6
72:7 76:10,17,17
76:19,24 77:7
78:16 91:10
92:1
**grievance** 97:6
97:13,16
**ground** 5:24
93:17
**groundwork**
20:2
**group** 2:4 19:6
34:2
**guess** 24:8 28:16
32:8 62:21
66:12 108:13
**guessing** 56:3
**guy** 72:5,12,16
80:24
**guys** 31:5
**gym** 9:22 10:4
12:9

**h**

**half** 19:2
**halt** 55:11
**hand** 27:2 49:2,8
50:6,23

**handling** 4:15
71:4,12
**handwritten**
13:25
**hang** 24:23
96:14
**happen** 33:8
**happened** 7:10
33:10 47:13
48:5,25 62:4
**happens** 38:24
44:2 77:25
**happy** 6:7,9,11
**harbor** 14:23
15:10,10
**haul** 64:7
**hawkins** 2:9 3:6
5:1,2,7,8 23:15
23:19 25:24
26:1 28:18,24
52:25 53:4 56:5
88:25 89:3
96:16 100:2,4
107:13,21,23
108:24
**hazardous** 20:3
20:6 64:2,3,5,7,9
**hazards** 21:5,8
65:3,8
**he'll** 82:3,3
**head** 6:3 53:19
60:1 87:5,8
**heads** 61:7
**health** 9:7,13
15:3,17 104:8,13
104:17
**healthcare**
102:13,23 104:8

hear 6:2,6,14
10:10
heard 85:4
hearing 85:2
heavier 38:21
heavy 40:22,25
79:14,16
height 40:18,20
held 8:20,22
14:20 33:24
87:4 96:11 98:8
98:16 99:4,7,17
100:19 101:7
103:7 104:9,10
104:20
help 87:8
hiding 66:15,22
high 14:9,10,24
14:25 31:4,12,15
32:5
higher 89:20
hill 35:5,20
66:17
hills 21:8,11,21
34:21,23 35:2
42:6
hire 13:9
hired 16:9 17:4
history 4:11
12:13 67:6
hit 67:2
hits 60:9
hold 19:3
home 13:6 18:6
20:23 76:24
honest 25:11
43:3 50:24
51:21 75:12

94:7
hopefully 25:2
hot 106:13
hour 6:9 24:6,9
24:10 37:4,4,11
37:12 43:21,25
44:3 45:21
46:14 53:1
57:22,23,23
92:20 95:22,25
96:2,3,6,8,8,10
house 8:25
huh 12:25 39:3
human 87:8
humiliation
107:18
hump 20:20

**i**

idea 87:12
identification
13:20 24:18
25:5 28:7 48:23
52:4 67:8 69:12
70:16 71:9
identified 89:4
107:25
identify 47:8
52:2 74:23
75:18,18
imminent
106:14
impacts 112:21
impartial 112:22
impartiality
110:17 112:15
important 6:1
67:23,25

inbound 105:3,5
105:7
incident 7:10
12:2,6 23:25
24:2,3,17 27:8
27:24 28:6,11
29:1,1,5 48:8,13
48:21 49:15,23
70:10 76:6
78:15 87:3
96:11 104:20
include 28:19
39:1,4 59:10
93:21 107:17
included 42:5
48:10
including 104:8
income 98:22
99:6,9
inconvenience
63:9
increasing 50:7
incur 103:8
index 3:1 4:1
indiscernible
69:21 103:21
individuals 12:5
industries 30:6
85:11
industry 85:12
information
13:2,3 53:11
54:3,21 55:1,19
56:20 68:21
105:9 107:25
108:3,7
informing 24:16

initialize 71:16
initiate 86:13,17
initiation 34:15
inman 20:19,20
42:22 43:4
61:12,19,24 62:3
62:8,10,16,18,22
62:24 63:5,10,24
64:10,15,18 65:3
65:8,12,19 66:6
66:17 68:1,9,12
68:13,14 69:7
71:25 73:25
75:22 77:22
78:16,19,22,23
79:6,7,8,20,23
79:25 80:2,13
82:21 87:14
88:1,21 89:7,12
89:18 90:25
91:3,15,17 92:19
94:6 95:21
105:5,9,16
inner 14:23
15:10,10
inspection 48:21
installed 77:21
instinct 87:8
instructed 73:23
89:6,9
instructing 95:1
insurance 99:22
99:23 100:5,6,18
102:1,11,23
103:5
intact 49:5
integrated 54:22
55:5 66:22

| | | | |
|---|---|---|---|
| **interest** 110:8,15 112:13 | 14:22,24,25 15:2 15:5,8,8,20 | 73:1,17,18,19,21 79:17,18 80:7,21 | **leg** 47:18 91:23 |
| **interested** 11:5 112:11 | 16:24 17:10 | 81:3,20,24 82:3 | **legal** 110:12,23 |
| **intermodal** 63:19,23,25 64:4 | 19:5,17 30:5 | 84:7 87:16,22,23 | **length** 22:8 40:16 |
| **interrogatories** 104:5 107:24 | 32:8,12,17 33:11 | 87:25 88:4,5,16 | **leniency** 26:14 |
| **interrogatory** 108:10 | 33:12 110:1 | 90:2,14,22,22 | **letter** 4:6,7,8,9 |
| **interrupt** 96:15 | **jobs** 14:20 16:15 | 91:1 93:1 99:14 | 24:15,15,19,24 |
| **introduce** 96:20 | 16:21,23,24 31:2 | 101:19 103:6 | 25:3 27:3,6,19 |
| **invade** 107:11 | 31:5 33:16,23 | 104:6 106:12,18 | 28:4,4,8,10,20 |
| **investigation** 4:6 | **join** 17:24 | **knowledge** 12:2 | 47:12 100:12 |

interest 110:8,15
112:13
interested 11:5
112:11
intermodal
63:19,23,25 64:4
interrogatories
104:5 107:24
interrogatory
108:10
interrupt 96:15
introduce 96:20
invade 107:11
investigation 4:6
6:21,23 7:8,9,12
7:14 24:16,25
25:17,19 26:8
27:11,16,20
52:19 94:15
95:4
involve 11:13
involved 28:25
29:4 48:13
62:14 106:19
involving 29:1
48:21 49:23
62:18 89:5
issue 39:24
issued 96:23
97:17
issues 10:8 11:5

**j**

jacob 69:3
jason 69:15
jc 26:9,11,12
job 1:25 7:6 10:9
10:13 12:13

14:22,24,25 15:2
15:5,8,8,20
16:24 17:10
19:5,17 30:5
32:8,12,17 33:11
33:12 110:1
jobs 14:20 16:15
16:21,23,24 31:2
31:5 33:16,23
join 17:24
joining 14:21
journals 108:22
judge 45:7,8
june 26:25 27:23
28:20 29:5

**k**

keep 11:23 32:11
keepler 11:22
kind 19:14 78:10
kinds 6:3
knew 22:3 73:5,7
73:8
know 6:10,10
10:4 11:4,11,16
12:24 16:20
21:7 22:3 32:17
35:3 36:11
38:19 39:11
50:25 51:1,2,3
51:22,24 53:6
54:8 55:23 57:4
57:6,25 59:8
63:8,11,11,13
64:13,24,25 65:1
65:5,6 66:15,23
69:20 72:12,12
72:16,21,22,24

73:1,17,18,19,21
79:17,18 80:7,21
81:3,20,24 82:3
84:7 87:16,22,23
87:25 88:4,5,16
90:2,14,22,22
91:1 93:1 99:14
101:19 103:6
104:6 106:12,18
knowledge 12:2
29:1 46:16
49:19 88:19
known 32:22
78:3 80:9
knows 108:14,16

**l**

label 49:15
lane 14:4
lapsed 102:21
larry 1:5,13 3:3
5:3,14,16
late 13:23 17:1
law 2:4 97:4,13
97:17,17 110:4
lawyer 102:5
lay 20:2
lead 50:19,20
71:17 77:14
learn 23:3 30:5,5
62:21 75:14
learning 73:14
leave 51:18,19
leaving 51:9,14
left 14:21 15:2
15:11,22 16:4,5
16:5,21,25

leg 47:18 91:23
legal 110:12,23
length 22:8
40:16
leniency 26:14
letter 4:6,7,8,9
24:15,15,19,24
25:3 27:3,6,19
28:4,4,8,10,20
47:12 100:12
letters 47:8,9
letting 36:11
level 93:16
lever 35:12
limit 9:17 24:9
36:22 45:22
line 21:3,7,12,20
21:24 34:19
35:2 36:18,20
51:7 77:21 80:7
80:10 87:13
88:21
lines 15:13 16:6
16:7,10
lining 11:10
link 19:20
linked 19:21
listed 13:6,11
14:9 22:11
68:11 108:10
little 6:22 7:25
8:2 16:22,24
31:18 40:4,5
53:9 67:25
live 7:16
lived 7:20
lives 7:18

living  15:6
loaded  60:4
loading  16:15
local  26:12 30:21
  33:22 77:1
location  7:20
  14:7 50:11
  51:10 54:1
  61:21 65:25
  79:3
locations  42:4
  53:22,25 59:19
  59:21 65:24
  66:4 88:5
locomotive
  17:22 29:8,10,15
  30:2,24 31:10
  32:14,25 33:5,24
  34:20 35:4,11,22
  36:3,14,16,19
  37:3 40:7,14
  41:24,25 42:16
  45:3,15 47:9
  50:5 53:12
  54:24 55:4,18
  57:1,11,13,14
  58:2,10 66:23
  71:11,17 74:16
  74:18 75:1,2
  77:14,15,16,17
  77:24 86:15
  88:7,15 90:8
  93:9 98:7
  103:12
locomotives  60:3
lodging  77:1
log  71:20

long  6:11 7:20
  7:24 8:20 68:1
  98:23 100:9
  102:5
longer  39:22
looking  86:18,23
  86:24 104:5,23
loss  107:7
lot  44:14
loud  6:1
lula  47:18,19,21
  47:22
lump  100:21
lynnwood  18:17

## m

m  84:24
mail  2:7,11
main  20:7 21:7
  35:2 51:7 58:9
  80:7,9
mainline  34:22
  52:12
maintaining
  110:17 112:14
making  19:18
  48:22 110:16
management
  26:18 43:10,16
  44:6,12,19,25
  45:4,11,18,25
  46:4,6,8,9,17,22
  47:1 53:10
  54:22,25 55:6,10
  55:12 58:17,18
  58:24 59:1
  66:23 71:17,20
  71:21 74:12,19

74:24 75:4,19,24
  76:3 77:18,18
  82:10 83:3 84:2
  92:11,15,23 93:1
  93:4,9,17,25
  94:4,11,23,24
  95:8,17
manner  20:10
manny  10:21,22
  10:23 11:22
march  13:1,9
  47:14 96:25
  101:3 103:8
mark  25:20 26:4
marked  4:17
  13:20 22:25
  24:13,14,18 25:5
  28:3,3,7 48:23
  52:1,4 67:4,8
  69:12 70:16
  71:9
market  2:10
marriage  8:5
married  7:22,24
  8:5
master  83:10,13
  83:15,22,23,25
  86:5 106:8,19,22
master's  83:18
  106:10
material  64:3,5
materials  20:3,5
  64:2,9
matter  11:12
  13:18 19:24
  91:9 110:15,24
  112:13

maximize  71:19
maximum  22:8
mccaston  78:25
mcdonough  17:9
  30:4
mean  20:1 21:7
  21:10 22:1 24:9
  28:14 34:1 35:6
  37:18 38:13,23
  39:21 40:3 57:9
  57:19,22 59:3
  65:14 80:8,23
  84:23 87:22
  108:6
means  19:21
  57:21
mechanism  39:4
mechanisms
  35:16 37:15
medical  102:6
  102:11 103:8
  104:7
medicare  9:10
medicines
  104:16
meeting  42:21
member  17:17
  17:21 18:1
  29:23 86:20,21
members  62:19
  63:5,9
mental  15:3,17
  104:8,13,17
mentally  15:15
mentioned  12:2
  30:15 39:14
  46:12 54:3
  55:25 66:21

83:24
**met**  85:1
**miami**  16:23
**michael**  48:17
**mile**  44:2 45:21
**miles**  24:5,8,10
  37:3,4,11,12
  43:21,25 46:14
  53:25 55:21
  56:20,22 57:21
  57:23,23 66:25
  75:22 92:20
  95:22,25 96:2,3
  96:6,7,8,10
**minute**  23:16
  52:25 88:25
**minutes**  95:24
  96:4
**mistaken**  67:24
**mixed**  19:14,16
  63:23 64:8
**money**  100:17
**monitor**  45:5
  55:7 93:25
**monitoring**
  54:25 74:19
**month**  17:8,9
  30:3 100:11
  101:15 103:1
**months**  17:10
  30:4 101:4
  102:8,9,10
**moore**  108:7,9
  108:11,13
**morales**  10:21
  10:23 11:22
**moreland**  14:1

**morning**  5:8
  6:15
**motion**  107:22
**move**  14:4 51:6
  98:11
**moved**  15:4 62:8
**moving**  43:18
  62:14
**multiple**  94:5
**murphy**  90:18

**n**

**n**  1:24
**name**  5:1,8,12
  11:4 15:1 20:17
  22:10 48:14
  72:4,8 80:21
  90:22
**named**  69:3,14
  70:5,18 72:4
**names**  10:17
  18:11
**national**  102:6
**natural**  87:8
**nature**  82:25
  108:22
**necessarily**  91:8
  91:24
**necessary**  83:13
**need**  6:3,8,9
  10:19,19 11:4
  37:7 40:7 45:24
  58:16 71:2
**needed**  22:24
  32:11 81:3
  84:23
**needs**  40:17
  44:21 45:12

46:23
**never**  23:12,14
  31:8 50:24 60:7
  82:7,8,9,23 85:1
  89:11,12 98:15
**new**  22:24 23:13
**nice**  80:24
**night**  77:4,6,14
  78:15 82:10,18
  83:21 84:13,17
  85:8 92:4,13
  94:11 105:19
**nighttime**  39:25
**nineteen**  8:4
**nodded**  87:5
**nodding**  87:7
**nods**  6:3
**noneconomic**
  107:8,16,16,19
**nonunion**  16:13
  16:14
**norfolk**  1:8 5:2
  5:10,21 7:4,6
  9:12 12:21
  13:23 14:21
  16:1,9,17 17:1
  17:10,20 18:3
  23:25 25:8,13
  26:17 32:10
  52:21 59:9
  61:11,17 67:7,13
  68:23 69:11
  70:2,15 71:3
  78:9 97:21
  105:4 107:1
  108:18
**norm**  11:16 86:5
  86:14

**normal**  11:9
  90:3
**north**  18:17 42:3
  42:5,14 47:18
  59:15,15
**northern**  1:2 5:4
**notably**  107:11
**note**  13:25
**notes**  13:22
**notice**  27:10,15
  27:20
**noticing**  110:24
**notified**  25:12
  26:7,9 89:12
**notifies**  106:17
**notify**  58:5,19,20
  106:7,16
**notifying**  58:17
  106:3
**november**  1:16
  7:10 8:22 9:25
  12:2,6 25:13
  26:23 34:20
  63:21 64:11,15
  65:13,18 67:16
  67:17 68:9
  69:18,18,24 70:8
  71:24 76:3,6
  78:15 83:21
  84:8,24 85:8
  87:2,3 88:2,11
  92:4 94:4
  100:15 101:1,20
  101:21 105:2,6
  105:14 107:1
**ns**  51:12,15
  108:19

| | | | |
|---|---|---|---|
| **number** 5:4 15:9 24:14 47:7 50:10 51:24 63:1,2 81:18,18 82:6,9 83:18 84:5 90:12 | **ocga** 110:7,9,25 **offered** 25:7 **offering** 26:18 **office** 2:6,11 32:16,20 83:11 **officer** 8:19 25:21 26:3 | 44:20 57:2,12,15 57:22,23 58:4,18 59:13 74:8,10,15 75:5 76:16,18 82:21,23 88:8,12 88:16 92:24 93:5,18 95:14,19 | **order** 22:19 24:4 24:5,10 38:19 54:7,9,11,12,15 54:17 55:23 71:18 79:19 **ordered** 96:18 |
| **numbers** 59:10 77:16 83:1 | 112:22 **officers** 85:13 90:19 | 96:7 105:16,22 106:4,15,25 107:5 | **ordering** 111:12 **orders** 22:12 53:15 |
| **o** | **official** 58:24 59:2 82:10 85:9 | **operated** 18:16 21:4 34:15,19 | **origin** 62:14 **original** 84:11 |
| **o'connor** 2:9 **o.c.g.a.** 109:3 **oath** 5:22 **object** 100:1,3 107:10 **objects** 23:16 **obligated** 47:13 **obligation** 110:17 112:14 **observe** 73:13,24 75:21 **obstacles** 66:1 **obvious** 40:13,14 **obviously** 37:3 90:8 **occasion** 47:14 47:14 48:25 52:6,15 89:8 **occasions** 35:8 68:11 72:3 95:9 **occupy** 32:19 **occur** 36:22 49:24 52:9 **occurred** 13:2 52:3,6 70:8 92:24 **occurs** 44:11 52:22 | 85:10,11,15,20 86:9,12,12 94:18 **officials** 84:2 85:12,13,13 **offs** 60:22 78:19 **okay** 6:4,12 7:15 10:12 11:6 12:17 47:22 50:22 61:16 65:17 67:11,18 69:23 90:16,19 91:16 94:14,20 96:1 99:24 101:12 102:4 105:14 108:15 **old** 8:3 **once** 29:13 36:24 37:13 43:17 44:2,4,25 47:2 55:15 68:3,6 72:7 79:22 91:4 91:9 106:16 **ones** 98:15 **operate** 19:10 30:13 35:23,25 41:5 43:12 | 41:25 43:4,7 63:24 75:10,13 78:16 88:20 95:21,25 96:3 **operating** 20:18 22:20 37:12,23 43:20 47:17 50:7 53:20 55:5 55:17 57:8,20 58:8,21 66:5 70:22 93:16 94:6 **operation** 4:15 20:20 62:8 71:4 71:13 75:19 92:15 **opposed** 17:22 **opposite** 20:25 21:1 34:17 42:21 **optimizer** 46:7 46:12,13,17 **option** 103:25 **options** 38:13,25 39:8,15 | **originally** 91:22 **originate** 59:24 **originated** 72:7 **originates** 59:21 **origination** 61:11,18 **outbound** 61:6,7 **outcome** 112:12 **outlaw** 89:25 **outside** 8:25 9:16,20,24 92:7 **overpasses** 42:7 **p** **p.c.** 2:4 **p.m.** 109:1 **page** 3:5 4:3 13:16 14:19 24:15 28:19,21 49:14 **pages** 12:15 13:16 **paid** 32:8 103:9 **pair** 61:19 63:18 **paperwork** 19:19 |

paragraph 105:1
  105:6,10
paragraphs
  105:1
part 8:16 10:20
  16:24 18:8
  50:14,16 68:21
  70:1 71:6,8
  80:10
participate
  103:2
particular 14:12
  22:3 25:13,21
  31:5 32:6 33:20
  45:9 47:25 68:4
  79:3 91:14
particulars 22:8
parties 97:12
  111:2,12 112:21
parts 92:20
party 110:19
  111:2 112:11,17
pass 30:10
passes 54:14
password
  111:10,11
pay 68:18 99:19
  100:15 102:17
payment 100:24
payments
  101:12,18,25
pending 6:11
  97:4 104:25
pennsylvania
  2:10
people 10:3,5
  11:19 42:21
  63:6,7,12 107:25

108:16
percent 58:8
  91:5 105:13
perdue 69:15
perfect 13:3 87:7
perform 48:21
  60:21 78:20
  103:17
performed 62:19
period 17:14
  23:4 98:18 99:4
  103:7
periodic 30:7
periodically
  12:24
permission 58:6
  58:17
permit 71:18
permitted 57:2
  73:24 88:7,15
person 32:18,19
  83:25 86:16
  89:7 90:22
personal 32:11
  91:6
perspective
  42:16
philadelphia
  2:10
phone 83:1
phrase 56:7
physical 23:5,13
  37:22 66:8 73:9
  73:14,25 87:13
  88:9,13,17,21
  106:14
physically 33:14

pick 62:10,16
  89:19
picked 89:24
pickups 60:22
  78:19
pieces 61:15
pilot 54:25 72:1
  72:3 79:2 81:3,6
  82:22 84:10,14
  84:23 85:19,21
  86:16 89:8,11
  105:4,16
place 66:4
  110:25
placed 47:24
  67:24
plaintiff 1:6 2:3
plan 84:11 103:1
  103:10
please 6:7,8,10
  17:6 18:15 21:3
  24:2 27:5 34:19
  36:6 37:10
  38:12 40:2
  41:10 42:4,17
  48:25 52:6 56:1
  59:13 66:11
  78:8 79:22 83:7
point 17:17,24
  18:6,11 23:16
  31:3 32:1,3
  34:15,16 53:1
  61:11,18 80:17
  92:13
points 18:9
  30:19,21 34:13
policy 99:22,23
  100:6,7

pool 19:5,10
  20:16,23 33:11
  33:16,24 34:1,7
  34:9,11 76:14,15
  76:16 91:13,20
pools 18:23
portable 47:24
position 8:10,11
  8:20 17:1 32:18
  32:21 34:8 98:2
positions 8:22
  46:21
positive 21:17
  53:6 77:20
possibility 66:21
  84:9
possible 107:4
possibly 90:13
posted 22:5
power 35:12,13
  37:14,20,24 38:4
  39:1,2 50:8 51:6
  93:10
preference 41:21
premium 102:17
  103:4
prepare 13:19
prepared 36:25
  37:7
preparing 40:4
prescribed
  104:15
prescription
  104:15
present 2:16
  9:18 103:12
press 65:2

**pretty** 9:22
38:15 56:22
80:24 86:14
106:1
**previously** 61:2
**prior** 14:20 15:6
61:24 65:13
68:9 84:24 88:1
**priority** 89:20
**privilege** 107:12
**probably** 19:2
56:7 58:20 81:5
93:2 100:12,13
101:1,14,14,15
106:5 108:13,16
**problem** 81:4
**problems** 75:18
75:21,23 92:14
**procedure** 97:13
109:2
**procedures** 7:4
**proceed** 22:21
79:20
**proceeding** 2:16
89:6 90:24
111:4,11 112:9
112:20
**proceedings**
110:14
**process** 27:20
86:13,17 97:6,9
97:11
**produced** 5:17
111:4
**professional**
104:8 110:18
112:15

**professionals**
104:8
**program** 102:6
**progressed** 33:4
**prohibited**
110:25
**prohibitions**
110:9
**prompt** 46:23
47:1 93:4 95:6,9
**prompted** 92:24
94:4
**prompting** 94:10
**properly** 23:10
45:6
**property** 37:23
51:12
**props** 95:2
**protect** 34:12
103:20
**protected** 111:10
111:11
**protest** 97:5
**provide** 110:23
**provided** 105:4
**pt** 75:23
**ptc** 53:6,10,11
53:24 54:3,5,21
55:2,5,17,19
56:20 66:22
75:19 77:25
78:1,2,12 92:15
**public** 58:14
97:4,13,17,17
**publications**
108:19
**published** 71:3

**pull** 50:8
**pulled** 50:6,14
50:16,17
**pulling** 51:15
**purpose** 12:14
73:8
**purposes** 52:17
67:4
**pursuant** 2:13
109:2
**put** 12:14 24:19
39:1 61:6
**putting** 39:9

## q

**qualifications**
23:12
**qualified** 17:11
17:14 19:17
23:1,5 30:12
35:23,25 41:5
43:12 73:1,7
77:11 81:9,10,10
81:15 86:3,15
87:12,19,21 88:8
88:12,20 103:18
103:20
**qualify** 9:10
22:24 23:12
**qualifying** 65:11
65:14 73:6
**question** 6:11
31:19 33:3
40:12,15 61:14
65:16 73:4
82:17 94:9,18
95:16

**questions** 5:9,20
5:25 6:7,15
10:19 12:12
13:14 53:5,10
72:19 81:16
87:1 94:21
104:6 108:24,25
111:6 112:6
**quicker** 40:5
**quote** 49:22
101:23

## r

**radio** 80:24
106:20
**rail** 77:8,21
**railroad** 11:9,16
11:17 21:24
27:14 42:9,12
82:24 85:12,25
86:4,6 99:6
**railway** 1:8 5:2
**rain** 39:14
**raining** 38:23
39:19
**ramp** 16:11,12
**ran** 34:12 74:6
**ranking** 98:7
**rated** 92:20 96:8
**reach** 44:2 53:25
97:12
**reaches** 46:5
47:2
**reaching** 66:25
**react** 41:7
**read** 52:14
**ready** 23:21

**realize** 76:19
**realized** 105:15
**really** 13:15
  41:23 46:18
  51:24 75:12
  80:23 85:1
  92:10 95:7
  106:11
**rear** 48:4 50:25
  53:19
**reason** 6:14 12:9
  28:22 67:19
  72:23 78:12
  79:12 84:21
  86:11 90:3
  107:2
**reasoning** 90:1
**reasons** 93:6
  99:18
**recall** 34:25 35:2
  64:12 70:18
  80:25
**receive** 18:22
  28:9 32:15 76:9
  98:19,23 99:6,9
  105:21
**received** 17:6
  27:3,6,23 30:1
  47:9 49:16
  76:18 98:24
  99:3 100:5,12
  101:14
**receives** 99:18
  111:3
**receiving** 100:17
**recognize** 12:20
  24:15,24 27:10
  44:16,17,20 49:1

67:6
**recognizing**
  46:19
**recollection** 43:1
  43:22 64:18
  70:21
**recollections**
  69:17
**record** 4:11,17
  5:1,12 12:15,20
  23:20 27:19
  31:20 36:6
  38:12 40:14
  43:15 47:7
  52:17 55:18
  56:1 64:25 67:4
  67:5,6 70:24
  110:13,17 111:5
  112:8
**records** 101:25
**recreational**
  9:19
**reduced** 112:7
**reducing** 93:21
**reduction** 63:1
**refer** 7:8,12
  47:12 61:22
  87:2
**referred** 89:20
**referring** 7:9,13
  40:23 42:1 58:1
  87:3
**reflect** 13:2
  67:15
**refresh** 43:1
  69:17 70:21
**refuse** 76:22
  82:20,23

**refused** 105:22
  105:24 106:25
**refusing** 106:4
**regard** 7:9 68:18
  93:24
**regarding** 24:16
  54:4
**regular** 18:23
  19:3,4
**regulations** 2:13
  110:5
**reimbursed**
  103:9,9
**reinstate** 26:10
  26:14,16
**reinstated** 96:22
  97:21,24 98:1,1
  98:5
**reinstatement**
  25:8 26:6,8,19
  96:18
**relate** 108:19
**related** 27:24
**relates** 68:25
**relating** 47:9
  108:1 111:10
**relationship**
  110:15 112:13
**relative** 112:10
**relocate** 32:11
**reluctance** 85:7
**reluctant** 85:19
**rely** 75:4
**remain** 102:6
**remainder** 49:4
  51:15
**remained** 29:23

**remark** 28:22
**remember** 15:5
  15:7 16:25
  25:20 29:3,4
  31:7 42:25 43:2
  43:3 48:14 69:3
  69:6,14,16 70:5
  72:4,8 74:9
  76:12 77:16
  80:21,22 81:2,2
  81:20 84:18,19
  84:20 91:5,15
  94:7,8,10,13
  95:3,5,7 102:18
**rep** 25:12 26:12
**repeat** 6:7
**rephrase** 17:12
  23:9 25:15
  30:13 31:19
  32:24 33:3 40:6
**reply** 81:12
**report** 62:23,24
  62:24 63:9
  75:18,20 92:14
  92:17 110:16
**reported** 62:25
**reporter** 2:15
  5:13,25 6:2 23:9
  23:21 25:24
  28:18 87:9
  110:2,7,11 111:7
  111:9
**reporting** 2:14
  18:6,9,11 110:6
  110:23
**repository**
  111:12

| | | | |
|---|---|---|---|
| **represent** 94:21 | 104:9,19 | 70:24 71:22 | **roy** 26:9,11,12 |
| **representations** | **retained** 4:18 | 72:19 77:2 | **rrb** 99:9 101:12 |
| 110:3 | **retire** 9:5 | 80:14 83:12 | 102:1 |
| **represented** | **retired** 9:2,3,4 | 85:16 86:13,17 | **rule** 108:19 |
| 25:19 26:8 59:6 | **retiree** 9:7 | 86:21 88:5,24 | 109:2 |
| 59:8 97:9 | **retirement** 99:7 | 91:20 92:4,4,5 | **rules** 2:13 4:14 |
| **representing** 5:2 | **return** 20:23 | 92:21 93:6,10,13 | 5:24 7:4 30:8 |
| **reprimand** 4:8 | **revealed** 55:1 | 93:19 94:15 | 71:4,12,22 109:2 |
| 28:5,10 | **reverse** 56:15 | 96:17 97:1,7,14 | 110:5 |
| **requested** 79:2 | **review** 94:14 | 97:18 99:16,19 | **rumors** 10:14 |
| **required** 30:7,10 | **reviewed** 6:17 | 101:6,6,25 | 11:8,13 |
| 37:2 58:5 77:25 | 6:25 7:1 13:19 | 102:10 105:25 | **run** 29:20 34:2 |
| **requires** 71:16 | **revis** 11:23 | 107:21 108:24 | 45:20 58:11 |
| **residence** 32:11 | **rex** 7:17 | 108:25 | 72:14,17 73:5,12 |
| **resistance** 41:3,3 | **rhawkins** 2:11 | **rise** 24:2 87:3 | 73:23 74:3 |
| **respect** 50:13 | **rice** 19:13 | **road** 1:20 2:5 | 78:12,13 79:17 |
| **respectively** | **ride** 86:1,2 | 13:14 21:3,12,20 | 79:23 93:2 |
| 59:20 | **riding** 86:8,12 | 22:8 34:19 | **running** 52:12 |
| **response** 94:18 | **right** 5:22 7:8 | 36:18,20 72:5,8 | 53:12 57:21 |
| 94:24 | 9:20 12:19 13:6 | 72:10,20 73:5,23 | 78:10 79:6,9,9 |
| **responsible** 22:4 | 14:9,17 15:23,24 | 74:3,11,14,20,22 | 89:17 |
| **rest** 20:24 21:1 | 16:1,20,25 18:9 | 75:11,17,17 81:8 | **runs** 35:7 43:17 |
| 34:16 49:6 50:5 | 20:21 22:25 | 85:2 86:2 | 43:18 44:16,25 |
| 51:7 77:1 | 23:15,20,23 | **robert** 2:9 5:1,8 | 75:16 |
| **restricted** 56:23 | 24:23 26:25 | **rode** 72:10,20 | |
| 57:2,4,5,8,12 | 27:17,21 28:1,6 | 74:3,11,14,19,22 | **s** |
| 73:24 74:4 | 28:17 29:21 | 75:5,11,21 86:2 | **s** 2:3,4,8,9 |
| **restriction** 22:15 | 31:10,21 34:5,9 | 86:15 | **safely** 103:17 |
| 22:20 54:7,19 | 37:5,21,25 38:12 | **rodney** 108:7,9 | **safety** 7:4 58:14 |
| **restrictions** | 39:2,22 43:25 | 108:11,13 | **sat** 81:7,7,7,19 |
| 19:24 20:1,10,13 | 44:18 45:1,16 | **role** 93:24 | 81:19,19 |
| 55:8,20 64:14 | 46:10,24 47:3,6 | **rolled** 49:3,9 | **savings** 71:19 |
| **restrictive** 36:22 | 48:18 50:9 | 50:21,23 51:2 | **saying** 39:11 |
| 57:15,18,20 58:4 | 51:25 52:25 | **rolling** 49:11 | 57:6,25 64:13 |
| 58:12,18,22 | 54:12 58:24 | **rollout** 49:23 | 65:6,14 75:23 |
| 72:14,17 73:5,12 | 60:19 64:19 | **roster** 98:2,11 | 84:20 87:20,23 |
| **result** 20:9 28:5 | 66:16,19 68:20 | **rotate** 71:2 | 91:11,24 95:6,10 |
| 63:2 97:20 | 69:20,22,25 | | 100:12 |

**says**  55:14 95:5
   105:6
**scheduled**  105:7
**school**  9:22 14:9
   14:10,24,25 17:8
   30:3
**screen**  12:14,19
   24:12 67:3
   70:24
**screenshot**  69:10
   70:1,13,14
**screenshots**  4:12
   4:13 67:5 69:25
**scroll**  12:20
   14:17 25:2 71:7
**scrolling**  49:14
   71:15
**seaway**  11:25
**second**  13:15
   26:2 73:4 96:14
**section**  71:16
**security**  8:19
**see**  7:6 11:22
   12:16 15:4 25:3
   36:24 37:2 40:3
   44:18 57:17
   62:13 67:9 95:2
**seeing**  67:12
   68:23 69:11
   70:2,15
**seek**  58:5
**seeking**  58:17
**seen**  50:25 104:7
**sees**  55:18
**seg**  1:8
**segment**  65:8
   87:13 94:17

**seldom**  106:18
**select**  32:5 39:16
   98:14
**selected**  98:15
**seniority**  29:17
   29:18,21 31:4,13
   31:16 32:5,12
   34:8 98:2,5,11
**separate**  70:1
**separately**  66:16
**september**  28:2
   28:20,20
**serve**  34:12
   60:15 85:19
   86:16 112:21
**serves**  97:14
**service**  11:20
   12:7,15,20 29:16
   29:21 43:6
   70:11 87:4
   91:14,20 96:12
   97:3,21 98:9,16
   98:19 99:4,7,18
   100:19 101:7,17
   102:8 103:7
   104:9,10,20
   106:2
**services**  110:24
**set**  38:18,24
   41:14,16 60:11
   60:13,21 78:19
**sets**  42:20
**seven**  98:25 99:2
   101:10
**share**  24:12 27:5
   47:5
**sharing**  70:25

**shift**  32:7
**shipments**  64:12
**shipped**  63:17
**shooter**  19:18
**short**  29:20 39:8
**shove**  48:4
**shoved**  47:15
   48:6 50:10
**shoving**  48:1
**show**  13:16
   53:16,19,22 67:2
   68:20 94:17
   104:23,25
**shown**  71:6
**shuping**  2:4
   23:17 53:2 56:3
   96:14 100:1,3
   107:10,15
   108:25
**shuttle**  91:3
**side**  16:23 31:3
**signal**  36:4,7,8,9
   36:12,13,13,21
   36:22,24,25 37:2
   37:8 41:11,11,12
   41:16,18 44:16
   44:17,20,21
   45:19 46:1,5
   53:13,22,25 54:1
   57:5 65:24 66:4
   66:15,22,24,24
   66:25 72:22
   73:19 78:10,12
   82:4 89:21
**signaled**  21:13
   21:17
**signals**  41:8
   46:19 68:17

**signature**  109:3
   111:15,16
   112:23
**signed**  7:3
**significant**  9:25
**significantly**
   10:1
**simply**  37:23
   38:4 60:12
   74:19
**single**  42:6,12,18
   42:19,23 56:11
   56:12,16 64:19
**sir**  5:11,23 6:24
   8:2 12:18
**sister**  10:6,8
**sister's**  11:4
**site**  57:24
**sitting**  50:12
**six**  20:14 55:21
   56:20,22 66:25
**sixty**  99:12
**skipping**  94:25
**slack**  48:22
**slow**  12:8 22:12
   22:19 24:4,5,10
   35:8,14,17 37:2
   37:10,15,24 38:3
   38:16,19,25
   39:10 40:7,17
   41:13,16 44:15
   44:22 45:13,21
   46:4,9,10,11,14
   52:12 53:15
   54:7,11,12,15,17
   55:23 77:24
   82:1

**slowing** 40:12 44:12 45:6
**slowly** 73:13
**smart** 17:18,21 18:1 25:22,25 29:23 97:9 98:19 99:3,17 100:6,7,18 102:1
**snipes** 10:25 11:2,22
**snow** 39:15
**solely** 63:25 110:20 112:18
**solutions** 110:12 110:23
**somebody** 11:10 11:11
**son** 7:19 8:3 9:13
**son's** 9:21
**sooner** 6:10 40:4
**sorry** 11:1 15:10 18:19 22:10 36:10 100:2 101:6
**sort** 15:20 20:5 21:6 35:20 107:19
**sound** 29:13
**source** 9:14
**south** 18:5,19 19:11 30:17,18 30:20 31:1,21 33:15,22 42:3,5 42:8,11 50:2 59:16,16,22,23 59:23 66:12 67:23 68:3 76:10 77:7

**southern** 1:8 5:2 5:10,21 7:6 9:12 12:21 13:23 14:21 16:1,9,18 17:2,10,20 18:3 23:25 25:8,13 26:17 32:10 52:22 61:11,17 67:7,13 68:23 69:11 70:3,15 71:3 78:9 97:21 105:4 107:1,8 108:18
**southern's** 7:4 59:9
**speak** 5:24
**special** 21:4 22:12,15,19
**specific** 34:12,25 85:6 111:1
**specifically** 110:4
**speed** 22:8,16,21 24:6,9,9 36:22 36:24 38:17 40:5,9,15,19 43:25 44:7,9 45:6,10,21 46:13 47:2 54:6,16,17 54:19 55:10,20 56:23 57:2,4,6,8 57:12,15,18,20 58:5,12,18,22 72:14,17 73:5,12 73:24 74:4,6,8,9 74:10 75:10,13 92:21,25 93:3,5 93:18,21 95:14

95:19
**speeding** 23:25 24:4,17 29:1
**speeds** 21:6,10 22:5,11 46:21 53:14 54:4,4 55:8,23
**spent** 17:8,9 30:3 30:4
**spoke** 73:20
**spouse** 8:8 9:7 9:10
**spread** 11:8
**stacked** 40:23
**stand** 29:16,20
**start** 40:4 55:9 100:9
**started** 100:11 100:12,15,17 101:14 102:25
**starting** 19:1
**starts** 63:2
**state** 9:4,5,8 15:3 15:9,11,12,14 110:11 112:3
**stated** 112:6
**statement** 2:15
**states** 1:1
**stay** 55:13 96:1,5 96:9
**step** 44:21 45:12 45:24
**steps** 37:10
**stick** 27:2,8,24 28:5,11 29:5
**sticking** 107:19
**stop** 36:8,25 37:7,23 38:4,18

39:22 40:17 41:1,11,12,17 44:10,13,15 46:14 55:8 58:2 62:9,10 77:24 78:2,10,12,22 79:3,12 94:1 100:10,24 101:13,18
**stopped** 10:4 41:15 70:24 78:23,25 79:1,25 89:7 100:25 101:6,19
**stopping** 36:12 40:13,19 41:14 44:7,10
**storage** 51:11,15
**store** 15:1
**straight** 37:18 79:24
**street** 2:10 78:25
**stretch** 42:17
**studies** 14:14
**study** 14:12
**stuff** 11:12
**subcontractor** 110:12,21 112:19
**submitted** 2:15 111:6,9
**subparts** 65:16
**subsidiary** 8:17
**substitute** 102:11
**successfully** 27:6
**sudden** 55:14

**suggest** 23:15
  52:25 88:25
**suite** 2:10
**sum** 100:21
**summarize** 34:7
**sunny** 38:23
**super** 82:1
**superintendent**
  108:9,13
**supervising**
  15:15
**supervisor** 58:20
  59:4 82:12,16
  83:8,24 85:18,25
**supervisors**
  26:18 28:25
  29:3,4 48:13
  83:5 85:12
  106:11
**supposed** 51:18
  57:8
**supposedly** 50:8
**sure** 8:11 11:24
  15:8 16:22,24
  19:19 24:6
  25:11 31:4
  33:10 34:1
  39:20 41:17
  42:25 43:24
  45:6 49:22 53:2
  55:7 56:6 57:3
  58:7,8 68:2 73:3
  81:25 90:1,12
  91:8,14,21 92:10
  94:9 96:5 99:13
  101:22 103:6
  104:21 105:11
  105:13 106:1

**suspension** 4:9
  48:10 49:16
**swap** 90:20
**swear** 5:13
**switch** 11:10
  62:18 89:1
**switched** 63:22
  90:2,3
**switching** 20:20
  56:13 89:14,15
  89:16
**sworn** 5:17
**symbol** 70:22
  90:11
**system** 15:3
  43:10,13,16,20
  44:3,7,12,19,25
  45:4,12,18,25
  46:4,17,22,23
  47:1,2 53:10
  54:6,22,25 55:1
  55:2,6,11 66:23
  71:17,21 74:12
  74:19,24 75:4,19
  76:3 77:18,18
  78:1 92:11,15,23
  93:4,9,17,25,25
  94:4,5,11 95:9
  95:11,13,17,18

**t**

**take** 5:25 6:2,8
  6:10,12 19:7
  20:24,24 21:1
  23:10 30:7 33:9
  34:8,16 37:10
  39:22 44:14
  51:16 55:15,15

56:7 66:16
  81:25 89:17
  91:10
**taken** 11:20 12:7
  23:18 43:6 53:3
  62:3 67:24
  70:10 77:1
  87:25 88:4 89:2
  101:17 102:8
  105:12 106:1
  112:5
**takes** 43:18 44:5
  44:6
**talked** 46:19
**talking** 9:19
  22:25 46:6,8
  79:25 80:23
**taught** 57:5
**td** 25:22,25
  29:23 97:9
  98:19 99:3,17
  100:18
**technology**
  53:11 77:21
**telephone** 82:5
  83:16,18,22,23
**telephoned** 82:8
**tell** 6:8 12:5
  14:20 26:5
  47:13 48:25
  54:5,11,15 60:7
  72:13 73:17
  80:25 82:20
  84:12,16 86:1
  87:18 93:9,11,13
  106:5
**telling** 81:15

**tells** 53:24
**ten** 48:10 49:16
  49:20 88:4 96:2
  96:6,7,9
**term** 36:4 56:23
  85:15,24 86:10
  94:23
**terminal** 18:6
  76:24
**terminated**
  76:20 92:1
**termination**
  34:16 61:12,18
  62:15
**terms** 40:16
  55:18 58:17
  92:25 107:15
  110:20 112:18
**territories** 18:4
  23:3 30:13,16,16
  30:25 31:12,23
  41:25
**territory** 21:15
  22:24 23:6,13
  30:5,6 31:6,18
  31:20 32:6
  37:17 38:1,19
  39:10 41:18
  42:8,18 43:19
  50:2 54:14
  55:17 65:3,12,19
  65:22 72:13,17
  72:21,24,25 73:2
  73:6,10,14,19,25
  75:14,22 77:25
  88:1,9,12,17
  92:19

**terry**  29:6
**testified**  5:18
  107:21
**testifying**  95:3
**testimony**  37:1
  44:19,24 46:3
  58:10 85:18
  88:11 94:10,17
**tests**  30:10
**text**  47:12
**tg&y**  15:1
**thank**  29:15
**thing**  20:7 41:14
  85:6
**things**  82:25
  107:17,20
**think**  8:21 9:6
  14:6 19:1 20:7
  21:10 22:2,9
  24:5 30:4 31:3,6
  31:7,9 32:7
  42:24 48:14
  50:19,22 56:6,7
  59:21 62:13
  63:6,6 64:17,22
  67:24 68:16,17
  72:4,23 80:9
  87:17 89:19,21
  91:3 92:9 99:10
  99:22 100:11
  101:14,22,22,23
  101:24 104:6
  107:25 108:5,16
**thinking**  63:7
**thomasville**
  14:10 15:7
**thought**  24:19
  95:8 107:1

**three**  13:16,16
  50:19,20,22 51:1
  51:14,18,19 89:5
**threshold**  44:3
**throttle**  46:21
  74:15
**throw**  102:3
**tie**  27:2 69:21,24
**tied**  50:8
**tim**  90:18
**time**  6:8 16:24
  17:18 23:4,24
  25:7 26:19 27:1
  28:14 29:8,14,24
  29:24 32:25
  33:4,10 41:15
  42:1 43:4 47:17
  48:1,5,20 52:8
  52:11 55:12
  61:17 63:19,20
  63:24 68:16
  69:20 71:18
  73:24 75:16
  81:20 82:3
  83:21 89:17
  93:25 95:23
  96:5 97:3 98:18
  99:4 101:20
  103:15,21 106:9
  106:20 111:2
**times**  16:20
  22:11,23 31:20
  35:16 44:14
  94:5 95:6 97:12
  102:23 103:23
  104:2
**timetable**  22:10
  22:12

**title**  8:11
**toccoa**  30:22
  33:17,21
**today**  5:22 6:18
  13:19 94:15
  98:14
**told**  12:7 26:13
  64:20 72:13,17
  72:17 73:5,12
  74:9 81:21,24
  82:23 87:17
  105:8
**tommy**  25:20
  94:18
**ton**  16:22
**toned**  81:21
**top**  40:22,25
**topics**  89:1
**total**  100:14
**totally**  62:11,11
**tour**  20:24 91:19
  92:5,14 94:3
**track**  21:6 22:5,8
  22:11,21 34:24
  42:6,6,12,18,18
  42:19,20,20,23
  42:23,24,25 43:2
  45:6 47:25
  51:11 53:16
  55:8 56:10,11,12
  56:12,13,13,14
  56:14,15,16,17
  56:18,18,19 58:9
  64:17,19,20 65:5
  65:8 66:2 73:21
  74:6 79:9,15,24
  79:24 80:4,6,9
  93:3,5,18 95:14

  95:19 96:8
**trackage**  42:22
  65:24 88:8
**tracked**  42:9
**tracks**  22:17,18
  38:22 42:20
  51:15 56:9,13
  61:6 79:5,6,8,10
  79:11 80:15
  92:20
**trades**  14:13
**traffic**  79:14,16
**train**  11:11
  19:12,15,20,21
  20:17 21:1,10,18
  22:5,20 27:2
  34:17 35:6,7,8
  35:14,17 37:3,11
  37:11,13,24 38:4
  38:16,17,18,20
  38:21,21,22,25
  39:6,9 40:7,10
  40:13,13,16,17
  40:18,19,20,23
  40:25 41:10,13
  41:15,17 42:19
  43:9,15,17,17,18
  43:20 44:7,8,9
  44:10,12,15,22
  44:25 45:8,13,19
  45:20,25 46:3,4
  46:4,10,11,15
  47:2,17 48:4
  49:5,6 50:4,5,7
  50:10,13 52:12
  52:13 53:6,12,20
  54:10 55:5,9,11
  55:15 57:8,24

58:14 59:10,10
60:8,12,21 61:3
61:7,18,21,24
62:2,11,15 63:17
65:15 67:23
68:15 70:22,22
75:5 76:7,19
77:17,21,25 78:2
78:11,16 79:3,13
80:1,2 81:23,25
82:21 83:10,13
83:15,18,22,23
83:25 86:5
88:16 89:9,18,20
89:24 90:6,11,25
91:11,25 92:10
92:25 93:5,8,16
93:18 94:1,10
95:14,19,21
105:3,7,17,22
106:4,8,10,13,15
106:18,22,25
107:5 108:5
**trained** 35:22,25
41:4,7 43:12
**trainee** 31:7,8,21
31:24
**training** 15:17
15:19,20 17:6,7
17:8,10,14,22
29:21,24 30:1,3
30:5,14 31:10
42:2
**trains** 18:15,18
35:23,25 37:13
37:14 41:5
42:21 59:13,18
66:5 67:24,25

68:1,2 79:15,17
89:14,15 90:2,3
90:14
**transcript** 6:21
6:22 94:15
111:4 112:5,8
**transcripts**
111:4,10
**transport** 19:12
20:3
**transported**
64:10
**travel** 66:9
**traveled** 18:16
65:18,22
**traveling** 36:23
**travels** 60:19
**travis** 81:9,14,16
81:17,18,23,23
84:14 85:6
**treck** 20:24
**tree** 66:14,21
**trent** 2:4
**tried** 93:2
**trip** 46:6,13,17
68:12,25 69:7
71:21 73:4 75:1
75:23 91:23
105:3,5,8
**triple** 69:20
**trips** 65:12 67:16
67:20 68:8
71:25 87:25
88:4 89:5
**true** 42:14 65:24
66:1 69:1 76:2
93:22 96:4
111:5 112:8

**try** 24:21 37:21
96:1
**trying** 15:4,7
27:5 52:12
69:16 96:5,7,9
**tss** 2:7
**tucker** 90:17
**tune** 64:22
**turn** 79:18 92:1
**turnout** 45:6,9
56:3,4,7,9,10,15
56:16
**twice** 65:15,19
67:24
**two** 8:21 14:16
24:12,15 28:19
28:21 34:12
38:13 42:20
47:7 50:19,20
51:1 56:11,12,14
56:15,19 65:11
65:14 67:5 68:8
71:25 88:5
100:12 101:2
**type** 13:17 22:15
33:5,8 68:22
105:21 107:20
**types** 63:17 64:5
**typewriting**
112:7
**typically** 60:11
60:15 93:4,17

**u**

**u.s.** 5:4
**uh** 12:25 39:3
**unclear** 30:14

**understand** 5:10
6:5,13,15 7:15
13:4 23:8 37:1
37:22 44:18
49:4 50:9,22
52:22 60:8
62:13 82:2 87:4
**understanding**
89:23
**understated** 6:6
**understood**
51:25
**unimpaired** 98:5
**union** 16:12
17:17,21 25:12
25:21 26:3,12
59:6,7 86:20,22
94:18 99:17,19
99:20,24 102:7
102:21 103:1,10
**united** 1:1
**unloading** 16:15
**unpack** 97:4
**unqualified**
88:16
**unsafe** 57:10,16
106:4,15
**unsignaled**
21:15
**unusual** 21:9,11
21:24 22:2 65:2
65:8
**updated** 12:23
13:22
**uphill** 21:22
35:23 37:20
38:3 66:14,18

**uploaded**   111:11
**use**   27:1 35:12
   38:11,18 41:20
   74:23 76:1,2
   83:16 93:10
**utilization**   71:20
**utilize**   71:18
**utu**   17:18

**v**

**van**   10:25 11:2
   11:22 91:3
**variables**   39:12
**vehicle**   91:6
**verbally**   6:1,4
**verbatim**   110:17
**verbiage**   98:4
**verify**   27:5 79:12
**veritext**   110:12
   110:23
**versa**   66:14
**versus**   41:22
**vice**   66:14
**visible**   36:16,18
**volunteered**
   29:16
**vs**   1:7

**w**

**wages**   100:22
   107:7
**wait**   79:4,18
**waiting**   81:22
**waived**   109:4
**waiver**   4:10
   27:16 48:7,10
   52:2,15,17
**walk**   9:22

**walker**   70:19,22
**walter**   70:6 87:9
   87:12,25 108:1
**want**   11:23
   13:15 28:15
   39:12 40:4
   43:24 44:24
   47:5 53:5 67:21
   84:12,16 85:25
   86:2 96:14
   104:25
**wanted**   13:15
   25:13 26:9,16
   38:3 84:21
**warlawgroup.c...**
   2:7
**warning**   36:8,11
**warshauer**   2:4
**way**   9:25 18:17
   29:21 30:21
   38:18 43:2 57:7
   64:21 65:7
   66:14 86:1
   104:22 108:19
**ways**   10:12
**we've**   53:1
**weather**   39:14
**week**   98:25 99:1
   99:2,3,11,14
   100:5 101:10
**weeks**   100:12
   101:2
**weight**   40:18
   41:2 45:8 57:24
**went**   15:11,12
   18:18 23:12
   24:6,7 30:15
   31:2 49:11 51:2

68:2,5 69:7 91:2
   91:16 96:25
   97:16 101:2,5
   105:12
**wet**   39:21
**wheel**   106:13
**wife**   7:19 8:18
   9:13 102:19
**wilcox**   14:4
**willie**   70:6 87:9
   108:1
**willing**   26:13
**wind**   41:3
**wise**   81:20
**witness**   3:3 5:13
   5:17 56:4 109:3
**witnesses**   111:9
**wolf**   72:5,6 74:3
   74:11,14,20
   75:11,17 86:2,4
**word**   81:2,2
**words**   26:15
   35:13 57:19
   60:21 61:5 62:7
   85:11 101:7
**work**   8:12 9:16
   9:20,24 12:17
   18:4 24:21
   26:22,22 30:6,25
   31:5 33:14
   60:21 62:20
   78:20 96:25
   101:2 103:13
   105:8
**worked**   15:2,3,8
   15:10,11,12 16:7
   16:22,23 22:23
   23:4,6 31:6,7,8

31:12,20,24 69:6
   97:23,24
**working**   22:18
   23:8,11 32:17
   69:3,14,18 70:5
   70:18 103:15
**works**   8:13
**written**   2:14
   30:10
**wrong**   11:10
   86:19,23,24

**y**

**y**   47:18,19,23,24
**yard**   19:20 20:17
   20:19,20,21
   33:16 42:22
   43:4 51:16 57:4
   61:12,19,25 62:3
   62:8,10,16,18,22
   63:5,10,24 64:10
   64:15,18 65:3,8
   65:12,19 66:6,17
   68:1,1,9,12,13
   68:14 69:7
   71:25 74:1
   75:22 77:8,22
   78:16,19,22,23
   79:4,6,7,8,20,23
   79:23,25 80:2,2
   80:4,10,13 82:21
   87:14 88:1,21
   89:7,12,18,18
   90:25 91:3,15
   92:19 94:6
   95:21 105:5,16
**yarding**   80:1
   90:25

**yeah**   7:1 18:19
  18:25 19:16
  31:7 46:13
  56:22 75:15
  85:14 86:14
  91:12 99:24
  102:10 103:22
**year**   14:15 25:13
  52:3 97:1 98:24
  100:14,25 101:7
  101:8
**years**   7:21,25
  8:1,2,21 14:7
  15:9 19:2
**young**   72:12,16

**z**

**zoom**   29:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Employee Profile Setup

 **NORFOLK SOUTHERN**

| | |
|---|---|
| **Transportation Dept.** | March 30,2021 |
| **Employee Profile** | **Datasource: TIMS** |

Redacted    **L COSTON**

## Address / Personal

| | | | | | |
|---|---|---|---|---|---|
| **Home:** | Redacted | **Mailing:** | Redacted | **Phone #'s:** | |
| | Redacted GA | | Redacted GA | | |
| | 30273-2454 | | 30273 Redacted | | |
| **Hire Date:** | 3/20/2006 | **Status:** | Suspended | **Division:** | Georgia |
| **Birth Date:** | Redacted | | | | |

## CSR

| Date | Description | Location | RR |
|---|---|---|---|
| 8/16/2006 | Brakeman, Charlotte Southend | Atlanta, GA | NS |
| 8/16/2006 | Conductor, Charlotte Southend | Atlanta, GA | NS |
| 6/6/2012 | Dismissed | Atlanta, GA | NS |
| 12/13/2012 | Reinstated to service on a leniency basis | Atlanta, GA | NS |
| 10/30/2015 | Engineer | Atlanta, GA | NS |
| 4/16/2018 | Off due to on duty injury | | |
| 11/27/2018 | RTW | | |
| 11/28/2020 | Held of pending per Desey Parks | | |
| 1/22/2021 | Dismissed | | NS |

## Discipline

| Date | Location | Description |
|---|---|---|
| 6/6/2012 | MP 621.4 | DISMISSED; excessively exceeding the maximum authorized speed as directed by Slow Order #4346, issued on April 23, 2012 at 11:21 a.m. This incident occurred on April 25, 2012 at approximately 9:48 a.m. while serving as crewmember on Train 290P425, in the vicinity of MP. 621.4. |
| 12/13/2012 | | Reinstated to service on a leniency basis |
| 9/18/2014 | | LETTER OF REPRIMAND; failure to use a brake stick to tie a hand brake on train on 06/24/2014 at approximately 2:39 am while serving as Conductor on Train 119P423. |
| 3/19/2016 | MP 585 | START Minor; Violation of NS Rule OR 182 - Failure to ensure route was properly lined for movement, resulting in a run thru switch. This occurred March 12, 2016, while serving as Engineer on train 46RP412 in the vicinity of Gainesville, GA. |
| 4/25/2016 | Lula. GA | START (SERIOUS) 10 DAYS DEFERRRED; Failure to stop short of engineering portable derail, resulting in the derailment of NS 997228, and Failure to stop within half the distance last received from Conductor. This incident occurred 3/31/2016 at approximately 3:15 pm while serving as Engineer on Train 96QP431 in the vicinity of Lula, GA. |
| 1/20/2017 | Commerce, GA | START (SERIOUS) 10 DAYS ACTUAL SUSPENSION BEGINNING 1/20/2017 AND ENDING AT 11:59 PM ON 1/29/2017; Violation of C-102(a); Failure to properly perform C-102a and make sure slack was adjusted before making cut on car on descending grade resulting in car rolling out of track and derailing. This incident occurred at approximately 10:14 a.m., while you were working as Engineer on train P91P401 in the |

<div style="border:1px solid black; display:inline-block; padding:10px; float:right;">

**EXHIBIT**

**1**

</div>

Employee Profile Setup

|  |  | vicinity of Commerce, GA on August 1, 2016. |
|---|---|---|
| 5/21/2017 | MP 597.3 | START (MINOR); Violation of Operating Rule 199; Left the mainline timer box open leaving a track light on at MP. 597.3. This incident occurred while serving as Conductor on train P12P420 on 5/20/2017. |
| 1/22/2021 | 113H | Dismissed - In connection with (1) intentionally delaying your assignment when you purposely operated your train at a low rate of speed, when there was no restriction requiring you to do so, and/or (2) your failure to utilize Carrier's required Train Energy Management system. These incidents occurred on November 27, 2020 at approximately 9:10 PM and 10:30 PM while serving as Engineer in the vicinity of milepost's 148H and 133H on Job Assignment 237P427. |



May 3, 2012/ocw

**CORRECTED COPY**
<u>**CERTIFIED MAIL – RETURN RECEIPT REQUESTED (7179 1000 1649 1374 9328)**</u>
<u>**CERTIFIED MAIL – RETURN RECEIPT REQUESTED (7179 1000 1649 1374 9335)**</u>

Mr. T. W. Murphy, Engineer
110 River Meadow Ct.
Calhoun, GA 30701 - 5404

Mr. L. Coston
Redacted
Redacted GA 30273 Redacted

Dear Mr. Murphy/Mr. Coston:

Arrange to attend a formal hearing/investigation on May 10, 2012, at 3:00 p.m., in the Conference room of Bldg C5 at 1550 Marietta Rd, N. W. Atlanta, GA 30318.

The purpose of this formal hearing/investigation is to determine the facts and to place your particular responsibility, if any, in connection with excessively exceeding the maximum authorized speed as directed by Slow Order # 4346, issued on April 23, 2012, at 11:21 a.m. This incident occurred on April 25, 2012, at approximately 9:48 a.m., while you were serving as crewmembers on Train 290P425, in the vicinity of MP 621.4.

In addition, this investigation will consider whether Engineer Murphy's certification as locomotive engineer should be revoked on account of the alleged violation of FRA Regulation 49, CFR 240.117 (c)(e)(2) in connection with the incident described above. The relevant regulation provides as follows:

(c)     A certified engineer who has demonstrated a failure to comply, as described in paragraph (e) of this section, with railroad rules and practices for safe operation of trains shall have his or her certification revoked.

  (e)     a railroad shall only consider violations of its operating rules and practices that involve:

    (2)     Failure to adhere to limitations concerning train speed when the speed at which the train was operated exceeds the maximum authorized limit by at least 10 miles per hour. When restricted speed is in effect, railroads shall consider only those violations of the conditional clause of restricted speed rules (i.e., the clause that requires stopping within one half of the locomotive engineer's

EXHIBIT
3

NS 000299

range of vision), or the operational equivalent thereof, which cause reportable accidents or incidents under part 225 of this chapter, as instances of failure to adhere to this section;

This letter will also serve as a notice that Engineer Murphy's locomotive engineer certificates is suspended under FRA Regulation 49 CFR 240.307 (b)(1) pending the outcome of this hearing.

At the hearing/investigation, you shall have the right to be represented by an employee or an organization representative of your own choosing.  A duplicate copy of this notice is enclosed for your representative.  You, and/or your representative, shall have the right to introduce witnesses in your behalf, to hear all testimony introduced and to question all witnesses.  If you desire any other witnesses who may provide material facts, please furnish their names as soon as possible.

Additionally you are hereby advised that you **do not** have the option to waive this hearing/investigation.

You are advised that you are to have the proper rest under the Federal Hours of Service Act prior to the commencement of the investigation.

Very truly yours,

*S. Dutton*

S. Dutton
Road Foreman

Carrier intends the following witness(es) to be in attendance:

Mr. B. Glass

Other witnesses may be called.

Cc:

Mr. R. A. Lewis
Mr. M. G. Giles
Mr. _____
Mr. _____
Labor Relations
Crew Management

NS 000300



June 6, 2012/ptc

CERTIFIED MAIL - RETURN RECEIPT REQUESTED (7106 1133 8800 0001 8917)

Mr. L. Coston, Conductor
Redacted
Redacted GA  30273 Redacted

Dear Mr. Coston:

Reference hearing/investigation held on May 24, 2012 at 3:00 PM in the conference Room of Bldg C5 at 1550 Marietta Rd, NW, Atlanta, GA 30318. The purpose of this hearing/investigation was to develop the facts and place your particular responsibility, if any, in connection with excessively exceeding the maximum authorized speed as directed by Slow Order #4346, issued on April 23, 2012 at 11:21 a.m. This incident occurred on April 25, 2012 at approximately 9:48 a.m. while you were serving as crewmember on Train 290P425, in the vicinity of MP. 621.4

The evidence adduced in this investigation clearly proved your responsibility in connection with the above charge.

For your responsibility in this incident, you are hereby dismissed in all capacities from the services of Norfolk Southern Railway Company.

Arrange to return your rulebooks, switch keys and any other company property in your possession to J. J. Gay, Trainmaster at Gainesville, GA.

Sincerely,

*J. C. Carter*

J. C. Carter
Superintendent of Terminal

Enclosure

Bcc:
Labor Relations
Mr. R. A. Lewis, II
Mr. M. G. Giles
Mr. S. K. Dutton
Mr. B. Glass
Mr. J. J. Gay

Operating Subsidiary: Norfolk Southern Railway Company



Norfolk Southern Corporation
1550 Marietta Road NW
Atlanta, Georgia 30318

June 27, 2014

<u>Certified Mail # 7013 3020 0001 6219 3945</u>
<u>Return Receipt Requested</u>

L. Coston
Redacted
Redacted GA 30273- Redacted

Dear Mr. Coston:

Arrange to attend a formal hearing/investigation at Inman Yard Terminal, 1550 Marietta Road NW, Atlanta, Georgia 30318 on **July 7, 2014 at 2:00 P. M.**

The purpose of this hearing/investigation is to determine the facts and to place your particular responsibility, if any, in connection with not using a brake stick to tie a hand brake on train. This incident occurred at approximately 2:39 A. M. on June 24, 2014 while performing service as conductor on assignment 119P423.

At this hearing you shall have the right to be represented by an employee or an Organization representative of your choosing. A duplicate copy of this notice is enclosed for your representative. You, and / or your representative, shall have the right to introduce witnesses in your behalf, to hear all testimony introduced and to question all witnesses. If you desire any other witnesses who may provide material facts, please furnish their names as soon as possible.

Additionally, in accordance with your Agreement, you are hereby advised that you have the option, prior to the investigation, to discuss with me, either personally through or with your representative, the act of occurrence and your responsibility, if any. If disposition of the charges is made, the hearing will be waived.

Also, arrange to have ten hours' rest prior to this hearing/investigation.

Sincerely,

*A. L. Terry*

A. L. Terry
Assistant Trainmaster

Carrier intends to have the following witnesses in attendance:
A. L. Terry – Asst. Trainmaster

Other witnesses may be called

Other persons receiving copy of this notice:
D. A. Browne – Asst. Division Supt.
D. J. Bostek – Division RFE

<div style="border:1px solid black;display:inline-block;padding:4px">

**EXHIBIT**

**4**

</div>



September 18, 2014/ptc

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED (7105 4522 6441 8000 1631)**

Mr. L. Coston
Redacted
Redacted GA  30273 Redacted

Dear Mr. Coston:

Reference hearing/investigation held on September 9, 2014 at 4:00 p.m., in the Inman Yard Mechanical Conference Room located at 1550 Marietta Rd., NW Atlanta, GA 30318.  The purpose of the hearing/investigation is to develop the facts and place your particular responsibility, if any, in connection with your not using a brake stick to tie a hand brake on train.  This occurred June 24, 2014, at approximately 2:39 a.m., while serving as Conductor on Train 119P423.

Evidence adduced in the hearing/investigation clearly proved your violation in connection with the above charge.

For your responsibility in this incident, you are hereby assessed a **Letter of Reprimand.**

Very truly yours,

A.  A. James
Assistant Terminal Superintendent

Enclosure

Cc:
Labor Relations
Mr. B. T. Fennell
Mr. M. G. Giles
Mr. A. L. Terry
Mr. D. T. Henry



April 6, 2016/ocw

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED (9214 7969 0099 9790 1607 2505 91)**

Mr. L. Coston, Engineer, EIN Redacted
Redacted
Redacted GA 30273 Redacted

Dear Mr. Coston:

Arrange to attend a formal hearing/investigation on April 14, 2016, at 3:00 p.m., at the Fairfield Inn by Marriott, located at 1755 Browns Bridge Rd., Gainesville, GA 30501.

The purpose of the hearing/investigation is to determine the facts and place your responsibility, if any, in connection with your failure to conduct a proper job briefing and failure to stop short of engineering portable derail, resulting in the derailment of NS 997228.

In addition Engineer Coston, you are charged with failure to stop within half the distance last received from Conductor and excessive engines on line for tonnage and performance.

This incident occurred March 31, 2016, at approximately 3:15 p.m., while serving as Engineer on train 96QP431 in the vicinity of Lula, GA.

Please be advised that at the hearing/investigation, you shall have the right to be represented by an employee or organization representative of your own choosing in accordance with your working agreement. A duplicate copy of this notice is enclosed for your representative(s). You and/or your representative(s) shall have the right to introduce witnesses in your behalf, to hear all testimony introduced and to question witnesses. If you desire any other witnesses who may provide material facts, please furnish their names as soon as possible.

Additionally, in accordance with Article 31 of your current agreement, you are hereby advised that you **do have** the option to waive this hearing/investigation.

You are advised that you are to have the proper rest under the Federal Hours of Service Act prior to the commencement of the investigation.

Very truly yours,

*R. C. Clevinger*

R. C. Clevinger

EXHIBIT
5

NS 000689

Trainmaster

Enclosure


Carrier intends the following
witness(es) to be in attendance:

Mr. S. K. Dutton
Mr. T. Harrison

Other witnesses may be called.

cc:

Mr. B. T. Fennell
Mr. D. Stinson

NS 000690

April 4, 2016/ocw

To Whom It May Concern:

I hereby waive my right to a formal investigation as stipulated in my working agreement and accept my responsibility in connection with:

1. Failure to stop short of engineering portable derail, resulting in the derailment of NS 997228.
2. Failure to stop within half the distance last received from Conductor

This incident occurred March 31, 2016, at approximately 3:15 p.m., while serving as Engineer on train 96QP431 in the vicinity of Lula, GA.

For my responsibility in said incident, I hereby waive my right to a formal investigation and understand that the discipline imposed upon me is a **START SERIOUS 10 DAYS DEFERRED suspension.** This acceptance precludes me or any representative acting on my behalf from appealing this discipline under a collective bargaining agreement. I accept discipline imposed in this case as set forth above.

It is my understanding that a copy of this letter is being entered into my personal record file.

_____                    _____
Name                                                         Date Signed   4/25/16

Larry Coston                                              0169457
Print Name                                                  EIN

RC Clevinger                                             Trainmaster
Signature of Officer                                    Title

NS 000697

 **NORFOLK SOUTHERN**

August 10, 2016/ptc

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED (7105 4522 6441 8000 6964)**

Mr. L. Coston (Engineer) EIN: Redacted
Redacted
Redacted GA  30273-Redacted

Dear Mr. Coston:

Arrange to attend a formal hearing/investigation on **Thursday, August 18, 2016 at 11:00 a.m.** in the **Trainmaster's Office located at 116 Industrial Blvd., Gainesville, GA 30501.**

The purpose of this hearing/investigation is to develop the facts and place your particular responsibility, if any, in connection with your failure to properly perform C-102a and make sure slack was adjusted before making cut on car on descending grade resulting in car rolling out of track and derailing. This incident occurred at approximately 10:14 a.m., while you were working as Engineer on train P91P401 in the vicinity of Commerce, GA on August 1, 2016.

Please be advised that at the hearing/investigation, you shall have the right to be represented by an employee or organization representative of your own choosing in accordance with your working agreement.  A duplicate copy of this notice is enclosed for your representative(s).  You and/or your representative(s) shall have the right to introduce witnesses in your behalf, to hear all testimony introduced and to question witnesses.  If you desire any other witnesses who may provide material facts, please furnish their names as soon as possible.

Additionally, in accordance with Article 31 of your current agreement, you are hereby advised that you **do have** the option to waive this hearing/investigation.

You are advised that you are to have the proper rest under the Federal Hours of Service Act prior to the commencement of the investigation.

Very truly yours,

*S. K. Dutton*

S. K. Dutton
Road Foreman of Engines

Enclosure

Operating Subsidiary: Norfolk Southern Railway Company

<div style="border:1px solid black">

**EXHIBIT 6**

</div>

NS 000700

Carrier intends the following
witness(es) to be in attendance:

Other witnesses may be called.

Cc:
Labor Relations
Mr. B. T. Fennell
Mr. D. H. Stinson
Mr. T. Bailey
Mr. D. T. Henry
Mr. T. Harrison

NS 000701



January 20, 2017/ptc

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED (7105 4522 6441 8000 8807)**

Mr. L. Coston, Engineer (EIN Redacted
Redacted
Redacted GA 30273-Redacted

Dear Mr. Coston:

Reference hearing/investigation held on **January 11, 2017 at 10:00 a.m. in the Trainmaster's Office located at 116 Industrial Blvd., Gainesville, GA 30501.** The purpose of this hearing/investigation is to develop the facts and place your particular responsibility, if any, in connection with your failure to properly perform C-102a and make sure slack was adjusted before making cut on car on descending grade resulting in car rolling out of track and derailing. This incident occurred at approximately 10:14 a.m., while you were working as Engineer on train P91P401 in the vicinity of Commerce, GA on August 1, 2016.

The evidence adduced in this investigation clearly proved your responsibility in connection with the above charge.

For your responsibility in this incident, you are hereby assessed **START (Serious) 10 days ACTUAL suspension beginning January 20, 2017 and ending at 11:59 p.m. on January 29, 2017.**

A copy of this notice and the discipline contained herein will become a part of your personal record files.

Sincerely,

K. M. Kirtz
Trainmaster

Enclosure

Cc:
Labor Relations
Mr. B. T. Fennell
Mr. D. H. Stinson
Mr. S. K. Dutton

Operating Subsidiary: Norfolk Southern Railway Company

 **START FORM AND DISCIPLINE WAIVER**

**DATE OF CONFERENCE:**
05/15/2022

**DIVISION:**
~~Delaware Div~~ CO

**EMPLOYEE NAME:**
L Coston

**EMPLOYEE ID#:**
Redacted

**POSITION WORKING:**
Engineer

**TRAIN/JOB:**
P12P414

**DATE OF OCCURRENCE:**
05/14/2022

**LOCATION:**
MP 582

**RULE(S) VIOLATED:**
L246

**RESULT OF RULES CHECK:**
☑ YES    ☐ NO

**DESCRIPTION OF OCCURRENCE/CHARGE:**
Engineer failed to bail the independent brake while making a planned stop at MP 582 allowing pressure to build to 58PSI while working as an engineer on P12P414

**CLASSIFICATION OF VIOLATION:**
Minor

**ACCEPTED DISCIPLINE:**
Alternative Handling

**LENGTH OF SUSPENSION (If applicable):**
None

**IS THIS VIOLATION DECERTIFIABLE:**
No

**IS DEFERRED TIME BEING ACTIVATED AS PART OF THIS SUSPENSION:**
No

**SUSPENSION BEGINNING**

**ENDING**

I understand that I am instructed to mark up for service at                    on

**SUPERVISOR NAME (PRINT CLEARLY):**
Anthony Thomas

**LABOR REPRESENTATIVE (If Present):**

In consideration of my accepting responsibility in connection with the incident described above, I understand that I am waiving my right to formal hearing as stipulated in my collective bargaining agreement and accept discipline imposed as outlined above. I further acknowledge that this acceptance precludes me or any representative acting on my behalf from appealing this discipline under a collective bargaining agreement.

_____
**EMPLOYEE SIGNATURE**

5/20/2022
**DATE**

**COMMENTS (Optional):**

**EXHIBIT 7**





EXHIBIT

8

NS 002045

```
DIST: PI  SUB-DIST: GR         CREW INFORMATION                    PSTS17B

   ASSIGNMENT: 237P411      OF: 11/11/20 1110  POOL/YARD: G-ATL/GRV
   ORIGIN STATION: 484      INT STATIONS:          FINAL STATION: 148H
   RETURN  TRAINS :                      RADIOS:
   DEPART      ARRIVED      ENTER FINAL  STOP FINAL   RLVD TRK  TRAIN LEFT
    1234    111120 2359        2359         2359

           RUN MILES            ENDING             CARS         CAB
        (EN CREW/TR CREW)  (LOADS/EMPTIES/TONS)  (HANDLED/MAX)   ?
          157    157        000    000   00000      150   150

FUNC      EMPLOYEE  NAME          TURN/ASGN  ORDR  RELV  OFFD  10 MLS MOT CO PHONE
   ------------------------- --------- TIME  TIME  TIME  HR  --- --- SV -------
CALL  COSTON, L.       (LARRY)  C003   EN  1110  2310  0002  N  157
CALL  PERDUE, J.       (JASON)  MU03   CO  1110  2309  2359  N  157




ENT=NXT F1=HELP F3=EXIT F4=DELAY F5=ENG F6=PAYRL PF7/8=SCROLL PF10=HOS REPRINT
CC
NO MORE  EMPLOYEES  TO  SCROLL  ON
```
Connected to TNPOOL.NSCORP.COM port 23                    1/8      NUM   14-27-49 IBM-3278-3 - TN7CP9

```
DIST: PI  SUB-DIST: GR         CREW INFORMATION                    PSTS17B

   ASSIGNMENT: 237P427      OF: 11/27/20 1110  POOL/YARD: G-ATL/GRV
   ORIGIN STATION: 484      INT STATIONS:          FINAL STATION: 148H
   RETURN  TRAINS :                      RADIOS:
   DEPART      ARRIVED      ENTER FINAL  STOP FINAL   RLVD TRK  TRAIN LEFT
    1203    112720 2358        2358         2358

           RUN MILES            ENDING             CARS         CAB
        (EN CREW/TR CREW)  (LOADS/EMPTIES/TONS)  (HANDLED/MAX)   ?
          157    157        000    000   00000      033   033

FUNC      EMPLOYEE  NAME          TURN/ASGN  ORDR  RELV  OFFD  10 MLS MOT CO PHONE
   ------------------------- --------- TIME  TIME  TIME  HR  --- --- SV -------
CALL  COSTON, L.       (LARRY)  C003   EN  1110  2310  0002  N  157
CALL  WALTER, W. JR    (WILLIE) AG10   CO  1110  2310  2358  N  157
VACT  VACANT  POSITION          AG10   CT  1110  2310  2358  N  156



ENT=NXT F1=HELP F3=EXIT F4=DELAY F5=ENG F6=PAYRL PF7/8=SCROLL PF10=HOS REPRINT

NO MORE  EMPLOYEES  TO  SCROLL  ON
```
onnected to TNPOOL.NSCORP.COM port 23                    1/8      NUM   14-31-38 IBM-3278-3 - TN7CP9

**EXHIBIT 9**

NS 002046

```
DIST: PI  SUB-DIST: GR      CREW INFORMATION                        PSTS17B

   ASSIGNMENT: 237P415      OF: 11/15/20 1030  POOL/YARD: G-ATL/GRV
   ORIGIN STATION: 484     INT STATIONS:              FINAL STATION: 148H
   RETURN TRAINS :                        RADIOS:
   DEPART    ARRIVED    ENTER FINAL   STOP FINAL   RLVD TRK   TRAIN LEFT
    1128    111520 1730            2020         2030

         RUN MILES              ENDING              CARS        CAB
       (EN CREW/TR CREW)   (LOADS/EMPTIES/TONS)  (HANDLED/MAX)   ?
         157      157       000    000   00000     150   150

FUNC    EMPLOYEE NAME          TURN/ASGN  ORDR  RELV  OFFD 10  MLS  MOT  CO  PHONE
-------------------------      ---------  TIME  TIME  TIME HR  ---  ---  SV  -------
CALL  COSTON, L.     (LARRY)   C003       EN   1030  2057  2057 N   157
CALL  WALKER, A. (ALEXANDER)   AG10       CO   1030  2102  2102 N   157
VACT  VACANT POSITION          AG10       CT   1030  2102  2102 N   156



ENT=NXT F1=HELP F3=EXIT F4=DELAY F5=ENG F6=PAYRL PF7/8=SCROLL PF10=HOS REPRINT
CALL FOR 10:30AM OKAY PER THE MTO/SHUTTLE ORDERED FOR 10AM
NO MORE EMPLOYEES TO SCROLL ON
```

**EXHIBIT 10**

NS 002047



EFFECTIVE JANUARY 1, 2019

RULES FOR
EQUIPMENT
OPERATION
AND
HANDLING

NORFOLK SOUTHERN

NS-1

**EXHIBIT**
**11**

NS 001925

4. To prevent freezing of the water lines, anytime the temperature is 10 degrees or below, or anticipated to drop to 10 degrees or below, except when other means of freeze protection are provided, the Engineer must leave all unattended locomotives running and:

- Place the reverser in neutral position with the lever inserted.

- Open generator field switch or circuit breaker on each control stand.

- Place the isolation switch in "RUN" position.

- Place throttle in Position 2.

The Train Dispatcher should be contacted as necessary for weather updates.

(b) If necessary to leave a locomotive on line-of-road on other than a track designated for tying up or setting off locomotives, permission must be obtained first from the Manager Train Operations.

(c) When a Remote Control Locomotive is left unattended:

1. Each OCU programmed to the RCL must be turned off. The OCU must be secured and stored properly or maintained in the RCO's immediate possession.

2. If going off duty, the locomotive must be placed in manual operation and properly secured unless another RCO is physically present to take control of the RCL.

## L-238. FUEL CONSERVATION PROCEDURES

The Train Dispatcher or Yardmaster should be contacted as necessary for weather updates concerning the current and expected temperatures.

(a) General Instructions

1. When the temperature is anticipated to remain above 32°F:

   a. Locomotive(s) at any location that will not be utilized within 30 minutes must be shut down.

   b. During meal periods, shift changes, and crew changes, shut down all locomotives unless a relieving engineer is present to immediately begin utilizing the locomotive.

NS 001926

2. When the temperature is 32°F or below, or anticipated to drop to 32°F or below, locomotives which are shut down must be restarted.

**(b)  Train Operations**

1. When a train or locomotive(s) is stopped, the Engineer must center the reverser handle to activate the low idle feature.

2. When any train is stopped, the crew will inquire on the length of delay and obtain updates on this information. If there will be a delay of 30 minutes or more, all locomotives except the controlling locomotive must be shut down. Locomotives will be restarted prior to the end of the delay to ensure the train is ready to proceed without additional delay when authorized. 5 minutes per locomotive should be used as a guideline for calculating the time needed to restart the locomotives.

3. Pusher locomotives must be isolated or shut down if temperature permits, at the first stop after determining power is not needed.

4. Locomotives in a remote consist of designated Distributed Power (DP) train when not required for tonnage will be left running and isolated and will not be shut down.

**(c)  Light Locomotives**

1. On light engine movements, all locomotives not required to safely control the movement will be isolated, or shut down if temperature permits.

2. When leaving locomotive servicing areas, only the controlling locomotive will be on line. Trailing locomotives in the working consist will be isolated. Locomotives in tow will be handled as set up at the servicing area.

3. On inbound trains, all working locomotives except the controlling locomotive will be shut down after yarding the train. Upon arrival at either a locomotive facility or designated area where Mechanical Department personnel or designated area, all locomotives will be shut down when the temperature is above 32°F unless Mechanical Department employees are physically present to mount and take immediate control of the locomotives.

56

NS 001927

**(d) Energy Management systems**

Engineers must initialize the energy management system on the lead locomotive and must then utilize auto control anytime conditions permit, in order to maximize fuel savings. To accurately calculate Energy Management utilization, engineers must log out of the Energy Management system at the completion of their trip.

*Revised 12/12/19*

**(e) Horsepower Per Ton (HPT)**

HPT information provided on the Train Clearance or Wheel Report indicates the appropriate locomotive configuration to be used based on train type, tonnage, and direction of travel. Engineers must operate with no more than the necessary axles on line, as indicated in the instruction. Locomotives not needed according to HPT values must be shut down. At locations where the train is stopped, engineer must make necessary changes to locomotives in use to comply with HPT requirements.

**(f) Trackside Plug-In Charging Stations**

Where trackside plug-in stations are available and when practicable, properly secured, equipped locomotives that will not be used for 4 hours must be connected to trackside plug-in charging stations regardless of temperature.

Locomotives equipped with trackside charging plug in systems can be identified by a blue electrical connection under the walkway by the diesel fuel tank fill.

**L-239.  YARD SERVICE LOCOMOTIVES**

SW1500, SW1001 and MP15DC type locomotives will be handled as follows:

**(a)** MP15DC type locomotives are not equipped with traction motor shunting and must not be operated under power in the eighth notch at speeds above 20 MPH. MP15DC type locomotives may be operated at maximum authorized speed up to 50 MPH in seventh notch or lower.

**(b)** Must be used as lead when operated in road service in multiple due to not being equipped with dynamic brakes.

**L-240.  LOCOMOTIVE CALENDAR DAY INSPECTION AND REPORTING**

**(a)  Calendar Day Inspection**

Each locomotive in use must be inspected once each

NS-1 Rules — January 1, 2019                                            57